UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 2005-CV10695-RGS


NANCY J. NETTO,
*Petitioner*

v.

LYNN BISSONNETTE,
*Respondent*

_____

MEMORANDUM OF LAW

OPENING BRIEF
IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2254
FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

_____


STEPHEN PAUL MAIDMAN, ESQUIRE
Attorney for Petitioner
1145 Main Street, Suite 417
Springfield, Massachusetts  01103
(413) 731-7300 (Voice & Fax)
maidman@prodigy.net
BBO #631882

## Table of Contents

Table of Authorities. . . . . . . . . . . . . . . . . . .   iv

Statement of the Issues. . . . . . . . . . . . . . . . .   1

Statement of the Case . . . . . . . . . . . . . . . . .   3

Statement of Facts Relevant to the Issues . . . . . . . .   7

    *Evidence Presented at Trial Relevant to the Incident*. . . .   7

    *Additional Evidence in the Record Presented by*
    *Affidavit In Connection with the Petitioner's*
    *Motion for New Trial.* . . . . . . . . . . . . . . . .   12

Summary of Argument . . . . . . . . . . . . . . . . . .   15

Argument. . . . . . . . . . . . . . . . . . . . . . . .   18

I.    THE PETITIONER WAS CONVICTED UPON CONSTITUTIONALLY
    INSUFFICIENT EVIDENCE BECAUSE THE EVIDENCE ADDUCED
    AT TRIAL FAILED TO ESTABLISH THAT SHE WAS A JOINT
    VENTURER IN THE KILLING . . . . . . . . . . . . . . .   18

II.   THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE
    OF COUNSEL UNDER THE FEDERAL CONSTITUTION BECAUSE
    HER COUNSEL DID NOT PERMIT HER TO MAKE THE DECISION
    OR EVEN CONSULT WITH HER ABOUT THE DECISION WHETHER
    TO REQUEST THE TRIAL JUDGE INSTRUCT THE JURY ON
    LESSER INCLUDED OFFENSES. . . . . . . . . . . . . . .   23

    A.   FUNDAMENTAL DECISIONS IN A CRIMINAL CASE
        CAN ONLY BE MADE BY THE DEFENDANT . . . . . . . . .   23

    B.   THE SIXTH AMENDMENT IMPOSES A DUTY ON
        COUNSEL TO CONSULT WITH THE DEFENDANT ON
        IMPORTANT DECISIONS IN A CRIMINAL CASE. . . . . . .   28

    C.   ETHICAL RULES AND PROFESSIONAL NORMS
        IMPOSE AN OBLIGATION ON COUNSEL TO
        CONSULT WITH THE DEFENDANT ON IMPORTANT
        DECISIONS IN A CRIMINAL CASE. . . . . . . . . . .   32

    D.   SINCE THE DECISION WHETHER TO FORGO A LESSER
        INCLUDED OFFENSE INSTRUCTION IS AN IMPORTANT
        DECISION IN A CRIMINAL CASE WHICH IS THE
        FUNCTIONAL EQUIVALENT OF A FUNDAMENTAL
        DECISION AND THIS DECISION COULD ONLY BE MADE

BY THE PETITIONER AFTER CONSULTATION WITH COUNSEL,
THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE
OF COUNSEL UNDER STRICKLAND BECAUSE HER COUNSEL
DID NOT PERMIT HER TO MAKE THE DECISION OR EVEN
CONSULT WITH HER ABOUT THE DECISION WHETHER TO
UNDERTAKE AN ALL-OR-NOTHING DEFENSE AND TO FORGO
LESSER INCLUDED OFFENSE INSTRUCTIONS. . . . . . . . 40

E.  SINCE THE DECISION WHETHER TO FORGO A LESSER
INCLUDED OFFENSE INSTRUCTION IS AN IMPORTANT
DECISION IN A CRIMINAL CASE, THE PETITIONER
RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
UNDER STRICKLAND BECAUSE HER COUNSEL DID NOT
EVEN CONSULT WITH HER ABOUT THE DECISION HE
MADE TO UNDERTAKE AN ALL-OR-NOTHING DEFENSE
AND TO FORGO LESSER INCLUDED OFFENSE
INSTRUCTIONS. . . . . . . . . . . . . . . . . . . . 49

III.  THE COMMONWEALTH VIOLATED THE PETITIONER'S FEDERAL
CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO THE DUE
PROCESS OF LAW BECAUSE THE COMMONWEALTH UTILIZED
OUTRAGEOUSLY FLAWED FINGERPRINT EVIDENCE TO OBTAIN
ITS CONVICTION IN THIS CASE . . . . . . . . . . . . . . 56

IV.  THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF
COUNSEL UNDER STRICKLAND BECAUSE COUNSEL DID NOT
ADEQUATELY CHALLENGE THE COMMONWEALTH'S OUTRAGEOUSLY
FLAWED FINGERPRINT EVIDENCE . . . . . . . . . . . . . . 59

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . 60

List of Accompanying Exhibits . . . . . . . . . . . . . . 61

## Table of Authorities

### *Cases*

Adams v. United States ex rel. McCann,
  317 U.S. 269 (1942) . . . . . . . . . . . . . .  24,29

Anders v. California,
  386 U.S. 738 (1967) . . . . . . . . . . . . . .  24,25

Beck v. Alabama,
  447 U.S. 625 (1980) . . . . . . . . . . . . . .  41,42

Boykin v. Alabama,
  395 U.S. 238 (1969) . . . . . . . . . . . . . .  24

Brookhart v. Janis,
  384 U.S. 1 (1966) . . . . . . . . . . . . . .  24,50

Commonwealth v. Berry,
  431 Mass. 326 (2000). . . . . . . . . . . . . .  41

Commonwealth v. Carver,
  33 Mass. App. Ct. 378, review denied,
  413 Mass. 1108 (1992) . . . . . . . . . . . . .  43

Commonwealth v. Chase,
  433 Mass. 293 (2001). . . . . . . . . . . . . .  43

Commonwealth v. Cowans,
  SUCR1997-11231. . . . . . . . . . . . . . . . .  58

Commonwealth v. Donlan,
  436 Mass. 329 (2002). . . . . . . . . . . . . .  48

Commonwealth v. Egerton,
  396 Mass. 499 (1986). . . . . . . . . . . . . .  41

Commonwealth v. Gould,
  413 Mass. 707 (1992). . . . . . . . . . . . . .  41

Commonwealth v. Jackson,
  419 Mass. 716 (1995). . . . . . . . . . . . . .  43

Commonwealth v. Latimore,
  378 Mass. 671 (1979). . . . . . . . . . . . . .  19

Commonwealth v. Matos,
  36 Mass. App. Ct. 958 (1994). . . . . . . . . .  43

Commonwealth v. Moffett,
  383 Mass. 201 (1981). . . . . . . . . . . . .     25,32

Commonwealth v. Moran,
  387 Mass. 644 (1982). . . . . . . . . . . . .        47

Commonwealth v. Netto,
  438 Mass. 686 (2003). . . . . . . . . . . . .    passim

Commonwealth v. Pagan,
  35 Mass. App. Ct. 788 (1994). . . . . . . . .        43

Commonwealth v. Pizzotti,
  27 Mass. App. Ct. 376 (1989). . . . . . . . .        43

Commonwealth v. Roberts,
  407 Mass. 731 (1990). . . . . . . . . . . . .        43

Commonwealth v. Simpson,
  428 Mass. 646 (1999). . . . . . . . . . . . .        28

Commonwealth v. Woodward,
  1997 WL 694119 (Mass. Super. Nov. 10, 1997) . . . .  52

Commonwealth v. Woodward,
  427 Mass. 659 (1998) . . . . . . . . . . . . .  17,41,43

Commonwealth v. Yunggebauer,
  23 Mass. App. Ct. 46 (1986) . . . . . . . . .        43

Estelle v. Williams,
  425 U.S. 501 (1976) . . . . . . . . . . . . .        27

Faretta v. California,
  422 U.S. 806 (1975) . . . . . . . . . . . . .    passim

Fay v. Noia,
  372 U.S. 391 (1963) . . . . . . . . . . . . .        24

Florida v. Nixon,
  ___ U.S. ___, 125 S. Ct. 551 (2005) . . . . . . .    30,49

Frendak v. United States,
  408 A.2d 364 (D.C. 1979). . . . . . . . . . .        27

Gideon v. Wainright,
  372 U.S. 335 (1963) . . . . . . . . . . . . .  15,27,29

Government of the Virgin Islands v. Weatherwax,
   77 F.3d 1425 (3d Cir.), cert. denied,
   519 U.S. 1020 (1996). . . . . . . . . . . . . .    53

Halner v. Commonwealth,
   378 Mass. 388 (1979). . . . . . . . . . . . . .    32

Henry v. Mississippi,
   379 U.S. 443 (1965) . . . . . . . . . . . . . .    31

Hurtado v. Tucker,
   245 F.3d 7 (1st Cir. 2003). . . . . . . . . . .    19

Illinois v. Allen,
   397 U.S. 337 (1970) . . . . . . . . . . . . . .    26

In re Trombly,
   627 A.2d 855 (Vt. 1993) . . . . . . . . . . . .    44

Jackson v. Virginia,
   443 U.S. 307 (1979) . . . . . . . . . . . . .  passim

Johnson v. Zerbst,
   304 U.S. 458 (1938) . . . . . . . . . . . . . .    29

Jones v. Barnes,
   463 U.S. 745 (1983) . . . . . . . . . . . . .  passim

Keeble v. United States,
   412 U.S. 205 (1973) . . . . . . . . . . . . . .    42

Kimmelman v. Morrison,
   477 U.S. 365 (1986) . . . . . . . . . . . . .  48,55

Lockhart v. Fretwell,
   506 U.S. 364 (1993) . . . . . . . . . . . . . .    48

McMann v. Richardson,
   397 U.S. 759 (1970) . . . . . . . . . . . . . .    30

New York v. Hill,
   528 U.S. 110 (2000) . . . . . . . . . . . . . .    31

North Carolina v. Alford,
   400 U.S. 25 (1970). . . . . . . . . . . . . .  24,27

People v. Brocksmith,
   642 N.E.2d 1230 (Ill. 1994) . . . . . . . . . .    44

People v. Frierson,
  705 P.2d 396 (Cal. 1985). . . . . . . . . . . .        44

People v. Petrovich,
  664 N.E.2d 503 (N.Y. 1996),
  federal habeas relief denied sub nom.
  Petrovich v. Leonardo, 229 F.3d 384 (2d Cir. 2000).    44

Powell v. Alabama,
  287 U.S. 45 (1932). . . . . . . . . . . . . .        27,29

Reed v. Ross,
  468 U.S. 1 (1984) . . . . . . . . . . . . . .          31

Rock v. Arkansas,
  483 U.S. 44 (1987). . . . . . . . . . . . . .          24

Roe v. Flores-Ortega,
  528 U.S. 470 (2000) . . . . . . . . . . . . .        31,46

Rompilla v. Beard,
  ____ U.S. ____, 125 S. Ct. 2456 (2005). . . . . . . .  37

Simeon v. State,
  90 P.3d 181 (Alaska Ct. App. 2004). . . . . . . .      36

Smith v. Robbins,
  528 U.S. 259 (2000) . . . . . . . . . . . . .          24

Spaziano v. Florida,
  468 U.S. 447 (1984) . . . . . . . . . . . . .          42

State v. Boeglin,
  731 P.2d 943 (N.M. 1987). . . . . . . . . . .        42,44

Strickland v. Washington,
  466 U.S. 668 (1984) . . . . . . . . . . . . .        passim

Taylor v. Illinois,
  484 U.S. 400 (1988) . . . . . . . . . . . . .          31

United States v. Boigegrain,
  155 F.3d 1181 (10th Cir. 1998), cert. denied,
  525 U.S. 1083 (1999). . . . . . . . . . . . .          27

Wainright v. Sykes,
  433 U.S. 72 (1977). . . . . . . . . . . . . .          23

Wiggins v. Smith,
  539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . .   37

Williams v. Taylor,
  529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . .   19


*Statutes*

G.L. c. 211D. . . . . . . . . . . . . . . . . . . . . . .   38

G.L. c. 278, § 33E. . . . . . . . . . . . . . . . . . .   5,6,7

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . .   1


*Federal Constitutional Provisions*

Sixth Amendment . . . . . . . . . . . . . . . . . . . . .   passim

Fourteenth Amendment. . . . . . . . . . . . . . . . . . .   passim


*Massachusetts Criminal Procedural Rules*

Rule 25(b)(1) . . . . . . . . . . . . . . . . . . . . . .   4

Rule 25(b)(2) . . . . . . . . . . . . . . . . . . . . . .   4,5

Rule 30(b). . . . . . . . . . . . . . . . . . . . . . . .   4

*Rules of Professional Conduct*

Alaska Rule 1.2 . . . . . . . . . . . . . . . . . . . . .   36

American Bar Association Model Rule 1.2 (1999). . . . 33,34,35,37

American Bar Association Model Rule 1.2 . . . . . . .   34,52

American Bar Association Model Rule 1.4 (1999). . . .   33,35

American Bar Association Model Rule 1.4 . . . . . . .   34

Massachusetts Rule 1.2 . . . . . . . . . . . . . . . 33,35,36,52

Massachusetts Rule 1.4 . . . . . . . . . . . . . . . .   33,35

*Other Authorities*

American Bar Association Center for Professional
  Responsibility, Model Rules of Professional
  Conduct at http://www.abanet.org/cpr/ mrpc/mrpc
  home.html . . . . . . . . . . . . . . . . . . . . . . .       32

ABA Ethics 2000 Commission materials at
  http://www.abanet. org/cpr/ethics2k.html. . . . . .       34

ABA Standards for Criminal Justice, Standard 4-5.2,
  Control and Direction of the Case, (2d Ed. 1980). .    38,50

ABA Standards for Criminal Justice, Standard 4-5.2,
  Control and Direction of the Case (3d ed. 1993) . .  37,39,52

Center for Professional Responsibility (American
  Bar Association), A Legislative History:  The
  Development of the ABA Model Rules of
  Professional Conduct, 1982-1998 (1999) . . . . . .       33

CPCS Performance Guidelines Governing Representation
  of Indigent Persons in Criminal Cases, General
  Principles of Representation (2004) . . . . . . . .       39

Restatement (Third) of the Law Governing Lawyers
  (2000). . . . . . . . . . . . . . . . . . . . . . .    40,53

G.C. Hazard & W.W. Hodes, Law of Lawyering
  (3d ed. 2001) . . . . . . . . . . . . . . . . . . .       51

Margaret Colgate Love, The Revised ABA *Model Rules
  of Professional Conduct*:  Summary of the Work of
  Ethics 2000, 15 Geo. J. Legal Ethics 441 (2002) . .       34

M.C. Warner, Anders in the Fifty States:  Some
  Appellants' Equal Protection is More Equal Than
  Others, 23 Fla. St. U.L. Rev. 625 (1996). . . . . .       25

David Weber & Kevin Rothstein, Man freed after 6
  years:  Evidence was flawed, Boston Herald
  (Jan. 24, 2004) . . . . . . . . . . . . . . . . . .       58

Herbert P. Wilkins, The New Massachusetts Rules of
  Professional Conduct:  An Overview, 82 Mass.
  L. Rev. 261 (1997). . . . . . . . . . . . . . . . .       32

x

Rodney J. Uphoff, <u>Who Should Control the Decision
   to Call a Witness:  Respecting a Criminal
   Defendant's Tactical Choices</u>, 68 U. Cin. L. Rev.
   763 (2000). . . . . . . . . . . . . . . . . .     34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 2005-CV10695-RGS


NANCY J. NETTO,
*Petitioner*

v.

LYNN BISSONNETTE,
*Respondent*


MEMORANDUM OF LAW

BRIEF IN SUPPORT OF PETITION FOR HABEAS CORPUS

Now comes the Petitioner by and through her undersigned counsel and respectfully submits this brief[1] in support of her petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[2]


Statement of the Issues

The petition for habeas corpus presented to this Court in this case raises the following issues:

_____

[1] On August 18, 2005, this Court ordered the Petitioner to file a brief in support of her petition.  Since a "brief" is not listed on the Civil CM/ECF menu of documents, for the purpose of electronic filing, this paper also styled "Memorandum of Law" as set forth in the Civil CM/ECF menu of documents under "Other Documents".

[2] The transcript of the Petitioner's trial in the Bristol Superior Court will be cited by volume and page number as "Tr. Volume/Page".  Exhibits hereto will be cited by identifying letter and, where appropriate, by page number as "Exhibit Letter at Page".

1.  With respect to the Petitioner's federal constitutional
    claim regarding the adequacy of the evidence:

    A.  Whether the Petitioner was convicted upon
        constitutionally insufficient evidence under the
        standard of the United States Supreme Court stated in
        Jackson v. Virginia because the evidence adduced at
        trial failed to establish that the Petitioner was a
        joint venturer in the killing?

2.  With respect to the Petitioner's federal constitutional
    claims relating to the denial of the effective assistance
    of counsel and the due process of law guaranteed by the
    Sixth Amendment and the Fourteenth Amendment to the United
    States Constitution:

    A.  The decision whether to forgo a lesser included
        offense instruction is an important decision in a
        criminal case which is the functional equivalent of a
        fundamental decision and this decision could only be
        made by the Petitioner after consultation with
        Counsel.  Did the Petitioner receive ineffective
        assistance of counsel under Strickland v. Washington
        because her Counsel did not permit her to make the
        decision or even consult with her about the decision
        whether to undertake an all-or-nothing defense and to
        forgo lesser included offense instructions?

    B.  The decision whether to forgo a lesser included
        offense instruction is an important decision in a
        criminal case.  Did the Petitioner receive
        ineffective assistance of counsel under Strickland v.
        Washington because her Counsel did not even consult
        with her about the decision he made to undertake an
        all-or-nothing defense and to forgo lesser included
        offense instructions?

3.  With respect to the Petitioner's federal constitutional
    claims relating to the Commonwealth's presentation of
    "fresh fingerprint" testimony:

    A.  Whether the Commonwealth's presentation of "fresh
        fingerprint" testimony deprived the Petitioner of her
        rights to a fair trial and to the due process of law
        guaranteed by the Sixth Amendment and the Fourteenth
        Amendment to the federal constitution?

B.  To the extent the Petitioner's Counsel did not do
    anything to challenge the "fresh fingerprint"
    testimony as being premised on flawed forensics,
    whether the Petitioner was denied the effective
    assistance of counsel under <u>Strickland v. Washington</u>
    and guaranteed by the Sixth and Fourteenth Amendments
    to the federal constitution?

## Statement of the Case

On December 1, 1993, the Grand Jury of the Bristol Superior
Court returned two indictments against the Petitioner.  Under
Indictment Number 33618, the Petitioner was charged with the
crime of murder for the killing of Robert Levesque.  Under
Indictment Number 33619, the Petitioner was charged with the
crime of armed robbery with the victim being Robert Levesque.
The Committee for Public Counsel Services (CPCS) assigned
Attorney J. Drew Segadelli to represent the Petitioner at trial.
Exhibit A at 2, 9; Exhibit M at 7 (Affidavit of Attorney J. Drew
Segadelli at ¶ 2, 3).[3]

The Petitioner's jury trial in the Bristol County Superior
Court commenced on March 12, 1996 with Judge Charles J. Hely
presiding.  Tr. I/20.[4]  On March 15, 1996, the Petitioner moved

---

[3] Attorney Segadelli entered his appearance on behalf of the
Defendant on February 29, 1996.  Exhibit A at 2.  The Defendant's
first-degree murder trial commenced twelve days later on March
12, 1996.  Tr. I/20.

[4] The Defendant went was tried with her co-defendant, Joseph
Netto.  Tr. I/20.  The Commonwealth proceeded against the
Petitioner on the basis of joint venture liability.

for a required finding of not guilty at the close of the
Commonwealth's case pursuant to Rule 25(b)(1) of the
Massachusetts Rules of Criminal Procedure.  Tr. IV/225-239;
Exhibit A at 3.  Judge Hely denied the Petitioner's motion.  Tr.
IV/239; Exhibit A at 3.

Judge Hely instructed the jury on the crimes of first-degree
murder, second-degree murder, and armed robbery.  Tr. V/104-122.
On March 19, 1996, the jury returned a guilty verdict for first-
degree murder against the Petitioner based upon the theory of
felony-murder with armed robbery as the predicate offense.  Tr.
VI/154; Exhibit A at 3.[5]  Judge Hely sentenced the Petitioner to
the mandatory term of life imprisonment.  Tr. VI/161; Exhibit A
at 3.[6]

On March 22, 1996, the Petitioner filed a motion pursuant to
Rule 25 (b)(2) and Rule 30(b) of the Massachusetts Rules of
Criminal Procedure seeking to set aside the verdicts and the
entry of findings of not guilty, or in the alternative, seeking a
new trial or the entry of a finding on any lesser included

---

[5] The jury returned a guilty verdict on Indictment Number
33619 which accused the Petitioner of armed robbery.  Tr. VI/154.
Exhibit A at 9.

[6] The co-defendant was convicted of first-degree murder
based upon theories of felony-murder (with armed robbery as the
predicate offense), deliberate premeditation, and extreme
atrocity or cruelty.  Tr. VI/154-155.  The co-defendant was
convicted of armed robbery as well.  Tr. VI/155.

offense to the offenses charged.  Exhibit A at 4, 10; Exhibit D.[7]
Judge Hely held a hearing on the motion on May 1, 1996.  Exhibit
F.[8]  Judge Hely denied the Petitioner's motion on May 3, 1996.
Exhibit A at 4, 10; Exhibit D.

The Petitioner timely appealed both of her convictions.
Exhibit A at 4, 10.  CPCS assigned new counsel, Attorney Steven
J. Rappaport, to represent the Petitioner on her direct appeal.
Exhibit A at 4; Exhibit B at 1.[9]  The Supreme Judicial Court

---

[7] Rule 25(b)(2) states as follows:

(2) *Motion After Discharge of Jury*.  If the [motion for
required finding of not guilty] is denied and the case
is submitted to the jury, the motion may be renewed
within five days after the jury is discharged and may
include in the alternative a motion for new trial.  If
a verdict of guilty is returned, the judge may on
motion set aside the verdict and order a new trial, or
order the entry of a finding of not guilty, or order
the entry of a finding of guilty of any offense
included in the offense charged in the indictment or
complaint.

[8] The transcript of this hearing is set forth as Exhibit F.
The transcript was ordered by the undersigned counsel for the
purpose of preparing the Petitioner's post-appeal motion for new
trial.  This transcript was not prepared for the Petitioner's
direct appeal and it was not part of the appellate record for the
case.  This transcript was filed in the Bristol Superior Court
Clerk's Office on September 17, 2004.  Exhibit A at 8.

[9] On direct appeal, the Petitioner challenged the
sufficiency of the evidence and whether a substantial likelihood
of a miscarriage of justice occurred under G.L. 278, § 33E
because the trial court failed to instruct the jury as to lesser
included offenses within the charge of armed robbery.  The
Petitioner also challenged her conviction for armed robbery as
duplicative.  See Exhibit G.

reviewed the case in accordance with G.L. c. 278, § 33E and, on February 14, 2003, the Court affirmed the Petitioner's murder conviction without any reduction in the sentence.  Commonwealth v. Netto, 438 Mass. 686, 707 (2003); Exhibit B at 4.[10]  The Court vacated as duplicative the Petitioner's conviction for armed robbery.  Id.

On April 13, 2004, represented by new counsel, the Petitioner filed a Motion for New Trial and a Motion for Funds for Fingerprint Expert in the Bristol Superior Court.  Exhibit A at 7; Exhibit M; Exhibit N.  On August 11, 2004, Judge Hely denied both motions without an evidentiary hearing.  Exhibit A at 7; Exhibit O.[11]

On September 8, 2004, the Petitioner filed a petition in the Single Justice Session of the Supreme Judicial Court seeking leave to appeal the denial of her Motion for New Trial to the full court pursuant to G.L. c. 278, § 33E.  Exhibit B at 6; Exhibit P.  On March 18, 2005, Justice Judith A. Cowin denied the

_____

[10] The Supreme Judicial Court acknowledged that "had they been requested, instructions on the lesser included offense of unarmed robbery, and corresponding instructions on felony-murder predicated on unarmed robbery, would have been required."  Commonwealth v. Netto, 438 Mass. at 704.

[11] Judge Hely ruled that the issues presented in the Defendant's Motion for New Trial were waived "by the defendant's failure to raise them at the trial, in a prior motion for a new trial, and in the prior appeal."  Exhibit O at 1.  He further ruled that the Petitioner received the effective assistance of counsel at trial.  Exhibit O at 2.

petition for leave to appeal to the full court and did so without a hearing.  Exhibit B at 6; Exhibit Q.[12]

Statement of Facts Relevant to the Issues

*Evidence Presented at Trial Relevant to the Incident*

For the purpose of this petition, the facts relevant to the incident were adequately stated in the decision of the Supreme Judicial Court as follows:

> *The victim, Robert Levesque, lived alone in a second-floor apartment at 837 Second Street in Fall River.  He operated a restaurant located nearby, and was known to carry a significant amount of cash on his person.  He also loaned money to many people, taking as pledges various items of personal property.  As a result, he possessed a quantity of jewelry, belonging either to himself or to persons who owed him money.*
>
> *The defendants, Joseph and Nancy Netto, husband and wife, lived in the apartment next to Levesque, having moved in only a few weeks prior to Levesque's murder. Another apartment on the second floor was occupied by Michelle Griffin and Bennie White, who were friends of the Nettos.  The Nettos were impoverished and addicted to heroin.  They had few possessions and, much of the time, no food.  They received a Social Security check at the beginning of each month, but spent most of the little money they had on heroin.*
>
> *Levesque had helped the Nettos acquire their apartment and, for some brief period after they moved in, the Nettos had been on friendly terms with Levesque.  Nancy Netto would visit Levesque in his apartment on occasion.  However, approximately one week prior to his murder, there had been some friction between Levesque and Nancy Netto; as a result, she was no longer welcome in his apartment.  At some point prior to the murder,*

---

[12] Justice Cowin ruled that the Petitioner failed to raise any issues which presented a "new and substantial question" within the meaning of G.L. c. 278, § 33E.  Exhibit Q at 1.

*Joseph Netto told Bennie White that he did not like Levesque, predicting that Levesque would "end up with a knife in his back."*

*On November 18, 1993, the day before the murder, the police were summoned to the Nettos' apartment in response to a report of some disturbance.  Joseph Netto mistakenly believed that it was Levesque who had telephoned the police, and Joseph Netto expressed anger that Levesque had done so.*

*As of the next morning, Friday, November 19, the Nettos were in desperate need of money for heroin.  Nancy Netto was described as "very dope sick," suffering withdrawal to the point that she was drooling.  She asked Griffin and White for money, telling them that she had not eaten in three days.  She promised to pay them back when her next Social Security check arrived. Both Griffin and White refused to lend her any money. She asked to use their telephone (as the Nettos had no telephone in their apartment), and Griffin overheard her making telephone calls to other friends in a vain effort to obtain money from them.*

*In the late afternoon, Levesque had closed up his restaurant and stopped in at a local club that he often patronized.  At the club, he was seen with significant cash, including many one hundred dollar bills.  He left the club at approximately 5:30 P.M.  Sometime shortly thereafter, a neighbor in the apartment below Levesque's heard loud noises coming from Levesque's apartment.  She heard men's voices yelling, the sounds of furniture being moved, and objects breaking.  There was then a loud crash on the floor.  Next, she heard rapid footsteps going in and out of Levesque's apartment, up and down the stairway, and in and out of the building's front door.  Over the course of the evening, she also heard foot traffic going from Levesque's apartment toward the back of the building, where the Nettos' apartment was located.*

*At approximately 6 P.M., Nancy Netto telephoned a friend, one John Costanzo, asking him to come over and give her a ride.  Sometime later, Costanzo arrived at the defendants' apartment, where he saw Joseph Netto with several one hundred dollar bills in his hands.  On seeing the money, Costanzo asked to be paid back on an earlier loan.  Joseph Netto said that the money was not*

*his, and that he would repay Costanzo in a few days. Costanzo then drove Nancy Netto to Providence, where she purchased at least twenty bags of heroin, costing approximately $140. She also bought cigarettes and gave Costanzo twenty dollars for gasoline.*

*While they were out, Michelle Griffin stopped in briefly at the Nettos' apartment. Joseph Netto was there, barefoot and wearing nothing but shorts. Griffin saw miscellaneous items on the kitchen table, which was odd because  the Nettos had very few possessions.  After Griffin left, White also stopped in at the Nettos' apartment.  White noticed that Joseph Netto had a cut on his hand that he appeared to be treating.  There were bottles of "expensive" liquor on the table, and a basket of other items.  Towels and clothing were soaking in the bathroom sink and tub. White asked Joseph Netto where the liquor had come from.  Joseph replied that he had stolen it from his brother-in-law's basement.  He offered one of the bottles to White, telling him not to tell Griffin about it.  White asked him about the cut on his hand.  Joseph replied that he had been cut during the theft.  While White was still there, Nancy Netto and Costanzo returned from their heroin-buying trip.  The Nettos each injected some heroin, and gave a bag to White.*

*Costanzo left, at which point Nancy Netto asked White to give her a ride to buy groceries.  As they were about to leave, Joseph Netto reminded White that he was not to say anything to Griffin about the bottle of liquor he had been given.  On hearing this remark, Nancy Netto "went out of her mind," screaming to Joseph that he "[was not] supposed to tell anyone" and that she "[could not] believe [he] said anything."  Joseph took her into the bedroom to calm her down.  When they came back out, Joseph asked Nancy where the money was. She told him that she had "stashed it," but could not remember where.  They then found the money in the bedroom, and White and Nancy Netto left to buy groceries.*

*White took Nancy Netto to two different stores, at which she spent approximately one hundred dollars on groceries.  While they were out, Griffin, from her own apartment on the second floor, heard "banging around, clattering, scuffling" noises from Levesque's*

apartment.  After the noises had gone on for quite some
time, she heard a loud "thump," which prompted her to
go out and investigate.  She saw that the Nettos'
apartment door was slightly open, and, as she
approached that door, Joseph Netto came up behind her
in the hallway.  He was still barefoot and dressed only
in shorts.  Joseph asked her if she had heard noises in
Levesque's apartment.  When Griffin replied that she
had, Joseph took her arm and directed her into his own
apartment.  Griffin asked him if Nancy and White were
back, to which Joseph relied that Nancy had a great
deal of money to spend and would be out for a while.
Griffin was uneasy and wanted to leave, but Joseph kept
his hold on her arm and asked her to wait for Nancy and
White to return.

Nancy and White did return shortly thereafter, loaded
with grocery bags.  Griffin had never seen the Nettos
buy such a quantity of groceries before.  When Joseph
suggested that they give some of the groceries to
Griffin and White, Nancy protested that she had not
eaten in three days and that they were "her groceries."
Griffin and White left and returned to their own
apartment.

At approximately 6:00 A.M. the next day, the Nettos
went to Costanzo's home, inviting him to go out for
coffee.  Costanzo declined.  Later that morning, the
Nettos rented a room at a motel located a few miles
from their home.  They paid for the room in cash.  One
of the motel workers who knew Nancy Netto struck up a
conversation with her.  Nancy and Joseph both explained
that their apartment was being painted and that they
had come to the motel to escape the paint fumes. They
had bags of items with them, which they claimed to have
bought at a second-hand store.

When Levesque failed to show up at his restaurant at
the usual time that Saturday morning, one of the
restaurant workers went to his home.  Discovering
Levesque's vehicle in the lot, and getting no response
from knocking on his door, she telephoned the police.
The police broke down the door to Levesque's apartment
and found his body lying ten feet inside the doorway
with a knife sticking out of his back.  He had been
stabbed nineteen times.  He had also suffered multiple
cuts in the nature of defensive wounds, and a blow from
a blunt object to his forehead.  The knife in his back

*matched those in a set found in a drawer in the kitchen.  The apartment was "a shambles," with items turned over, drawers opened, and contents strewn about.*

*Forensic examination of blood samples at the scene identified two samples where the blood types and groupings were consistent with a combination of Levesque's blood and Joseph Netto's blood.  A bloody footprint on a piece of floor tile matched Joseph's right footprint.  A fingerprint on the handle of the bathroom door matched Nancy Netto's right thumb.  That thumbprint was determined to be "fairly fresh," based on the speed with which it reacted to the application of chemicals and on the fact that the print had been left in a location that would, in the ordinary course, be subjected to frequent handling.*

*The police obtained arrest warrants for the Nettos and a warrant to search their apartment.  That search uncovered eighteen dollars under a television set in the bedroom and clothes soaking in the bathroom tub and sink.  There was no sign that the apartment had been or was in the process of being painted.*

*Later that night, police found and arrested the Nettos in their room at the motel.  Among the items in their possession at the time of their arrest were jewelry, an ashtray, a toaster, and keys, which were later identified as belonging to Levesque.  They also had cash, including ten one hundred dollar bills, three of which had spots of blood on them.  Examination of Joseph Netto's hand revealed a fresh cut between his thumb and forefinger.*

*Counsel for Joseph Netto presented evidence that Costanzo had spent considerable amounts of money in the days immediately following the murder, and that he had not obtained such a sum of money from work.  Counsel also presented evidence of a telephone call made to his office by Bennie White two months prior to the trial, during which White suggested that he knew more bout the murder than he had told the police (or the jury).  Counsel for both defendants suggested in closing argument that the crime had been perpetrated by either Costanzo or White.*

Commonwealth v. Netto, 438 Mass. 686, 688-692 (2003)(footnotes omitted).

*Additional Evidence in the Record Presented by Affidavit*
*In Connection with the Petitioner's Motion for New Trial*

The trial record shows that neither the Petitioner nor the Commonwealth requested any lesser included offense instructions for other possible verdicts which the jury could have returned in this case. Tr. V/5-7; Exhibit C.  The trial judge raised this issue with counsel for the parties after asking them whether they were satisfied with the possible verdicts presented to the jury on the verdict slip.  Id.

Counsel did not consult with the Petitioner regarding the decision whether to ask the trial judge to instruct the jury on any lesser included offenses.  Exhibit M at 4-5 (Affidavit of Nancy Netto at ¶¶ 7, 8, 9, 10, 12); Exhibit M at 7 (Affidavit of J. Drew Segadelli at ¶ 5).  Counsel did not explain to the Petitioner the potential advantages and the potential disadvantages of asking the trial judge to instruct the jury on lesser included offenses.  Exhibit M at 5 (Affidavit of Nancy Netto at ¶ 10).  Counsel did not give the Petitioner the opportunity to make this decision.  Exhibit M at 5 (Affidavit of Nancy Netto at ¶ 11); Exhibit M at 7 (Affidavit of J. Drew Segadelli at ¶ 6).

Based upon what she now knows about lesser included offenses, if the Petitioner had been given the opportunity at the time of trial to make the decision whether she wanted the jury instructed on lesser included offenses, she would have told her Counsel that her choice would have been to ask the judge to instruct the jury on lesser included offenses. Exhibit M at 5 (Affidavit of Nancy Netto at ¶ 14). Based upon what she now knows about lesser included offenses, if her Counsel had asked her at the time of trial for her opinion on whether she wanted the jury instructed on lesser included offenses, she would have told him that she wanted him to ask the judge to instruct the jury on lesser included offenses. Exhibit M at 5 (Affidavit of Nancy Netto at ¶ 15). Based upon what she now knows about lesser included offenses, at the time of trial the Petitioner would have never gambled her fate on an all-or-nothing defense which could result in a prison sentence without the possibility of parole. Exhibit M at 6 (Affidavit of Nancy Netto at ¶ 16).

With respect to the fingerprint evidence in this case, Counsel did not retain the services of a fingerprint expert to assist him in his preparations for trial. Exhibit M at 7 (Affidavit of J. Drew Segadelli at ¶ 4). As nationally recognized fingerprint expert Kenneth R. Moses now states in his affidavit, the Commonwealth's expert's testimony regarding the "freshness" of the Petitioner's fingerprint expresses an opinion

that is not shared by other fingerprint experts and is contrary to empirical experience and testing.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 9).  Wide variations exist in the ability of a latent print to survive even under harsh conditions and, as a result, development of a latent fingerprint at a crime scene is no guarantee of its having been recently placed. Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 10).  No reliable indication of a print's freshness can be obtained from its rate of development or appearance after it is developed. Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 11).  Moses warns that the estimation of the age of a latent print is fraught with danger and may result in a wrongful conviction.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 12).[13]

---

[13] In its response to the Petitioner's Motion for New Trial, the Commonwealth did not provide any expert forensic evidence by way of affidavit rebutting the opinions offered by Mr. Moses or any other new evidence supporting Trooper Lauria's "fresh fingerprint" testimony.  Instead, the Commonwealth pointed out that "[Trooper Lauria] never indicated that his opinion was based on any scientific studies."  Commonwealth Brief at 41.  And, after presenting Trooper Lauria to the jury as a witness who had been previously qualified as a fingerprint expert in federal court and in the state courts sitting in four Massachusetts counties, the Commonwealth claimed in its response that "[Trooper Lauria's] testimony may be considered within the general knowledge of a police investigator *not rising to the level of expert testimony*."  Tr. III/65; Commonwealth Brief at 42 (emphasis added).

Summary of Argument

On her direct appeal to the Supreme Judicial Court, the
Petitioner argued that there was insufficient evidence of her
presence, knowledge of a weapon, or participation in the crime to
warrant a conviction of felony murder as a joint venturer
predicated on armed robbery.  The Petitioner contends the
evidence the Commonwealth presented at her trial was insufficient
to support her conviction for first-degree murder under the
Jackson standard and that the Supreme Judicial Court's decision
was objectively unreasonable in its assessment that the weight of
the evidence was sufficient warrant her conviction.

The United States Supreme Court recognized in Jones v.
Barnes that the defendant has the ultimate authority to make
"fundamental decisions" in a criminal case.  With respect to the
most important decisions to be made in the preparation and
presentation of the case, it is the defendant – with the
assistance of counsel – who is constitutionally entitled to make
those choices which will ultimately determine her fate.  Although
the thrust of Supreme Court jurisprudence since Gideon has been
that the help of a lawyer is essential to ensure the criminal
defendant a fair trial, the Court has never wavered from its view
that the right to make a defense remains personal to the
defendant.

Counsel must perform certain basic tasks during the course of representing any criminal defendant.  The Supreme Court has recognized – and has recently reiterated – that foremost among these responsibilities is the duty to consult with the defendant on important decisions in the case.  Similarly, the legal profession's ethical rules as embodied in the American Bar Association's Model Rules of Professional Conduct, the Massachusetts Rules of Professional Conduct, and the prevailing norms of criminal defense lawyers as reflected in the American Bar Association's Standards for Criminal Justice unequivocally require counsel, at a bare minimum, to consult with the defendant on all important decisions in a criminal case.  The Committee for Public Counsel Services, the state agency which assigned counsel for the Petitioner in this case, has its own performance standards for assigned and appointed counsel which insist on consultation with the defendant on all important decisions.

In this case, the critical decision whether to pursue an "all-or-nothing" defense and to forgo jury instructions for lesser included offenses was the functional equivalent of a fundamental decision under federal constitutional law.  This decision could only be made by the Petitioner after consultation with her Counsel.  She was never given the opportunity to do so by her Counsel.

This Court may conclude that it need not reach the federal constitutional question of whether the decision to forgo a lesser included offense instruction is so akin to a fundamental decision that it could only have been made by the Petitioner after full consultation with her Counsel.  The Supreme Judicial Court reiterated in the <u>Woodward</u> case that, at least in certain circumstances, a defendant may pursue under state law an all-or-nothing strategy.  But, on the facts of this case, consultation between Counsel and the Petitioner was absolutely required on whether to pursue such a powerful and risk-laden defense and this consultation never took place.  This consultation was mandated under the federal constitution because the decision is so akin to a fundamental decision.  Not only was this decision critically important to the Petitioner in terms of the potential outcome of the litigation, it was completely analogous to a plea decision. Counsel who makes such a strategic choice entirely without consultation with a defendant on what is analogous to a plea decision cannot be found to have provided effective assistance of counsel within the meaning of the Sixth and Fourteenth Amendments to the federal constitution.

In sum, under the federal constitution, Counsel's conduct so undermined the proper functioning of the adversarial process that the Petitioner's trial cannot be relied on as having produced a just result.

The Commonwealth's presentation of "fresh fingerprint" testimony amounted to the use of outrageously flawed forensic evidence and it undoubtedly made a difference in the jury's conclusion. This error deprived the Petitioner of her rights to a fair trial and to the due process of law guaranteed by the federal constitution. To the extent the Petitioner's Counsel did not do anything to adequately challenge the "fresh fingerprint" testimony as being premised on flawed forensics, the Petitioner was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments to the federal constitution.

<u>Argument</u>

I.  THE PETITIONER WAS CONVICTED UPON CONSTITUTIONALLY INSUFFICIENT EVIDENCE BECAUSE THE EVIDENCE ADDUCED AT TRIAL FAILED TO ESTABLISH THAT SHE WAS A JOINT VENTURER IN THE KILLING.

On her direct appeal, the Petitioner argued "that there was insufficient evidence of her presence, knowledge of a weapon, or participation in the crime to warrant a conviction of felony murder as a joint venturer predicated on armed robbery." <u>Commonwealth v. Netto</u>, 438 Mass. 686, 701 (2003). The Petitioner contends the evidence the Commonwealth presented at her trial was insufficient to support her conviction for first-degree murder under the standard established by the Supreme Court in <u>Jackson v.</u>

<u>Virginia</u>, 443 U.S. 307, 318-319 (1979),[14] and that the Supreme
Judicial Court's decision was objectively unreasonable in its
assessment that the weight of the evidence was sufficient warrant
the conviction.[15]

The Supreme Judicial Court ruled that the Commonwealth's
fresh fingerprint evidence, in combination with the testimony
that the Petitioner had been unwelcome in Levesque's apartment
for one week prior to the crime, was constitutionally sufficient
to prove that the Petitioner was in Levesque's apartment at the
time of the murder and robbery.   <u>Commonwealth v. Netto</u>, 438 Mass.
at 701-702.   This conclusion is objectively unreasonable because,
in the final analysis, it is premised upon impermissible
speculation regarding the timing of the placement of the

---

[14] The constitutional standard established in <u>Jackson v.
Virginia</u> asks, "whether, after viewing the evidence in the light
most favorable to the prosecution <u>any</u> rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt." <u>Id.</u> at 319 (emphasis in original).

[15] In its decision in the Petitioner's case, the Supreme
Judicial Court never identified by name <u>Jackson v. Virginia</u> as
the Supreme Court's clearly established precedent for evaluating
federal constitutional claims challenging a criminal conviction
based upon the sufficiency of the evidence.   Nor did it cite the
functionally equivalent Massachusetts case, <u>Commonwealth v.
Latimore</u>, 378 Mass. 671, 677-678 (1979).   Nonetheless, for
federal habeas purposes, in accordance with <u>Williams v. Taylor</u>,
529 U.S. 362, 409 (2000), the Petitioner's federal sufficiency of
the evidence claim ultimately will turn on whether the Supreme
Judicial Court's decision constitutes an unreasonable application
of the <u>Jackson</u> standard.   <u>See</u> <u>Hurtado v. Tucker</u>, 245 F.3d 7, 16
(1st Cir. 2003).

Petitioner's fingerprint.  Michelle Griffin testified that the Petitioner had visited Levesque's apartment on numerous occasions, but Trooper Richard Lauria, the Commonwealth's fingerprint expert, could not definitively state how long the Petitioner's fingerprint had been actually present on the door handle.  Tr. II/18-19, 79-80, Tr. III/82, 85-88.[16]  And no other witness placed the Petitioner in Levesque's apartment (or even in the apartment building itself) at the supposed time of Levesque's murder.[17]

As for evidence that the Petitioner had knowledge that her coventurer was armed with a dangerous weapon, the Supreme Judicial Court concluded that the evidence was sufficient to merely infer this essential element of the crime of armed robbery

---

[16] Completely aside from whether the Commonwealth's use of its "fresh fingerprint" testimony had any kind of legitimate forensic basis and whether it effectively denied the Petitioner her federally protected rights to a fair trial and to the due process of law (see Argument III infra), the Commonwealth's fingerprint expert did not exclude the placement of the print at the time when Michelle Griffin testified that she had last seen the Petitioner in the victim's apartment (about a week before the murder).  Tr. II/18-19, Tr. III/82, 85-88.

[17] Jennifer Awad testified that she heard yelling, the voices of men arguing, and the sounds of furniture moving and things breaking emanating from Levesque's apartment between 5:00 PM and 5:30 PM on the night of the murder.  Tr. I/229-230, 237-240.  She testified that she heard the footsteps of a heavy man coming and going between Levesque's apartment and another apartment in the building at that time.  Tr. I/230-234, 242, 244, 248, 252.  She did not hear the footsteps of a woman that night. Tr. I/242, 247-249.

under a joint venture theory.  Commonwealth v. Netto, 438 Mass. at 702-703.  This conclusion is also objectively unreasonable.

The only reasonable inference based on the evidence offered at trial was that the stabber procured the murder weapon from the inside of Levesque's apartment once inside of Levesque's apartment.[18]  Trooper John Hubbard testified that the murder weapon was a knife that matched a set of steak knives found in a kitchen drawer inside of Levesque's apartment.  Tr. IV/101. There was no evidence offered to suggest that the Petitioner knew that the plan for the robbery included the use of a weapon or that the Petitioner was even aware of that planned weapon. Instead, the Supreme Judicial Court made the logical leap that because resistance from Levesque could be reasonably anticipated, the perpetrators would have recognized that a dangerous weapon would have been necessary to overcome his resistance and hence the Petitioner would have been aware of that planned weapon.  The Petitioner respectfully suggests for the purpose of habeas relief that this inference is objectively unreasonable and that no rational trier of fact could have ever properly found this essential element of the crime of armed robbery beyond a reasonable doubt based upon this evidence.

---

[18] The Supreme Judicial Court acknowledged that the Commonwealth presented strong but circumstantial evidence that the Petitioner's coventurer was the principal perpetrator. Commonwealth v. Netto, 438 Mass. at 701, 704.

Finally, the Supreme Judicial Court's ruling that there was sufficient evidence to establish the Petitioner's participation in the crime is objectively unreasonable.  There was no evidence that the Petitioner acted as an accessory before the crime, aided in the commission of the crime, or even had knowledge that her coventurer intended to commit the crime of armed robbery.  In its decision, the Supreme Judicial Court refers to evidence other than the fingerprint linking the Petitioner to the crime. Commonwealth v. Netto, 438 Mass. at 702 n.17.  Yet that evidence only shows that the Petitioner utilized the proceeds of the crime or attempted to conceal the crime after the crime occurred.  The record of the Petitioner's trial is simply devoid of any evidence of some sort of act by the Petitioner which contributed to the crime happening.

In sum, viewing the totality of the evidence in evaluating the Supreme Judicial Court's decision, that court's assessment that the weight of the evidence was constitutionally sufficient under Jackson to support the Petitioner's conviction is objectively unreasonable.

II.   THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
      UNDER THE FEDERAL CONSTITUTION BECAUSE HER COUNSEL DID NOT
      PERMIT HER TO MAKE THE DECISION OR EVEN CONSULT WITH HER
      ABOUT THE DECISION WHETHER TO REQUEST THE TRIAL JUDGE
      INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES.

In order to ensure that the trial process can be relied upon as having produced just results, the Petitioner was constitutionally entitled to counsel functioning as "counsel" within the meaning of the Sixth Amendment.  Strickland v. Washington, 466 U.S. 668, 686-687 (1984).  In this case, the Petitioner was denied her Sixth Amendment and Fourteenth Amendment federal constitutional rights to the effective assistance of counsel under the Strickland standard.

    A.   FUNDAMENTAL DECISIONS IN A CRIMINAL CASE CAN ONLY BE
         MADE BY THE DEFENDANT.

The Supreme Court recognized in Jones v. Barnes, 463 U.S. 745, 751 (1983), that the defendant has the ultimate authority – and the sole responsibility – to make "fundamental decisions" in a criminal case.  These fundamental decisions for the defendant include the ultimate right to choose whether to enter a plea of guilty, whether to waive a jury trial, whether to testify, and whether to take an appeal.  See also Wainright v. Sykes, 433 U.S. 72, 93 n.1 (1977)(Burger, C.J., concurring).[19]

---

[19] The list of fundamental rights in Jones v. Barnes was in dictum.  Other Supreme Court cases have held that certain constitutional rights which are considered "fundamental" and personal to the defendant are waivable only by the defendant.

(Continued on Next Page)

Jones v. Barnes held that as a matter of federal

constitutional law, the criminal defendant does not have the

right to control which issues are argued on appeal.[20]  However,

_____

Examples of fundamental decisions that only the defendant is
empowered to make are entry of a guilty plea, Boykin v. Alabama,
395 U.S. 238 (1969), Brookhart v. Janis, 384 U.S. 1 (1966);
waiver of a jury trial, Adams v. United States ex rel. McCann,
317 U.S. 269, 277-78 (1942); and whether to pursue an appeal, see
Fay v. Noia, 372 U.S. 391, 439 (1963).

    The constitutional stature of the defendant's right to
testify in his own behalf at trial was recognized in Rock v.
Arkansas, 483 U.S. 44 (1987).  In that case, the Court did not
need to decide whether the constitutional right to testify was
fundamental in character and therefore personal to the defendant
or whether the right to testify could be waived by counsel.
Nonetheless, the Court in Rock emphasized that the right to
testify "is one of the rights that 'are essential to due process
of law in a fair adversary process,'" 483 U.S. at 51, quoting
Faretta v. California, 422 U.S. 806, 819 n.15 (1975), and that
the right to testify is "[e]ven more fundamental to a personal
defense than the right of self-representation".  Id. at 52.
Finally, the Court noted that it has "[o]n numerous occasions . .
. proceeded on the premise that the right to testify on one's own
behalf in defense to a criminal charge is a fundamental
constitutional right."  Id. at 53 n.10.

    [20] In Jones v. Barnes, 463 U.S. 745, 754 (1983), the Supreme
Court held that assigned counsel in a criminal case does not have
a constitutional obligation to present on appeal every
nonfrivolous contention requested by the defendant if counsel, as
a matter of professional judgment, chooses not to present those
points.  The Court had previously addressed the problem of the
frivolous or meritless appeal.  It ruled in Anders v. California,
386 U.S. 738, 741-45 (1967), that in order to protect the
defendant's right to appellate counsel, courts must safeguard
against the risk of granting counsel's motion to withdraw on the
basis that the appeal is frivolous where the appeal is not
actually frivolous.  Anders delineated a procedure whereby the
motion to withdraw must be accompanied by a brief referring to
anything in the record that might arguably support the appeal.
More recently, in Smith v. Robbins, 528 U.S. 259, 272-76 (2000),
the Court indicated that the Anders procedure is only one method
(Continued on Next Page)

two other Supreme Court cases which preceded <u>Jones v. Barnes</u>

suggested that defendants must have the right to make the

decisions central to their defense since they, and not their

counsel, must bear the consequences of these decisions.

In the first case, <u>North Carolina v. Alford</u>, 400 U.S. 25

(1970), the defendant pled guilty to a lesser included offense of

second degree murder to eliminate the possibility of receiving a

---

of satisfying the federal constitution's requirements for
indigent criminal appeals; states are free to adopt other
procedures so long as they safeguard a defendant's right to
appellate counsel.

The various state courts have addressed the <u>Anders</u> issue in
different ways. <u>See</u> M.C. Warner, <u>Anders in the Fifty States:</u>
<u>Some Appellants' Equal Protection is More Equal Than Others</u>, 23
Fla. St. U.L. Rev. 625, 642-656 (1996). In Massachusetts, the
Supreme Judicial Court has specifically rejected the procedure
outlined in the <u>Anders</u> case and has given the criminal defendant
significantly more control regarding the decision over which
issues are to be presented on appeal. <u>Commonwealth v. Moffett</u>,
383 Mass. 201, 208-09 (1981).

Under <u>Moffett</u>, once appellate counsel is appointed on behalf
of the criminal defendant, no withdrawal is permitted solely on
the basis of the frivolousness or lack of merit of the appeal.
Appointed counsel, at the insistence of the defendant, must
present contentions which counsel deems frivolous in a succinct
manner and in a way which does the least amount of harm to the
defendant's cause. With the exception of a <u>Moffett</u> preface,
counsel must not argue against the defendant's interests. <u>Id</u>.

The <u>Moffett</u> case recognized the <u>Anders</u> procedure caused
conflicts between appellate counsel and the defendant and made
the appellate court's review process more complex. <u>Id</u>. at 205-
06. However, <u>Moffett</u> is also a strong acknowledgment by the
Supreme Judicial Court of the principle enunciated in <u>Faretta v.</u>
<u>California</u>, 422 U.S. 806, 819-20 (1975), that the defendant is to
be personally given the right to make "his" defense.

death sentence for first-degree murder.  The Court held that it was not constitutionally impermissible for a trial judge to accept a guilty plea from a defendant who professed his innocence to the particular acts that were alleged to constitute the crime. The Court emphasized that a defendant might have important reasons for intelligently concluding that pleading guilty was in his best interests while still proclaiming his innocence, such as the possibility of a shorter sentence than that which would be imposed after trial.  Id. at 37-38.

In the second case, Faretta v. California, 422 U.S. 806 (1975), the Court expressed a similar concern for the right of the defendant to control the defense.  Faretta held that the Sixth Amendment guarantees "the right to self-representation – to make one's own defense personally."  Id. at 819.  The Court explained:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants the accused personally the right to make his defense.  It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." . . . The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

While acknowledging that a pro se defendant may conduct the defense to his detriment, the Court reasoned that "his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'"  Id. at 834, quoting Illinois v.

<u>Allen</u>, 397 U.S. 337, 350-51 (1970)(Brennan J., concurring).[21]  In short, <u>Faretta</u> makes plain that counsel is "an assistant" to the defendant and the defendant is personally given the right to make "his" defense.  <u>Id</u>. at 819-20.  It is, after all, the *defendant's* day in court.

Although the thrust of Supreme Court jurisprudence since <u>Powell v. Alabama</u>, 287 U.S. 45 (1932), and <u>Gideon v. Wainright</u>, 372 U.S. 335 (1963), has been that the help of a lawyer is essential to ensure the criminal defendant a fair trial, the Court has never wavered from its view that the right to make a defense remains personal to the defendant.  Taken together, <u>Alford</u> and <u>Faretta</u> stand for the proposition that "respect for a defendant's freedom as a person mandates that he or she be permitted to make fundamental decisions about the course of the proceedings."  <u>Frendak v. United States</u>, 408 A.2d 364 (D.C. 1979).[22]

---

[21] In <u>Estelle v. Williams</u>, 425 U.S. 501, 512 (1976), the Court expressed a similar concern for the rights of a defendant to make important decisions in a criminal case:

> Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney.  Any other approach would rewrite the duties of trial judges and counsel in our legal system.

[22] At least one federal circuit court of appeals judge has expressed doubt whether the list of fundamental rights in <u>Jones v. Barnes</u> is exclusive.  In <u>United States v. Boigegrain</u>, 155 F.3d

(Continued on Next Page)

Thus, with respect to the most important decisions to be made in the preparation and presentation of any criminal case, it is the defendant – with the assistance of counsel – who is constitutionally entitled to make those decisions which may ultimately determine his fate.  The Sixth Amendment speaks of "the Assistance of Counsel" and as Justice Stewart, emphasized in Faretta, "an assistant, however expert, is still an assistant." 422 U.S. at 820.

    B. THE SIXTH AMENDMENT IMPOSES A DUTY ON COUNSEL TO CONSULT
       WITH THE DEFENDANT ON IMPORTANT DECISIONS IN A CRIMINAL
       CASE.

    The Supreme Court has long recognized the importance of the right to the assistance of counsel under the Sixth Amendment. Its fundamental purpose is to protect the defendant's right to a

---

1181, 1191 (10th Cir. 1998), cert. denied, 525 U.S. 1083 (1999), Judge Holloway, concurring in part and dissenting in part from the majority opinion, pointed out that the Supreme Court has never held that the list of fundamental decisions reserved to the defendant is limited to those specifically enumerated in Jones v. Barnes along with the right, in certain circumstances, to self-representation which had been previously established in Faretta v. California.  Judge Holloway expressed his view that a criminal defendant is entitled to make what he regarded as a "fundamental decision" on whether or not to raise the issue of competency to stand trial.  Judge Holloway would require counsel to assist the Defendant in presenting the Defendant's expressed position on competency and, if necessary, to assist the Defendant in resisting a finding of incompetency to stand trial regardless of counsel's own view of the issue.  Compare Commonwealth v. Simpson, 428 Mass. 646, 654 (1999)(defense counsel ordered to file motion for new trial despite fact that defendant consistently refused to assert defense based on incompetency to stand trial).

fair trial.[23]  Gideon v. Wainright, 372 U.S. 335, 344 (1963);

Johnson v. Zerbst, 304 U.S. 458, 462-63 (1938).  See also Powell

v. Alabama, 287 U.S. 45, 66-72 (1932)(failure to afford capital

defendants reasonable time and opportunity to secure counsel or

effectively appoint counsel constituted denial of due process

under Fourteenth Amendment).  The Sixth Amendment envisions that

the skill and knowledge of a lawyer will be utilized to ensure

that the criminal trial is fair and that the adversarial system

produces just results.  Strickland v. Washington, 466 U.S. 668,

685 (1984)("The accused is entitled to be assisted by an

attorney, whether retained or appointed, who plays the role

necessary to ensure that the trial is fair.").  See Adams v.

United States ex rel. McCann, 317 U.S. 269, 275, 276 (1942).

In order to ensure that the trial process can be relied upon

as having produced just results, the defendant is

---

[23] The Due Process Clauses of the Fifth and Fourteenth
Amendments to the federal Constitution guarantee the right to a
fair trial, but the basic elements of a fair trial are defined
through several provisions of the Sixth Amendment, including the
Counsel Clause.  See Strickland v. Washington, 466 U.S. 668, 684-
85 (1984).  The Sixth Amendment states:

In all criminal prosecutions, the accused shall enjoy
the right to a speedy and public trial, by an impartial
jury of the State and district wherein the crime shall
have been committed, which district shall have been
previously ascertained by law, and to be informed of
the nature and cause of the accusation; to be
confronted with the witnesses against him; to have
compulsory process for obtaining witnesses in his

(Continued on Next Page)

constitutionally entitled to counsel functioning as "counsel" within the meaning of the Sixth Amendment.  Strickland v. Washington, 466 U.S. at 686-87.  As the Court noted in McMann v. Richardson, 397 U.S. 759, 771 & n.14 (1970), the defendant is entitled to the effective assistance of competent counsel because "[t]he right to counsel is the right to effective assistance of counsel."

Counsel has certain basic tasks which must be performed during the course of representing any criminal defendant. Foremost among these responsibilities is the duty to consult with the defendant on important decisions.  The importance of this obligation was recognized in the Strickland case:

> Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. . . From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.

466 U.S. at 688 (internal citation omitted and emphasis added).  The Supreme Court has never retreated from this bedrock principle of constitutionally effective representation in a criminal case.  See Florida v. Nixon, ___ U.S. ___, 125 S. Ct. 551, 561 (2005)(defense counsel

---

favor, and to have the Assistance of Counsel for his defence.

obligated under Strickland to consult with capital defendant
regarding proposed trial strategy to concede guilt).

Those few Supreme Court cases considering the allocation of
decision-making authority in criminal cases suggest counsel has
broad discretion to make binding decisions of trial strategy and
tactics subject only to the obligation to consult with the
defendant.  "[W]hen a defendant chooses to have a lawyer manage
and present his case, law and tradition may allocate to counsel
the power to make binding decisions of trial strategy in many
areas."  Faretta v. California, 422 U.S. at 820.[24]  Nonetheless,
Strickland undeniably imposes a general affirmative duty on
counsel to consult with the defendant on important issues in
every criminal case.  See Roe v. Flores-Ortega, 528 U.S. 470, 480
(2000)(holding counsel has constitutional duty to consult with
defendant about appeal when rational defendant would want to

---

[24] See also New York v. Hill, 528 U.S. 110, 115 (2000)
(counsel's decision on scheduling matters binds defendant even
where delay results in waiver of defendant's rights under
Interstate Agreement on Detainers); Taylor v. Illinois, 484 U.S.
400, 418 (1988)(lawyer must have full authority to manage conduct
of trial since adversary process could not function if every
tactical decision required client approval); Reed v. Ross, 468
U.S. 1, 13 (1984)("absent exceptional circumstances, defendant is
bound by tactical decisions of competent counsel"); Jones v.
Barnes, 463 U.S. 745, 751 (1983)(counsel controls decisions on
which arguments to raise on appeal); Henry v. Mississippi, 379
U.S. 443, 451-52 (1965)(counsel's decision to bypass
contemporaneous objection rule as part of trial strategy is
binding on defendant).

appeal or particular defendant demonstrated interest in appeal).[25]

    C.   ETHICAL RULES AND PROFESSIONAL NORMS IMPOSE AN OBLIGATION ON COUNSEL TO CONSULT WITH THE DEFENDANT ON IMPORTANT DECISIONS IN A CRIMINAL CASE.

    The legal profession's ethical rules as embodied in the American Bar Association's Model Rules of Professional Conduct ("ABA Model Rules") along with the prevailing norms of criminal defense lawyers reflected in the American Bar Association's Standards for Criminal Justice offer little practical guidance on the allocation of decision-making authority in a criminal case. But they unequivocally require counsel to consult with the defendant on important decisions in a criminal case.

    Mirroring Jones v. Barnes, ABA Model Rule 1.2 (1999) states that in a criminal case, counsel shall abide by the defendant's decisions with respect to the plea to be entered, the waiver of a jury trial, and whether to testify at trial.  Exhibit H at 1.[26]

_____

[25] See also Commonwealth v. Moffett, 383 Mass. 201, 208 (1981)(where defendant insists after consultation in pursuing frivolous issues, counsel must present contention succinctly in a way that will do the least harm to the defendant's appeal); Halner v. Commonwealth, 378 Mass. 388, 389 (1979)(stating even if counsel believes appeal of criminal conviction is inadvisable or frivolous, counsel should consult with defendant and leave ultimate decision whether to appeal to defendant).

[26] The ABA Model Rules were adopted by the American Bar Association in August 1983.  From 1983 through 1998, the ABA Model Rules were amended ten times.  See American Bar Association Center for Professional Responsibility, Model Rules of Professional Conduct at http://www.abanet.org/cpr/
(Continued on Next Page)

ABA Model Rule 1.2 (1999) states that except in limited
circumstances, the lawyer "shall abide by the client's decisions
concerning the objectives of the representation . . . and shall
consult with the client as to the means by which they are to be
pursued."  Exhibit H at 1.

Comment 1 to ABA Model Rule 1.2 (1999) goes on to establish
a distinction between the "objectives" and the "means" of the
representation.  Exhibit H at 1.  Comment 1 states it is the
lawyer's responsibility to select the means used to achieve the
client's ends, but the lawyer must consult with the client as to
means.  Exhibit H. at 1.

---

mrpc/mrpc_home.html.  The Massachusetts Rules of Professional
Conduct became effective on January 1, 1998 and replaced the
previous Code of Professional Responsibility which had been in
effect since October 2, 1972.  See generally Herbert P. Wilkins,
The New Massachusetts Rules of Professional Conduct:  An
Overview, 82 Mass. L. Rev. 261 (1997).

Exhibit H sets forth the 1999 version of Rule 1.2 and Rule
1.4 of the ABA Model Rules.  Exhibit J sets forth Rule 1.2 and
Rule 1.4 of the Massachusetts Rules of Professional Conduct
("Massachusetts Rules") which are presently in effect.  The 1999
version of Rule 1.2 and Rule 1.4 of the ABA Model Rules were in
effect at the time of the Petitioner's trial in 1996 and in 1998
when the corresponding Rule 1.2 and Rule 1.4 of the Massachusetts
Rules went into effect.  Through 1998, Rule 1.2 and Rule 1.4 of
the ABA Model Rules were never amended.  See Center for
Professional Responsibility (American Bar Association), A
Legislative History:  The Development of the ABA Model Rules of
Professional Conduct, 1982-1998, at 347 (1999).  Rule 1.2 of the
Massachusetts Rules was amended once since its adoption.  Rule
1.4 of the Massachusetts Rules has not been amended.  See infra
n.29.

ABA Model Rule 1.2 (1999) is confusing and has been severely criticized.[27]  However, the obligation of counsel to consult with the criminal defendant under this ethical rule is undisputed.[28]

---

[27] Comment 1 has been the subject of extensive criticism. "It is questionable whether Rule 1.2 was intended to authorize lawyers to act contrary to the express wishes of their clients on important strategic decisions."  Rodney J. Uphoff, Who Should Control the Decision to Call a Witness:  Respecting a Criminal Defendant's Tactical Choices, 68 U. Cin. L. Rev. 763, 776-77 (2000).  Commentators have sharply criticized the objective/means test as vague and unhelpful in determining whether counsel or the defendant has the right to make a particular strategic decision. Id. at n.57.

[28] In 1997, the American Bar Association's Ethics 2000 Commission undertook a comprehensive study of the ABA Model Rules.  See generally ABA Ethics 2000 Commission materials at http://www.abanet. org/cpr/ethics2k.html.  The American Bar Association adopted the Ethics 2000 Commission's recommendations in February 2002 and the amendments to the ABA Model Rules then became effective as formal American Bar Association policy and available for adoption by individual jurisdictions.  See Margaret Colgate Love, The Revised ABA Model Rules of Professional Conduct:  Summary of the Work of Ethics 2000, 15 Geo. J. Legal Ethics 441, 442-444 (2002).  The current version of Rule 1.2 and Rule 1.4 of the ABA Model Rules which reflect the Ethics 2000 Commission amendments are set forth in Exhibit I.

The objective/means dichotomy of the former ABA Model Rule 1.2 (1999) was left intact in the new ABA Model Rule 1.2, but a cross-reference was added to new language in the new ABA Model Rule 1.4(a)(2) which requires a lawyer to "reasonably consult with the client about the means by which the client's objectives are to be accomplished."  A new Comment [3] in the new ABA Model Rule 1.4 emphasizes, in relevant part:

In some situations – depending on both the importance of the action under consideration and the feasibility of consulting with the client – this duty will require consultation prior to taking action.  In other circumstances, such as during a trial when an immediate decision must be made, the exigency of the situation

(Continued on Next Page)

The Massachusetts version of ABA Model Rule 1.2 (1999) takes
a different approach to the problem.  Rule 1.2 of the
Massachusetts Rules of Professional Conduct ("Massachusetts
Rules") and its associated Comment 1 have a more client-centered
orientation than the corresponding ABA Model Rule and comment.
Exhibit J at 1-2.[29]  The first sentence of the ABA Model Rule 1.2
(1999) is omitted from the corresponding Massachusetts version of
the rule.  Massachusetts Rule 1.2 instead reads, "A lawyer shall
seek the lawful objectives of his or her client through
reasonably available means permitted by law and these rules."
Exhibit J at 1.  Comment 1 to Massachusetts Rule 1.2 then departs
in several important ways from Comment 1 of the corresponding ABA
Model Rule.  Exhibit J at 2.  First, Massachusetts Comment 1
makes clear that the defendant's wishes control subject to

---

may require the lawyer to act without prior
consultation.

Given that decisions relating to lesser included
offenses are rarely if ever all (and certainly not in the
present case) made under exigent circumstances, the Ethics
2000 Commission's revisions to ABA Model Rule 1.2 (1999) and
ABA Model Rule 1.4 (1999) would only seem to strengthen the
ethical requirement that counsel must consult with the
defendant about all decisions relating to lesser included
offenses.

[29] Rule 1.2 of the Massachusetts Rules was amended once.
The amendment is irrelevant for the purposes of the present case.
See Massachusetts Rules of Professional Conduct Rule 1.2 cmt.
[7](amendment with respect to disclosure of client wrongdoing).
Massachusetts Rule 1.4 has not been amended since its effective
date.  It remains identical to the ABA Model Rule 1.4 (1999).

counsel's other professional obligations under the ethical rules and applicable law.  Second, under Massachusetts Comment 1, counsel and the defendant must consult with one another about the means of achieving the defendant's objectives.  Third, the Massachusetts version unequivocally states that the list of fundamental decisions for the defendant enumerated in Massachusetts Rule 1.2 is illustrative and is not to be considered exclusive.[30]  And fourth, Massachusetts Comment 1 recognizes that there will inevitably be circumstances when lawyers are required to act on their own with regard to legal tactics.  The rule permits counsel to make such decisions within the framework of the objectives of the representation.

Hence, Massachusetts Rule 1.2 provides criminal defense counsel with substantially more guidance on the decision-making issue than the corresponding ABA Model Rule and emphasizes consultation with the client and respect for the client's wishes.

---

[30] In sharp contrast from the approach taken by Massachusetts, in considering its version of Rule 1.2, the Court of Appeals of Alaska recently deemed exclusive the list of decisions over which the client had ultimate authority.  In Simeon v. State, 90 P.3d 181, 184 (Alaska Ct. App. 2004), the Court ruled that the decision whether to request a lesser included offense instruction was for counsel to make because the Alaska Supreme Court effectively decided the issue when it did not include this particular decision in the list of client decisions enumerated in Alaska Rule of Professional Conduct 1.2(a).

The ABA Standards for Criminal Justice also impose an
obligation on counsel to consult with the criminal defendant.[31]
ABA Standards for Criminal Justice, Standard 4-5.2, Control and
Direction of the Case at 199-202 (3d ed. 1993) pertains to the
allocation of decision-making between counsel and the defendant.
Exhibit K.  ABA Standard 4-5.2(a) largely tracks ABA Model Rule
1.2(a) (1999) with respect to the list of fundamental decisions
in Jones v. Barnes, 463 U.S. 745, 751 (1983), but it also gives
the defendant the ultimate decision whether to accept a plea
agreement and whether to appeal.  Exhibit K at 1-2.  ABA Standard
4-5.2(b) provides, "Strategic and tactical decisions should be
made by defense counsel after consultation with the client where
feasible and appropriate."  Exhibit K at 2.

The Commentary relating to ABA Standard 4-5.2(b)
specifically addresses the obligation of counsel to consult with
the defendant on lesser included offense instructions.  It
explicitly states, "It is also important in a jury trial for
defense counsel to consult fully with the accused about any

_____

[31] The importance of the ABA Standards for Criminal Justice
was acknowledged in Strickland v. Washington, 466 U.S. 668, 688
(1984).  The Supreme Court referred to them as a guide for
determining what constitutes reasonable attorney performance.
More recently, the Supreme Court endorsed them again as "guides
to determining what is reasonable."  Rompilla v. Beard, ___ U.S.
___, 125 S. Ct. 2456, 2466 (2005), quoting Wiggins v. Smith, 539
U.S. 510, 524 (2003).

lesser included offenses the trial court may be willing to submit to the jury." Exhibit K at 3.[32]

The Committee for Public Counsel Services has promulgated its own performance standards which it employs for evaluating, supervising, and training counsel who are assigned or appointed pursuant to G.L. c. 211D. Assigned and appointed counsel in criminal cases must comply with these standards. CPCS assigned counsel for the Petitioner in this case. Counsel was subject to these performance standards.

---

[32] The Commentary to the previous edition of the ABA Standard 4-5.2 which was promulgated in 1980 went even further. Exhibit L at 3. It expressly allocated the decision regarding lesser included offenses to the defendant:

> It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter.

ABA Standards for Criminal Justice, Standard 4-5.2, Control and Direction of the Case, Commentary at 4-68 (2d Ed. 1980). The authors of the most recent edition of ABA Standard 4.5-2 offered no explanation for this significant change.

As with ABA Standard 4-5.2(b), CPCS's own performance standards mandate consultation with the defendant on all important decisions in a criminal case:

> The attorney should explain that final decisions concerning trial strategy, after full consultation with the client, and after investigation of the applicable facts and law, are ultimately to be made by the attorney.  The client should be made aware that the attorney is primarily responsible for deciding what motions to file, which witnesses to call, what questions to ask, and what other evidence to present. Implicit in the exercise of the attorney's decision-making role in this regard is consideration of the client's input and full disclosure by the attorney to the client of the factors considered by the attorney in making the decisions.  Counsel should inform the client of an attorney's ethical obligation, informed by professional judgment, not to present frivolous matters or unfounded actions.

CPCS Performance Guidelines Governing Representation of Indigent Persons in Criminal Cases, General Principles of Representation, § 1.3(g)(2004)(emphasis added).

Together, Jones v. Barnes and Strickland v. Washington mandate that the criminal defendant must make all fundamental decisions after consultation with counsel.  To the extent that they offer guidance on the allocation of decision-making authority in criminal cases, the ethical rules and professional norms of the legal profession appear to give substantial discretion to counsel over strategic and tactical decisions. But, these ethical rules and professional norms always insist

that counsel fully consult with the defendant on all important
decisions.[33]

    D.   SINCE THE DECISION WHETHER TO FORGO A LESSER INCLUDED
       OFFENSE INSTRUCTION IS AN IMPORTANT DECISION IN A
       CRIMINAL CASE WHICH IS THE FUNCTIONAL EQUIVALENT OF A
       FUNDAMENTAL DECISION AND THIS DECISION COULD ONLY BE
       MADE BY THE PETITIONER AFTER CONSULTATION WITH COUNSEL,
       THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
       UNDER STRICKLAND BECAUSE HER COUNSEL DID NOT PERMIT HER
       TO MAKE THE DECISION OR EVEN CONSULT WITH HER ABOUT THE
       DECISION WHETHER TO UNDERTAKE AN ALL-OR-NOTHING DEFENSE
       AND TO FORGO LESSER INCLUDED OFFENSE INSTRUCTIONS.

Under Massachusetts law, it is now abundantly clear "[w]hen
the evidence permits a finding of a lesser included offense, a
judge must, *upon request*, instruct the jury on the possibility of

---

[33] The most recent attempt at articulating the allocation of
decision-making authority between lawyers and clients is the
American Law Institute's Restatement (Third) of the Law Governing
Lawyers.  In the three sections addressing this issue, the
emphasis in the Restatement is heavily contractual with a
substantial civil litigation orientation.  However, the
Restatement clearly presumes full consultation with the client on
all important decisions in any case.  See Restatement (Third) of
the Law Governing Lawyers §§ 21, 22, 23 (2000).

     Sections 21, 22, and 23 of the Restatement view the
attorney/client relationship essentially as an agency in which
the client retains the broad authority of a principal.  In
Section 21 of the Restatement, the client is allocated virtually
limitless authority to "instruct the lawyer" to do anything
lawful.  Comment (e) to this section indicates that because
lawyers are obligated to consult with clients, clients will
ordinarily have sufficient time to intervene with instructions
regarding important decisions.  Where there is insufficient time,
particularly in situations involving "technical legal and
strategic considerations difficult for the client to assess," in
the absence of a contrary agreement or instructions from the
client, the lawyer is free to make the decisions.

conviction of the lesser crime." Commonwealth v. Woodward, 427
Mass. 659, 662-663 (1998), quoting Commonwealth v. Gould, 413
Mass. 707, 715 (1992)(emphasis added).[34]  The trial judge can act
sua sponte to give a lesser included offense instruction where it
is warranted by the evidence and even over the objections of both
parties.  See Commonwealth v. Berry, 431 Mass. 326, 337-38
(2000).  But, the trial judge is not required to give a lesser
included offense instruction in the absence of a request from
either party.[35]

Pursuing an all-or-nothing strategy is not improper.  This
type of defense is not constitutionally or ethically suspect.[36]

---

[34] The defendant is not entitled to a requested instruction
on a lesser included offense unless there is some evidence on the
element differentiating the greater and the lesser offense, and
that evidence "is sufficiently in dispute so that the jury may
consistently find the defendant innocent of the greater and
guilty of the lesser included offense." Commonwealth v. Berry,
431 Mass. 326, 336-337 (2000), quoting Commonwealth v. Egerton,
396 Mass. 499, 504 (1986).

[35] Lesser included offense instructions were originally
intended at common law as an advantage to the prosecution where
there was a failure of proof with respect to an essential element
of the crime.  When this occurred, the jury might still be
persuaded to convict the defendant of any crime necessarily
included in the offense charged.  In this country, lesser
included offense instructions have come to be regarded as often
beneficial to the defendant because they afford the jury a less
drastic alternative than conviction of the offense charged or an
acquittal.  See Beck v. Alabama, 447 U.S. 625, 633 & n.9 (1980).

[36] The Supreme Court has never held that a defendant is
entitled to a lesser included offense instruction as a matter of
procedural due process.  However, at least in a capital case, the
Constitution will not tolerate the risk of an unwarranted
(Continued on Next Page)

There will inevitably be trials where the defendant may become
sufficiently confident that the Commonwealth has not proven its
case that he may wish to take his chances with the jury on the
charged crime and forgo the lesser included offense
instruction.[37]  The Supreme Judicial Court has already noted that

---

conviction that is created when a jury is deprived of the
opportunity to convict the defendant of a lesser included
offense.  In such a case, a lesser included offense instruction
is a necessary element of a constitutionally fair trial.  The so-
called "third option" of a conviction on a lesser included
offense ensures the defendant receives the full benefit of the
reasonable doubt standard of proof.  Beck v. Alabama, 447 U.S.
625, 633-39 (1980).  See Keeble v. United States, 412 U.S. 205,
208 (1973).

    In Spaziano v. Florida, 468 U.S. 447, 456-57 (1984), the
Court ruled that a defendant is not constitutionally required to
take advantage of an offer to instruct the jury on lesser
included offense instructions in a capital murder case.  In
Spaziano, the trial court informed the defendant that it would
instruct the jury on lesser included offenses if the defendant
agreed to waive the statutes of limitations which had already run
as to those offenses.  The Supreme Court held that the defendant
was not required to waive the statutes of limitations baring
conviction on lesser included offenses in order to provide the
jury with the opportunity to convict him on one of the lesser
included offenses if the defendant knowingly chose to take his
chances on a charge of capital murder alone.  The teaching of
Spaziano is that the defendant is permitted to make strategic
choices regarding procedural safeguards such as lesser included
offense instructions and he will generally be bound by those
decisions.  See also State v. Boeglin, 731 P.2d 943, 946-947
(N.M. 1987)(defendant who waived lesser included offenses
instruction against advice of counsel and after colloquy is bound
by that decision).

    [37] Like many other strategic decisions that must be made in
a criminal trial, there is always the risk that this strategy
could backfire.  But, the defendant may prefer to seek an
acquittal on the charged crime and not a conviction on a lesser
included crime which may be the result of a compromise verdict by

(Continued on Next Page)

the defendant's pursuit of an all-or-nothing strategy does not inherently create a "structural flaw" in the trial.  Where there is no request for a lesser included offense instruction, respecting the defendant's strategic decision to present an all-or-nothing defense to the jury does not constitute error. Commonwealth v. Woodward, 427 Mass. at 663 & nn. 6 & 7, citing Commonwealth v. Roberts, 407 Mass. 731, 737 (1990).[38]

Hence, the defendant alone does not have the absolute right to elect an all-or-nothing strategy.  See Commonwealth v. Chase, 433 Mass. 293, 298 (2001); Commonwealth v. Matos, 36 Mass. App. Ct. 958, 962 (1994).  Yet, from time to time, circumstances will

---

the jury.  See Commonwealth v. Carver, 33 Mass. App. Ct. 378, 387, review denied, 413 Mass. 1108 (1992); Commonwealth v. Yunggebauer, 23 Mass. App. Ct. 46, 52 n.4 (1986).

[38] While the defendant may legitimately pursue this defense, the defendant's strategic choices are irrelevant to the judge's duty to give a lesser included offense instruction.  See Commonwealth v. Chase, 433 Mass. 293, 298 (2001); Commonwealth v. Jackson, 419 Mass. 716, 725 n.8 (1995).  See also Commonwealth v. Pizzotti, 27 Mass. App. Ct. 376, 385 (1989)("A judge need not fall in with a defendant's desire to gamble on the jury's acquitting him of the larger crime if that crime were put to them without the other choice.").

Still, in the absence of a request from either party, "[a] judge has no duty to undercut such a [all or nothing strategy] by giving an instruction which the defendant on appeal would surely argue tempted the jury to a compromise verdict adverse to the defendant."  Commonwealth v. Pagan, 35 Mass. App. Ct. 788, 792 (1994).  See Commonwealth v. Carver, 33 Mass. App. Ct. 378, 387 (1992)("[W]here the defendant as part of his trial strategy failed to request or object to the omission of a charge of involuntary manslaughter, there was no error in the judge's omission of such a charge").

arise where a defendant will be presented with the opportunity to make a tactical decision whether to ask for lesser included offense instructions.  This choice will effectively determine which theories of criminal liability are submitted to the jury. The Petitioner's case was one of those situations.

In virtually every jurisdiction including Massachusetts, the rules allocating the authority to make this decision remain unsettled.[39]  With the absence of controlling federal authority, it is unclear which decision-maker - the defendant or criminal

---

[39] There are a few notable exceptions.  The highest courts of Illinois, New Mexico, and Vermont have ruled it is the defendant's ultimate decision whether to request an instruction on a lesser charge at the conclusion of the evidence.  See People v. Brocksmith, 642 N.E.2d 1230, 1232-1233 (Ill. 1994)(defendant rather than defense counsel had ultimate responsibility for making decision to tender instruction on lesser included offense requiring reversal of conviction where decision was made by counsel alone); In re Trombly, 627 A.2d 855, 856 (Vt. 1993)(once defense counsel consults fully with client about lesser included offenses, defendant to decide whether to seek submission to the jury of those offenses); State v. Boeglin, 731 P.2d 943, 945 (N.M. 1985)(defendant and not defense counsel must decide whether to submit lesser included offenses to jury).

In an analogous situation, the Supreme Court of California held that a defendant (and not counsel) in a capital murder case controls the tactical decision whether to present a diminished capacity defense, the only defense that would permit a jury to find him guilty of a lesser, non-capital offense.  People v. Frierson, 705 P.2d 396, 403 (Cal. 1985).  See also People v. Petrovich, 664 N.E.2d 503, 504 (N.Y. 1996), federal habeas relief denied sub nom. Petrovich v. Leonardo, 229 F.3d 384, 386-387 (2d Cir. 2000)(as between defendant and counsel, defendant controls decision whether to request submission of affirmative defense of extreme emotional disturbance in murder case, which if accepted by jury, would have resulted in conviction on lesser offense).

defense counsel – has the ultimate authority to decide whether to request a lesser included offense instruction.  But, when read together, Jones v. Barnes and Strickland v. Washington unequivocally mandate that the defendant must make all fundamental decisions after consultation with counsel.  And since the decision whether to forgo a lesser included offense instruction is such an important decision – the functional equivalent of a fundamental decision in a criminal case – this decision can only be made by a defendant after consultation with counsel.

     In the Petitioner's case, Counsel did not consult with the Petitioner regarding whether to ask the trial judge to instruct the jury on lesser included offenses.  Exhibit M at 7 (Affidavit of J. Drew Segadelli at ¶ 5); Exhibit M at 4-5 (Affidavit of Petitioner Nancy Netto at ¶ 7, 8, 9, 10, 12).  Counsel did not give the Petitioner the opportunity to make this important decision.  Exhibit M at 7 (Affidavit of J. Drew Segadelli at ¶ 6); Exhibit M at 5 (Affidavit of Nancy Netto at ¶ 11).  He made this decision for her.  Counsel was entirely responsible for the decision to seek an "all-or-nothing verdict" in this case by forgoing any lesser included offense instructions.

     The record is now clear that Counsel alone made the decision to forgo any lesser included offense instructions for the crime of armed robbery, such as unarmed robbery (and the corresponding

instructions for felony-murder predicated upon unarmed robbery)
or even larceny, all potential verdicts which would have been
supported by the evidence introduced at trial.  Making what
amounted to a fundamental decision for the Petitioner without
even consulting with her regarding this decision is ineffective
assistance of counsel under the Strickland standard because,
under the circumstances of this case, the usurpation of this
decision by her Counsel was objectively unreasonable attorney
performance which prejudiced the Petitioner.  See Strickland v.
Washington, 466 U.S. 668, 686-686 (1984)("defendant must show
that counsel's representation fell below an objective standard of
reasonableness" and "the deficient performance prejudiced the
defense").[40]

---

[40] In order to obtain relief under the Strickland standard,
the Defendant must demonstrate prejudice.  This means a defendant
must show "a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different."  466 U.S. at 694.  "A reasonable probability is
a probability sufficient to undermine confidence in the outcome."
Id.  See also Roe v. Flores-Ortega, 528 U.S. 470, 484 (2000)(to
show prejudice from counsel's deficient failure to consult
regarding appeal, defendant must demonstrate reasonable
probability that but for counsel's deficient performance the
defendant would have timely appealed).

Viewed in the light most favorable to the Petitioner, the
Commonwealth's proof that the Petitioner participated in a joint
venture to commit armed robbery (the predicate offense for
felony-murder) was not overwhelming.  Yet, if the Petitioner had
been counseled with respect to potentially available lesser
included offenses, she might very well have intelligently made
the decision to seek jury instructions on the lesser included
offenses of unarmed robbery and larceny.  See Exhibit M at 5-6
(Continued on Next Page)

What happened in this case was not fair and undermined the entire adversarial process.  The difference between risking life in prison *without* the possibility of parole and risking life in prison *with* the possibility of parole is extraordinarily significant to every criminal defendant faced with making a decision with respect to this risk.  The result of the trial was fundamentally unfair or unreliable because, but for Counsel's usurpation of the Petitioner's right to make this important decision regarding how the jury would decide her fate, the jury could have rationally settled on a guilty verdict on the lesser included offense of unarmed robbery (or even larceny) which would have potentially resulted in a dramatically different penal

---

(Affidavit of Nancy Netto at ¶¶ 14, 15, 16).  This would have been a reasonable decision when balanced against the absolutely tremendous disparity in the potential penalties flowing from a conviction on the predicate offense of armed robbery versus a conviction on its lesser included offenses.

If the jury had been instructed on the lesser included offenses for armed robbery, there is a reasonable probability that the result in this case might have been different.  The jury could have easily found against the Commonwealth on the question whether the Defendant was liable on a theory of joint venture for armed robbery or unarmed robbery, an issue disputed in this case. Although the jury could have still returned a verdict of first-degree felony-murder based on the predicate offense of unarmed robbery, the Commonwealth would then have been required to prove beyond a reasonable doubt the additional element that the Petitioner committed the underlying felony with conscious disregard for human life.  See Commonwealth v. Moran, 387 Mass. 644, 651 (1982).  Constitutionally sufficient proof of the Petitioner's culpability on this additional element necessary to permit a conviction for first-degree felony-murder was not exactly a foregone conclusion.

outcome for the Petitioner.  See Lockhart v. Fretwell, 506 U.S.
364, 369 (1993)(to satisfy prejudice prong under Strickland,
defendant must show result of trial was "fundamentally unfair or
unreliable").  See also Kimmelman v. Morrison, 477 U.S. 365, 380
(1986)(right to effective assistance of counsel does not belong
solely to the innocent).  The Petitioner was entitled to a trial
where she alone could decide, with the proper assistance of
counsel, whether or not to ask the trial judge to instruct the
jury on the lesser included offenses for armed robbery and the
corresponding instructions for felony-murder predicated on those
crimes.[41]

---

[41] In Commonwealth v. Donlan, 436 Mass. 329, 334-335 (2002),
the motion judge ruled that the defendant was denied effective
assistance of counsel because the decision "whether or not to
request a lesser included offense instruction is a fundamental
decision which ultimately rests with the defendant, and . . .
failure to consult with the defendant before forgoing such an
instruction in favor of an 'all or nothing' strategy constitutes
ineffective assistance of counsel."  The Supreme Judicial Court
declined to decide whether the decision whether to request a
lesser included offense instruction is a fundamental decision as
to which the defendant has the ultimate authority, finding
instead that the defendant was not entitled to such an
instruction under the circumstances of that case.

E.    SINCE THE DECISION WHETHER TO FORGO A LESSER INCLUDED
      OFFENSE INSTRUCTION IS AN IMPORTANT DECISION IN A
      CRIMINAL CASE, THE PETITIONER RECEIVED INEFFECTIVE
      ASSISTANCE OF COUNSEL UNDER STRICKLAND BECAUSE HER
      COUNSEL DID NOT EVEN CONSULT WITH HER ABOUT THE DECISION
      HE MADE TO UNDERTAKE AN ALL-OR-NOTHING DEFENSE AND TO
      FORGO LESSER INCLUDED OFFENSE INSTRUCTIONS.

     For the purpose of this habeas corpus petition, this Court

need not decide who, as between Counsel or the Petitioner, was

entitled under the Sixth and Fourteenth Amendments to the federal

constitution to make the decision whether to seek or to forgo

lesser included offense instructions.  At the bare minimum,

Strickland requires full consultation with a defendant on such an

important decision in a criminal case and this Court should grant

the Petitioner a writ of habeas corpus because this mandatory

consultation did not happen in the Petitioner's case.  See

Florida v. Nixon, ___ U.S. ___, 125 S. Ct. 551, 560 (2005),

quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)("An

attorney undoubtedly has a duty to consult with the client

regarding "important decisions," including questions of

overarching defense strategy.").  Given that at least in certain

circumstances, a defendant may properly pursue an all-or-nothing

strategy under state law, this Court should recognize that, as a

matter of federal constitutional law, consultation between

counsel and a defendant is absolutely required on whether to

pursue such a powerful and risk-laden defense.

This consultation is mandated under the Sixth and Fourteenth Amendments to the federal constitution because this important decision is so akin to a fundamental decision within the meaning of Jones v. Barnes.  Not only is this decision critically important to a defendant in terms of the potential outcome of the litigation, it is analogous to a plea decision.  If, under Brookhart v. Janis, 384 U.S. 1, 7-8 (1966), counsel has no power to enter a plea for a defendant which is inconsistent with the defendant's expressed desires, counsel certainly cannot decide the crimes upon which the jury may rest its verdict absent consultation with a defendant.  As the commentary to the second edition of ABA Standard 4-5.2 emphasized, the decision regarding lesser included offenses is so strikingly similar to the defendant's fundamental decision about the charges to which to plead that it can be argued that only a defendant can make this kind of decision after consultation with counsel.  Exhibit L at 3.  Counsel who makes such a strategic choice entirely without consultation with a defendant on what is essentially a plea decision cannot be found to have provided effective assistance of counsel under the federal constitution.

As Professor Hazard points out in his treatise, "The more a decision marks a critical turning point in the representation, whether for tactical, strategic, economic, or even political and moral reasons, the more the lawyer should defer to the client."

G.C. Hazard & W.W. Hodes, <u>Law of Lawyering</u> §5.6 at 5-16 (3d ed. 2001).  The judgment call whether to request a lesser included offense instruction is unquestionably the type of decision on which counsel must consult with the client regarding the client's wishes.

In this case, the record is abundantly clear that the Petitioner had no input whatsoever into her Counsel's decision to adopt an all-or-nothing strategy.  Counsel just made the decision for the Petitioner to forgo any lesser included offense instructions without any kind of consultation with her.  This decision was not in an area within the unique competence of defense counsel.  Moreover, given the enormous consequences to the Petitioner – life in prison without the possibility of a parole – Counsel had every reason to at least talk to her about the potential advantages and disadvantages of his decision before gambling on such a high stakes strategy.[42]

The federal constitution will not tolerate the total usurpation of the Petitioner's right to have a voice in this absolutely critical trial decision.  Consultation was required under the Sixth and Fourteenth Amendments' guarantee of effective assistance of counsel.  See <u>Strickland v. Washington</u>, 466 U.S.

---

[42] There is nothing in the record of this case to suggest that the Petitioner would not have entertained a suggestion from her Counsel to request a lesser included offense instruction.

668, 688 (1984)(noting counsel's "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution").  Under the <u>Strickland</u> standard, Counsel's manifest failure to consult with the Petitioner, given the circumstances of this case, on whether to undertake an all-or-nothing defense was conduct which fell below an objective standard of reasonableness.  An "all-or-nothing" defense strategy is a great defense strategy – at least when it works.  But, the Petitioner suggests she was constitutionally entitled to at least full consultation before her lawyer decided to roll the dice on her behalf with *his* high-risk defense strategy.[43]

The breach of the duty of consultation with the Petitioner on this issue falls measurably below all recognized professional norms.  The failure to consult with the Petitioner under the circumstances of this case is deficient performance under Rule 1.2 of the American Bar Association's Model Rules of Professional Conduct, Rule 1.2 of the Massachusetts Rules of Professional Conduct, and Standard 4-5.2 of the American Bar Association Standards for Criminal Justice.  The Committee for Public Counsel

---

[43] This Court may wish to observe that in the <u>Woodward</u> case, the decision by defense counsel to pursue an "all-or-nothing" defense was "personally and publicly approved" by the defendant. <u>Commonwealth v. Woodward</u>, 1997 WL 694119, at *7 (Mass. Super. Nov. 10, 1997).

Services assigned Counsel to represent the Petitioner in this
case and Counsel's failure to consult with the Petitioner on this
important decision violated CPCS's own performance standards.[44]
While these prevailing norms are not always dispositive of
ineffective assistance of counsel claims, they are certainly
appropriate guides to what is viewed by the legal profession as
reasonable attorney performance in a criminal case.  See
Strickland v. Washington, 466 U.S. 668, 688 (1984).

     Of course, when making strategic or tactical decisions, the
degree of required client consultation and participation is
dependent upon the circumstances.  "The constitutional duty to
consult regarding issues on which counsel has the last word
requires only that counsel act reasonably in light of the
circumstance and what is likely to be accomplished by a
consultation."  Government of the Virgin Islands v. Weatherwax,
77 F.3d 1425, 1437 (3d Cir.), cert. denied, 519 U.S. 1020
(1996).[45]  But, in the Petitioner's case, the complete failure to

---

[44] To the extent the American Law Institute's Restatement
(Third) of the Law Governing Lawyers §§ 21, 22, 23 are viewed as
establishing standards of professional conduct, the failure of
counsel to consult with the Petitioner under the circumstances of
this case would also be deficient performance under those
standards.  See supra n.33.

[45] In Weatherwax, the Third Circuit explained that the
constitutional duty of counsel to consult with the criminal
defendant serves four important purposes even in cases where
counsel arguably has the final word on a particular strategic or
tactical decision.  First, consultation ensures that the
(Continued on Next Page)

consult with the Petitioner on whether she wished to pursue an

all-or-nothing strategy and forgo lesser included offense

instructions must be regarded as unreasonable attorney

performance within the meaning of <u>Strickland</u>.[46]    Other than the

Petitioner's fundamental decisions on how to plead, whether to

request a jury trial, and whether to testify at her trial, given

---

defendant will have the opportunity to assist in his own defense.
This is important because the defendant may indeed have superior
knowledge of the facts and circumstances of his own case.
Second, counsel is obligated to take into account the defendant's
thinking regarding the conduct of the litigation.    The views and
desires of the defendant may not be known to counsel in the
absence of consultation.    Third, a cooperative relationship
between counsel and the criminal defendant is promoted and
maintained through consultation.    And fourth, through
consultation, the defendant may learn that counsel is pursuing a
strategy that is inconsistent with the defendant's wishes.    As a
result of consultation, the defendant will then have the
opportunity to seek new counsel if the defendant deems the
disagreement over strategy or tactics significant.    77 F.3d at
1436-37.

[46] This lack of consultation may be more appropriately
characterized as outrageous attorney performance.    The
possibility of requesting lesser included offense instructions
for armed robbery did not require great legal foresight.    Counsel
could have (and competent counsel would have) identified this as
a significant issue in the case prior to trial or even as the
evidence came in during the trial.    Counsel could have discussed
the issue with the Petitioner well before the trial or at least
during the course of the trial and before the charge conference.
If necessary, counsel could have always requested a short recess
in order to properly address this matter with the Petitioner.

This was not the type of strategic or tactical decision that
had to be made during the heat of battle at the trial.    More than
ample opportunity for purposeful consultation with the Petitioner
existed.    Given the extraordinary impact of the selected strategy
on the potential outcome of the case, there was much to be gained
from consultation with the Petitioner.

the state of the evidence, the decision whether to request lesser included offense instructions for armed robbery was perhaps the single most important decision that had to be made in this case. Counsel had the utmost obligation to at least broach this subject with the Petitioner before he made this critical decision for her. Even if Counsel's unilateral decision was reasonable, under these circumstances, the failure to even minimally consult with the Petitioner was still deficient performance in the constitutional sense.

In the final analysis, this deficient attorney performance prejudiced the defense so as to deprive the Petitioner of a fair trial.[47]  As a practical matter, Counsel's conduct so undermined the proper functioning of the adversarial process in this case that the Petitioner's trial cannot be relied on as having produced a just result.  See Kimmelman v. Morrison, 477 U.S. 365, 374 (1986)("The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").  Under these circumstances, the granting of a writ of habeas corpus by this Court is the appropriate relief in this case.

---

[47] See supra n.40.

III.   THE COMMONWEALTH VIOLATED THE PETITIONER'S FEDERAL
       CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO THE DUE
       PROCESS OF LAW BECAUSE THE COMMONWEALTH UTILIZED
       OUTRAGEOUSLY FLAWED FINGERPRINT EVIDENCE TO OBTAIN ITS
       CONVICTION IN THIS CASE.

Trooper Richard Lauria, the Commonwealth's fingerprint expert, told the jury, without objection of any kind from the Petitioner's Counsel, that the fingerprint of the Petitioner found in the victim's apartment was "fairly fresh" and the oldest it could have been was three to four days old.  Tr. III/85-88. The Commonwealth relied on this evidence to place the Petitioner at the scene of the crime at the time of the crime.  Tr. V/82-83.[48]

This "fresh fingerprint" testimony was nothing less than voodoo science.[49]  As nationally recognized fingerprint expert

---

[48] The Commonwealth's "fresh fingerprint" evidence went to the heart of the Commonwealth's case.  In its opinion, the Supreme Judicial Court noted:

As to her presence at the scene, the Commonwealth introduced evidence that her fingerprint was on the bathroom door handle in Levesque's apartment, that it was a "fairly fresh" print, and that Nancy Netto had not been allowed into the apartment for one week prior to the crime.  In combination, that evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove that Nancy Netto had been in Levesque's apartment at the time of the crime.

Commonwealth v. Netto, 438 Mass. 686, 701-702 (2003).

[49] Judge Hely was obviously skeptical whether the Commonwealth's expert could ever legitimately answer the Prosecutor's question, "When is your best estimate as to when that print was left there?"  Judge Hely interrupted the re-direct
(Continued on Next Page)

Kenneth R. Moses stated in his affidavit submitted by the Petitioner in support of her motion for new trial, the Commonwealth expert's testimony regarding the "freshness" of the Petitioner's fingerprint expresses an opinion that is not shared by other fingerprint experts and is contrary to empirical experience and testing.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 9).

Wide variations exist in the ability of a latent print to survive even under harsh conditions and, as a result, development of a latent fingerprint at a crime scene is no guarantee of its having been recently placed.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 10).  Furthermore, no reliable indication of a print's freshness can be obtained from its rate of development or appearance after it is developed.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 11).  And most importantly for the purpose of this motion for new trial, Mr. Moses warns that the estimation of the age of a latent print is fraught with danger and may result in a wrongful conviction.  Exhibit M at 9 (Affidavit of Kenneth R. Moses at ¶ 12).[50]

---

examination and asked, "Is that something you're able to do?" and "Is that something you're able to answer?"  Tr. III/86-87.

[50] This would not be the first time in Massachusetts that fingerprint testimony resulted in a wrongful conviction.  In the Suffolk Superior Court, DNA evidence was utilized in a post-appeal motion for new trial to demonstrate beyond all doubt that the defendant could not have been the perpetrator of the crimes

(Continued on Next Page)

The Commonwealth's presentation of this outrageously flawed forensic evidence undoubtedly made a difference in the jury's conclusion.[51]   The Commonwealth's use of this purported "expert testimony" deprived the Petitioner of her rights to a fair trial and to the due process of law guaranteed by the Sixth Amendment and the Fourteenth Amendment to the federal constitution.   See Strickland v. Washington, 466 U.S. 668, 684-85 (1984).

---

for which he was convicted.   Commonwealth v. Cowans, SUCR1997-11231.   Faced with overwhelming and irrefutable scientific evidence, the Commonwealth finally went back and reexamined its fingerprint evidence and was forced to concede to Judge Peter Lauriat that its fingerprint identification was simply wrong. See David Weber & Kevin Rothstein, Man freed after 6 years: Evidence was flawed, Boston Herald 1 & 4 (Jan. 24, 2004).

[51] The Commonwealth did not miss the opportunity to highlight this flawed forensic evidence for the jury in its closing argument:

> Now, Mr. Segadelli is right.  Dick Lauria said that in the right condition, it could stay forever, It could stay right here for 115 years if no one touched it.  But he also told you that in a worst case scenario, that was there three or four days; and more than likely just several hours old.  He told you that because he said, When I put my chemicals down, it responded so quickly, that was a fresh print.

Tr. V/81-82.  Even worst, compounding the prejudice to the Petitioner, the Commonwealth also misstated its fingerprint expert's testimony.  Trooper Lauria never testified the fingerprint was "more than likely just several hours old."  Tr. III/87-88.

IV.    THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF
       COUNSEL UNDER STRICKLAND BECAUSE COUNSEL DID NOT
       ADEQUATELY CHALLENGE THE COMMONWEALTH'S OUTRAGEOUSLY
       FLAWED FINGERPRINT EVIDENCE.

The Commonwealth's "fresh fingerprint" testimony went
virtually unchallenged by the defense.  The Petitioner's Counsel
did not retain a fingerprint expert to assist him in the
preparation and presentation of this case.  Exhibit M at 7
(Affidavit of J. Drew Segadelli at ¶ 4).  As Kenneth Moses'
affidavit amply demonstrates, expert testimony relating even to
the mere suggestion of any forensic value of fingerprint
"freshness" would have been very helpful to the Petitioner's
case.

The Petitioner's "fresh fingerprint" was the literally the
only evidence which placed the Petitioner at the scene of the
crime.  From the Petitioner's perspective, it was the most
important – and the most damaging – evidence in her entire case.
If Attorney Segadelli had presented the testimony of a qualified
forensic expert, the Commonwealth's "fresh fingerprint" evidence
could have been easily attacked thereby severely undermining the
theory upon which the Commonwealth presented its entire case.

The prejudice to the Petitioner flowing from the
Commonwealth's use of this testimony was enormous.  To the extent
the Petitioner's Counsel did not do anything to challenge the
"fresh fingerprint" testimony as being premised on flawed
forensics, the Petitioner was denied the effective assistance of

counsel under the Sixth and Fourteenth Amendments to the federal constitution. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686-687 (1984).

<u>Conclusion</u>

For all the foregoing reasons, the petition for a writ of habeas corpus in this case should be granted.

NANCY NETTO
By her Attorney


/s/ Stephen Paul Maidman
_____
STEPHEN PAUL MAIDMAN, ESQUIRE
1145 Main Street, Suite 417
Springfield, Massachusetts  01103
(413) 731-7300 (Voice & Fax)
maidman@prodigy.net
BBO #631882

## List of Accompanying Exhibits

A. Docket Sheets from the Bristol County Superior Court

B. Docket Sheets from the Supreme Judicial Court

C. Excerpt of Transcript relating to Charge Conference on Lesser Include Offense Instructions

D. Defendant's Motion Pursuant to Rule 25(b)(2) and Rule 30(b)

E. Defendant's Memorandum in Support of her Motion Pursuant to Rule 25(b)(2) and Rule 30(b)

F. Transcript of Hearing on Defendant's Motion Pursuant to Rule 25(b)(2) and Rule 30(b)

G. Excerpt of Defendant's Appellate Brief on Direct Appeal (Section Designated "Issues Presented")

H. ABA Model Rules of Professional Conduct Rule 1.2 (1999) and Rule 1.4 (1999)

I. ABA Model Rules of Professional Conduct Rule 1.2 and Rule 1.4

J. Massachusetts Rules of Professional Conduct Rule 1.2 and Rule 1.4

K. ABA Standards for Criminal Justice, Standard 4-5.2, Control and Direction of the Case (3d ed. 1993)

L. ABA Standards for Criminal Justice, Standard 4-5.2, Control and Direction of the Case (2d ed. 1980)

M. Defendant's Motion for New Trial and Affidavits of Nancy Netto, J. Drew Segadelli, and Kenneth R. Moses (copies from Counsel's file)

N. Defendant's Motion for Funds for Fingerprint Expert and Affidavit of Counsel (copies from Counsel's file)

O. Memorandum of Decision and Order on Motion for New Trial (copy from Counsel's file)

P. Petition for Leave to Appeal

Q. Memorandum of Decision on Petition for Leave to Appeal (copy from Counsel's file)

**Commonwealth of Massachusetts**
2SC 241

BRISTOL ss.
Superior Court for
Criminal Business
DOCKET

**COMMONWEALTH vs.**   NANCY J. NETTO

No. 33618

| FOR COMMONWEALTH | FOR DEFENDANT | |
|---|---|---|
| John Stapleton, Asst. District Attorney | Edwrad Whittemore, Esq<br>3291 Main Street<br>Barnstable, Mass.<br>362-7600 | J. Drew Segadelli, Esq.<br>Fagan & Goldrick, P.C.<br> 536 Main St.<br>Falmouth, MA 02540<br>(508) 540-6900 |

URDER    265/1

| | | | DIST. CT. |
|---|---|---|---|
| ec. 1, 1993 | 1) | Entered | |
| ec. 1, 1993 | | Notice Ordered to be given to the Deft. that said indictment will be entered forthwith upon the docket of this Court. (Steele, J.) PRA | |
| ec. 1, 1993 | | Attested copy of indictment given to sheriff for service on the Deft. | |
| ec. 1, 1993 | | Notice to the Chief Justice and Attorney General with attested copy of Indictment as required by G.L. (ter. Ed.) 212, Section 7. | |
| ec. 8, 1993 | | Certification by Sheriff of Service of Attested copy of indictment on Deft.    ta | |
| ec. 8, 1993 | 2) | Notice of Appearance of Edward Whittemore, Atty. for the Deft.    ta | |
| ɔc. 8, 1993 | | Pleads not Guilty. PRA    ta | |
| ɔc. 8, 1993 | | Deft. Ordered to recognize in the amount $100,000. Cash without prejudice and committed failing to recognize. (Steele, J.) PRA    ta | |
| ɔc. 8, 1993 | 3) | Mittimus Issued.    ta | |
| c 13, 1993 | | MIttimus #3 returned with service.  cf | |
| ar. 22-94 | 4) | Habeas Corpus ordered and issued for the appearance of the deft. at New Bedford Superior Court on Friday, March 25, 1994 at 9:30 A.M. (Steele,J.) MWG    1ml | |
| ar. 29-94 | | Habeas Corpus #4 returned with service. | |
| ɪv. 22, 1994 | 5) | Habeas Corpus ordered and issued for the appearance of the deft at the New Bedford Superior Court on Friday, November 25, 1994 at 9:30 a.m.    nm | |

Exhibit A-1

| | | |
|---|---|---|
| Dec. 2, 1994 | 6) | Deft's Motion for names and the address of the Commonwealth's witnesses. |
| Dec. 2, 1994 | 7) | Deft's Motion for rewards, promises and inducments.  nm |
| Dec. 2, 1994 | 8) | Deft's Motion to preserve the evidence.  nm |
| Dec. 2, 1994 | 9) | Deft's Motion to inventory the evidence.  nm] |
| Dec. 2, 1994 | 10) | Deft's Motion to inspect the evidence.  nm |
| Dec. 2, 1994 | 11) | Deft's Motion for exculpatory evidence.  nm |
| Dec. 2, 1994 | 12) | Deft's Motion for production of statements of the deft.  nm |
| Dec. 2, 1994 | 13) | Deft's Motion for production of list of Commonwealth's experts.  nm |
| Dec. 2, 1994 | 14) | Deft's Motion for statements of Commonwealth's witnesses.  nm |
| Dec. 2, 1994 | 15) | Deft's Motion for probation records of Commonwealth witnesses.  nm |
| Dec. 8, 1994 | 16) | Habeas Corpus ordered and issued for the appearance of the Deft. at New Bedford Superior Court on Tuesday, January 17, 1995 at 9:30 A.M. (Steele,J.) PRA    lmc |
| Jan. 17, 1995 | | Habeas Corpus (#16) returned without service.    lmc |
| June 5, 1995 | 17) | Deft's motion to Suppress. – kan |
| June 6, 1995 | 18) | Habeas corpus ordered and issued for the appearance of the deft at New Bedford Superior Court on Monday, June 19, 1995 at 9:30 a.m.    hlm |
| June 20, 1995 | | Habeas Corpus #18 returned without service. – kan |
| Feb. 26, 1996 | 19) | Motion of Edward E. Whittemore, Attorney for the deft to Withdraw as Counsel  hlm |
| Feb. 27, 1996 | 20) | Habeas Corpus ordered and issued for the appearance of the deft at Taunton Superior Court on Tuesday, March 12, 1996 at 9:30 a.m.  hlm |
| Feb. 29, 1996 | 21) | Notice of Appearance of J. Drew Segadelli, Attorney for the deft.  hlm |
| Mar. 7, 1996 | 22) | Assignment of Drew Segadelli, Attorney for the deft.  hlm |
| Mar. 11, 1996 | | Motion #19 to Withdraw as Counsel for the Deft., Allowed. (Hely, J.) PRA/hlm |
| Mar. 11, 1996 | | Deft's Motion to Suppress #17, motion Denied on the record. (Hely, J.) PRA/hlm |

Exhibit A-2

𝕮𝖔𝖒𝖒𝖔𝖓𝖜𝖊𝖆𝖑𝖙𝖍
𝖔𝖋
𝕸𝖆𝖘𝖘𝖆𝖈𝖍𝖚𝖘𝖊𝖙𝖙𝖘
25C 241

BRISTOL ss.
Superior Court for
Criminal Business
DOCKET

page 2

NO. 33618

COMMONWEALTH vs.    NANCY J. NETTO

| FOR COMMONWEALTH | FOR DEFENDANT |
|---|---|
| | FOR APPEAL |
| | C1676755-3 |
| | Stephen Rappaport |
| | 171 Milk Street, Suite 400 |
| | Boston, MA   02109 |
| | 617-542-7150 |

DIST. CT.

| | | |
|---|---|---|
| Mar. 11, 1996 | 23. | Deft's Motion in Limine to Hold hte Deft Nancy Netto in a Different Area of the Courthouse Facility than Joseph Netto.  hlm |
| Mar. 11, 1996 | 24. | Defendant's Motion in Limine to Exclude Statements of Robert Levesque (Victim)  hlm |
| Mar. 11, 1996 | 25. | Defendant's Motion in Limine to Preclude the Commonwealth from Introducing into Evidence or Showing the Jury Photographs and Video of Robert Levesque (Victim.  hlm |
| Mar. 11, 1996 | 26. | Defendant's Motion in Limine for Sequestration of Witnesses  hlm |
| Mar. 11, 1996 | 27) | Defendant's Request for Jury Questions  hlm |
| Mar. 12, 1996 | | Defendant's Motion #23 in Limine, the defendants will be kept in separate cells when court is not in session. (Hely, J.) PRA/hlm |
| Mar. 15, 1996 | 28) | Defendant's Requested Statement of Law to be Read to the Jury  hlm |
| Mar. 15, 1996 | 29. | Defendant's Request for Jury Instructions  hlm |
| Mar. 15, 1996 | 30. | Defendant's Motion for Required Finding of Not Guilty as to the Charge of First Degree Murder, after the close of Commonwealth's Case, Denied. (Hely, J.) PRA/hlm |
| Mar. 19, 1996 | 31. | List of Exhibits  hlm |
| Mar. 19, 1996 | 32. | VERDICT GUILTY of Murder in the First Degree.  PRA/hlm |
| Mar. 19, 1996 | | Sentenced to Massachusetts Correctional Institution, Cedar Junction for and during the term of her Natural Life; Deft. advised of his right to appeal the judgment and sentence of the Court within thirty (30) days from the date thereof under MRAP Rule 4b; Deft. ordered to pay $50.00 to the **Victim Witness Assistance Fund**; the Court on imposing said sentence ordered that the defendant be deemed to have served - 848 - days of said sentence. (Hely, J.) PRA/hlm |

Exhibit A-3

| Mar. 19, 1996 | 33. | Warrant Issued; Superintendent commanded to withdraw first fifty ($50.00) dollars from defendants savings or personal account to pay to Court the Victim Witness Assessment. |
| Mar. 20, 1996 | 34. | Order for transcript of trial and sentencing on or about March 12, 1996 mailed to Yvette Perry, Court Reporter.  hlm |
| Mar. 20, 1996 | 35. | Order for transcript on trial and or sentencing on March 18, 1996 and March 19, 1996 mailed to Dan Horgan, Court Reporter.  hlm |
| Mar. 22, 1996 | 36. | Defendant's Motion to revise and Revoke.  hlm |
| Mar. 22, 1996 | 37. | Defendant's Notice of Appeal  hlm |
| Mar. 22, 1996 | 38. | Motion fo Drew Segadelli to Withdraw as Counsel for the defendant.  hlm |
| Mar. 22, 1996 | 39. | Motion to Assign Counsel on Appeal through Committee for Public Counsel Services.  hlm |
| Mar. 22, 1996 | 40. | Defendant's Motion Pursuant to MRCP 25(b)(2) and 30(b) and Memorandum of Law.  hlm |
| Mar. 25, 1996 | 41. | Habeas Corpus ordered and issued for the appearance of the deft. at Taunton Superior Court on Wednesday, May 1, 1996 at 9:00 a.m.  hlm |
| Apr. 12, 1996 | | Victim Witness Assessment Fee in the amount of $50.00 paid.  hlm |
| May 3, 1996 | | Deft's Motion #40 after hearing, Denied. (Hely, J.) PRA/hlm (copies to counsel & A.D.A.) |
| May 3, 1996 | | Deft's Motion #36 to Revise and Revoke, Denied. (Hely, J.) PRA/hlm |
| May 3, 1996 | | Motion #38 to Withdraw as Counsel, Allowed. (Hely, J.) PRA/hlm |
| May 3, 1996 | | Motion #39 to Assign Counsel on Appeal, Allowed. (Hely, J.) PRA/hlm |
| May 3, 1996 | | Letter sent to Committee for Public Counsel Services in Boston to Appoint Counsel for Deft. on his Appeal.  PRA/hlm |
| May 8,1996 | 42. | Assignment of Stephen Rappaport Attorney for the Deft. (CPCS) PFL/dla |
| May 23,1996 | 43. | Notice of Appearance of Steven J. Rappaport, Attorney for the Deft. (dla) |
| July 10 ,1996 | 44. | Original typed transcript of trial onMarch 18, 1996 submitted by Daniel E. Horgan, Official Court Reporter. (dla) |
| Dec. 18, 1996 | 45. | Order for transcript on Motion to Suppress heard on or about Mrch 11, 1996 mailed to Yvette Perry, Court Reporter.  hlm |

Exhibit A-4

Commonwealth
of
Massachusetts
2SC 241

BRISTOL SS.
Superior Court for
Criminal Business
DOCKET

PAGE  3

NO. 33618

## COMMONWEALTH vs.    NANCY J. NETTO

| For Commonwealth | For Defendant |
|---|---|

DIST. CT.

| | | |
|---|---|---|
| April 13,1998 | 46) A-D | Original typed transcript of trial on March 12, 13, 14, and 15 1996 submitted by Yvette J. Perry, Official Court Reporter. (dla) עס l - ٤ |
| ept. 30, 1998 | 47) | Certification of Delivery of Trial and Sentencing Transcripts by mailing (certified mail), to Stephen Rappaport, Ellie Cypher, A.D.A. and Appellate Counsel. vld |
| ept. 30, 1998 | 48) | Statement of the case.  vld |
| ept. 30, 1998 | 49) | Statement of the case.  vld |
| ept. 30, 1998 | 50) | Notice of Assembly of Record on Appeal. vld |
| ept. 30, 1998 | | Submitted to the Appeals Court. vld |
| 2/14/2003 | 51. | Entry from the SJC: The armed robbery conviction as to Nancy Netto is vacated as duplicative, the remaining convictions as to both defendants are affirmed, and relief pursuant to G.L. c. 278, §33E, is declined. (Marshall, C.J., Greaney, Cowin, Sosman & Cordy, JJ) dga |

Exhibit A-5

Exhibit A-6

## Commonwealth of Massachusetts
## SUPERIOR COURT
## Case Summary
## Criminal Docket

### Commonwealth v Netto, Nancy J

Details for Docket: BRCR1993-33618

#### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | BRCR1993-33618 | **Caption:** | Commonwealth v Netto, Nancy |
| **Entry Date:** | 12/01/1993 | **Case Status:** | Crim 1 Ctrm 1 -upper (New Bedford) |
| **Status Date:** | 03/21/2005 | **Session:** | Disposed (appeal denied) |
| **Lead Case:** | NA | **Deadline Status:** | |
| **Trial Deadline:** | | **Jury Trial:** | NO |

### Parties Involved

3 Parties Involved in Docket: BRCR1993-33618

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Netto | **First Name:** | Nancy J |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Other interested party |
| **Last Name:** | file copy | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Commonwealth | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

### Attorneys Involved

2 Attorneys Involved for Docket: BRCR1993-33618

| | | |
|---|---|---|
| **Attorney** | **Firm Name:** | BRIS01 |

**Involved:**

| | | | |
|---|---|---|---|
| **Last Name:** | Sullivan-Puccini | **First Name:** | Sharon L |
| **Address:** | 888 Purchase Street | **Address:** | PO Box 973 |
| **City:** | New Bedford | **State:** | MA |
| **Zip Code:** | 02740 | **Zip Ext:** | |
| **Telephone:** | 508-997-0711 | **Tel Ext:** | |
| **Fascimile:** | 508-997-0396 | **Representing:** | Commonwealth, (Plaintiff) |

**Attorney Involved:**

| | | | |
|---|---|---|---|
| | | **Firm Name:** | |
| **Last Name:** | Maidman | **First Name:** | Stephen Paul |
| **Address:** | 1145 Main Street | **Address:** | Suite 417 |
| **City:** | Springfield | **State:** | MA |
| **Zip Code:** | 01103 | **Zip Ext:** | |
| **Telephone:** | 413-731-7300 | **Tel Ext:** | |
| **Fascimile:** | 413-731-7300 | **Representing:** | Netto, Nancy J (Defendant) |

## Calendar Events

No Calendar Events found for Docket: BRCR1993-33618.

There are currently no calendar events associated with this case.

## Full Docket Entries

28 Docket Entries for Docket: BRCR1993-33618

| Entry Date: | Paper No: | Docket Entry: |
|---|---|---|
| 12/01/1993 | 1 | Indictment returned |
| 03/19/1996 | | Status at conversion to computer November 10, 2000 (see docket book |
| 03/19/1996 | | for other entries) |
| 07/21/2003 | 52 | Appointment of Counsel Stephen Paul Maidman |
| 09/29/2003 | 53 | Appearance of Deft's Atty: Stephen Paul Maidman |
| 04/13/2004 | 54 | Defendant's motion for new trial; Memorandum of Law in support; |
| 04/13/2004 | 54 | Affidavit of Nancy Netto; Affidavit of Attorney J. Drew Segadelli; |
| 04/13/2004 | 54 | Affidavit of Kenneth R. Moses (sent to Hely, J) |
| 04/13/2004 | 55 | Motion by Deft: for funds for fingerprint expert; Affidavit of counsel |
| 07/01/2004 | 56 | Commonwealth files memorandum of law in opposition to defendant's |
| 07/01/2004 | 56 | motion for new trial |
| 07/01/2004 | 57 | Commonwealth files opposition to defendant's motion for funds for |
| 07/01/2004 | 57 | fingerprint expert |
| 08/11/2004 | | Motion (P#55) denied (Charles J. Hely, Justice). Copies mailed August |
| 08/11/2004 | | 16, 2004 |
| 08/11/2004 | 58 | MEMORANDUM OF DECISION & ORDER ON MOTION FOR NEW TRIAL: The motion |
| 08/11/2004 | 58 | for new trial is denied August 11, 2004, Charles J. Hely ,j. Copies |
| 08/11/2004 | 58 | mailed August 16, 2004 |

| 08/14/2004 | | Exhibits returned to D.A.'s office |
| 09/08/2004 | 59 | NOTICE of APPEAL FILED by Nancy J Netto (re: denial of motion for new |
| 09/08/2004 | 59 | trial) |
| 09/17/2004 | 60 | Transcript of hearing testimony from May 1, 1996 received volumes # 1 |
| 09/17/2004 | 60 | from court reporter, Regina M. Griffin. |
| 01/28/2005 | 61 | SJC's Notice of Address Change |
| 03/21/2005 | 62 | Notice of Docket Entry dated 3/18/05 received from the Supreme |
| 03/21/2005 | 62 | Judicial Court: Memorandum of Decision and Judgment: It is ORDERED |
| 03/21/2005 | 62 | and ADJUDGED that the petition pursuant to G.L. c. 278, s. 33E, be, |
| 03/21/2005 | 62 | and the same hereby is, DENIED. |

## Charges

1 Charges for Docket: BRCR1993-33618

| No. | Charge Description: | Indictment: | Status: |
|-----|---------------------|-------------|---------|
| 1 | MURDER c265 s1 | | Guilty verdict |

© Copyright, Massachusetts Administrative Office of the Trial Court, 2000 - 2001.

No. 33619

**Commonwealth of Massachusetts**
2SC 241

BRISTOL SS.
**Superior Court for Criminal Business**
**DOCKET**

**COMMONWEALTH** vs.    NANCY J. NETTO

| FOR COMMONWEALTH | FOR DEFENDANT | |
|---|---|---|
| John Stapleton, Asst. District Attorney | Edward Whittemore, Esq<br>3291 Main Street<br>Barnstable, Mass.<br>362-7600 | J. Drew Segadelli, Esq.<br>536 Main St.<br>Falmouth, MA 02540 |

ARMED ROBBERY      265/17

DIST. CT.

| Dec 1, 1993 | 1) | Entered. |
|---|---|---|
| Dec. 8, 1993 | | Notice of Appearance of Edward Whittemore, Atty. for the Deft. (Vide 33618, #2)    ta |
| Dec. 8, 1993 | | Pleads not Guilty. PRA    ta |
| Dec. 8, 1993 | | Deft. Ordered and Recognized in the amount of $100. pers. for appearance etc. (Steele, J.) PRA    ta |
| Dec. 2, 1994 | | Deft's Motion for Names and Address of the Commonwealth's Witnesses (vide 33618 #6) |
| Dec. 2, 1994 | | Deft's Motion for Rewards, Promises and Inducements (vide 33618 #7) |
| Dec. 2, 1994 | | Deft's Motion to Preserve the Evidence. (vide 33618 #8) |
| Dec. 2, 1994 | | Deft's Motion to Inventory the Evidence. (vide 33618 #9) |
| Dec. 2, 1994 | | Deft's Motion to Inspect the Evidence. (vide 33618 #10) |
| Dec. 2, 1994 | | Deft's Motion for Exculpatory evidence. (vide 33618 #11) |
| Dec. 2, 1994 | | Deft's Motion for Production of Statements of the deft. (vide 33618 #12) |
| Dec. 2, 1994 | | Deft's Motion for Production of List of Commonwealth's Experts (vide 33618 #13) |
| Dec. 2, 1994 | | Deft's Motion for Statements of Commonwealth's Witnesses. vide 33618 #14) |
| Dec. 2, 1994 | | Deft's Motion for Probation Records of Commonwealth Witnesses. (vide 33618 #15) |
| June 5, 1995 | | Defendant's Motion to Suppress (vide 33618 #17) |

Exhibit A-9

| | |
|---|---|
| Feb. 26, 1996 | Motion of Edward E. Whittemore, Attorney for the deft to Withdraw as Counsel. (vide 33618 #19) |
| Feb. 29, 1996 | Notice of Appearance of J. Drew Segadelli, Attorney for the deft. (vide 33618 #21) |
| Mar. 7, 1996 | Assignment of Drew Segadelli, Attorney for the deft. (vide 33618 #22) |
| Mar. 11,1996 | Motion #19 to Withdraw as Counsel for the deft., Allowed. (Hely, J.) (vide 33618 ) |
| Mar. 11, 1996 | Deft's Motion to Suppress #17 motion Denied on the record. (Hely, J.) (vide 33618) |
| Mar. 11, 1996 | Deft's Motion in Limine to Hold the deft. Nancy Netto in a Different Area of the Courthouse Facility than Joseph Netto. (vide 33618 #23) |
| Mar. 11, 1996 | Defendant's Motion in Limine to exclude Statements of Robert Levesque (Victim) (vide 33618 #24)) |
| Mar. 11, 1996 | Deft's Motion in Limine to Preclude the Commonwealth from Introducing into Evidence or Showing the Jury Photographs and Video of Robert Levesque (Victim) (vide #33618 #25) |
| Mar. 11, 1996 | Deft's Motion in Limine for Sequestration of Witnesses (vide 33618 #26) |
| Mar. 11, 1996 | Deft's Request for Jury Questions (vide 33618 #27) |
| Mar. 12, 1996 | Deft's Motion #23 in Limine, the defendants will be kept in separate cells when court is not in session. (Hely, J.) (vide 33618) |
| Mar. 15, 1996 | Defendant's Requested Statement of Law to be Read to the Jury (vide 33618 #28) |
| Mar. 15,1996 | Defendant's Request for Jury Instructions (vide 33618 #29) |
| Mar. 19, 1996 | List of Exhibits (vide 33618 #31) |
| Mar. 19, 1996 | VERDICT GUILTY of Armed Robbery. (vide 33618 #32) |
| Mar. 19, 1996 | Sentenced to Massachusetts Correctional Institution, Cedar Junction for the term of not more than ten (10 years nor less than nine (9) years; to be served concurrently with sentence this day imposed in #33618; to be served at MCI Framingham; Deft. advised of his right to appeal to the Appellate Division of the Superior Court for a revie of sentence; Deft. advised of his right to appeal the judgment and sentence of the Court within thirty (30) days from the date thereof under MRAP Rule 4b; the Court on imposing said sentence ordered that the defendant be deemed to have served - 848 - days of said sentence. (Hely, J.) |
| Mar. 19, 1996 | 2. Warrant Issued. |

Exhibit A-10

Commonwealth
of
Massachusetts
2SC 241

BRISTOL SS.
**Superior Court for
Criminal Business
DOCKET**

Page 2

**NO.**    33619

**COMMONWEALTH** vs.    NANCY J. NETTO

| FOR COMMONWEALTH | FOR DEFENDANT |
|---|---|
| | **FOR APPEAL**<br><br>C1676755-3<br>Stephen Rappaport<br>171 Milk Street, Suite 400<br>Boston, MA    02109<br>617-542-7150 |

| | | |
|---|---|---|
| mar. 20, 1996 | Order for transcript of trial and sentencing on or about March 12, 1996 mailed to Yvette Perry, Court Reporter. (vide 33618 #34) | DIST. CT. |
| mar. 20, 1996 | Order for transcript on trial and or sentencing on March 18, 1996 and March 19, 1996 mailed to Dan Horgan, Court Reporter. (vide #33618 #35) | |
| Mar. 22, 1996 | Defendant's Motion to Revise and Revoke. (vide #33618 #36) | |
| Mar. 22, 1996 | Defendant's Notice of Appeal. (vide #33618 #37) | |
| Mar. 22, 1996 | Motion of Drew Segadelli to Withdraw as Counsel for the deft. (vide #33618 #38) | |
| Mar. 22, 1996 | Motion to Assign Coujsnel on Appeal through Committee for Public Counsel Services (vide #33618 #39) | |
| Mar. 22, 1996 | Deft's Motion Pursuant to MRCP 25(b)(2) and 30(b) and Memorandum of Law. (vide 333618 #40) | Exhibit A-11 |
| May 3, 1996 | Deft's Motion #40, Denied after hearing. (Hely, J.) PRA/hlm (vide #33618) | |
| May 3, 1996 | Deft's Motion #36 to Revise and Revoke, Denied. (Hely, J.) (vide #33618) | |
| May 3, 1996 | Deft's Motion #38 to Withdraw as Ciunsel, Allowed. (Hely, J.) (vide #33618) | |
| May 3, 1996 | Motion #39 to Assign Counsel on Appeal, Allowed. (Hely, J.) (vide #33618) | |
| May 3, 1996 | Letter sent to Committee for Public Counsel Services in Boston to Appoint Counsel for deft. on his Appeal. (vide #3618) | |
| May 8,1996 | Assignment of Stephen Rappaport Attorney for the Deft. (CPCS) PFL/dla (vide 33618 #42) | |

| | |
|---|---|
| May 23,1996 | Notice of Appearance of Steven J. Rappaport, Attorney for the Deft. (dla) (vide 33618 #43) |
| July 10, 1996 | Original typed transcript of trial on March 18, 1996 submitted by Daniel E. Horgan, Official Court Reporter (dla) (vide 33618 #44) |
| Dec. 18, 1996 | Order for transcript on Motion to Suppress heard on or about March 11, 1996 mailed to Yvette Perry Court Reporter. (vide 33618 #45) |
| April 13,1998 | Original typed transcript of trial on March 12, 13, 14, and 15 1996 submitted by Yvette J. Perry, Official Court Reporter. (dla) (vide 33618 #46 A-D) vol 1-4 |
| Sept. 30, 1998 | Certification of Delivery of Trial and sentencing Transcripts by mailing (certified mail) to Stephen Rappaport, Ellie Cypher, A.D.A. and Appellate Counsel. vld (Vide 33618 #47) |
| Sept. 30, 1998 | Statement of the case. vld (Vide 33618 #48) |
| Sept. 30, 1998 | Statement of the case. vld (Vide 33618 #49) |
| Sept. 30, 1998 | Notice of Assembly of Record on Appeal (Vide 33618 #50) vld |
| Sept. 30, 1998 | Submitted to the Appeals Court. vld |
| 02/14/2003 | Entry from the SJC:  The armed robbery conviction as to Nancy Netto is vacated as duplicative, the remaining convictions as to both defendants are affirmed, and relief pursuant to G.L. c. 278, §33E, is declined.  (Marshall, C.J., Greaney, Cowin, Sosman & Cordy, JJ) dga (Vide 33618 #51) |

Exhibit A-12

Exhibit B-1

# SUPREME JUDICIAL COURT
## for the Commonwealth
### Case Docket

---

### COMMONWEALTH vs. JOSEPH T. NETTO
SJC-07852

---

| CASE HEADER | | | |
|---|---|---|---|
| **Case Status** | Decided (Full Opinion) | **Status Date** | 02/14/2003 |
| **Nature** | Murder1 appeal | **Entry Date** | 10/08/1998 |
| **Appellant** | Defendant | **Case Type** | Criminal |
| **Brief Status** | | **Brief Due** | |
| **Quorum** | Marshall, C.J., Greaney, Cowin, Sosman, Cordy, JJ. | | |
| **Argued Date** | 10/11/2002 | **Decision Date** | 02/14/2003 |
| **AC/SJ Number** | | **Citation** | 438 Mass. 686 |
| **DAR/FAR Number** | | **Lower Ct Number** | |
| **Lower Court** | Bristol Superior Court | **Lower Ct Judge** | Charles J. Hely, J. |
| **Route to SJC** | Direct Entry: Murder 1 | | |

| ADDITIONAL INFORMATION |
|---|
| Transcripts received: 5 vols, 2 sets. Transcripts dates: 3/12/96, 3/13/96, 3/14/96, 3/15/96 and 3/18/96. |
| Transcripts received: 2 vols, 2 sets. (On Commonwealth's motion for blood samples: 4/22/99. Arraignment: 12/9/93.) (Both vols. w/Clerk's file) |

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Commonwealth** | Sharon L. Sullivan-Puccini, A.D.A. |
| Plaintiff/Appellee | Kevin Connelly, A.D.A. |
| Red brief filed | Inactive |
| 18 Main Br. | |
| 5 Extensions, 439 Days | |
| | |
| **Joseph T. Netto** | Charles W. Rankin, Esquire |
| Defendant/Appellant | Michelle Menken, Esquire |
| Blue brief & appendix filed | Earl Howard, Esquire |
| 18 Main Br., 18 App. | Inactive |
| 15 Extensions, 983 Days | |
| | |
| **Nancy J. Netto** | Steven J. Rappaport, Esquire |
| Defendant/Appellant | |
| Blue brief filed | |
| 18 Main Br. | |
| 2 Extensions, 127 Days | |

| DOCKET ENTRIES | | |
|---|---|---|
| **Entry Date** | **Paper** | **Entry Text** |
| 10/08/1998 | #1 | Entered. Notice to counsel. |
| 11/23/1998 | #2 | MOTION to extend to 03/23/99 filing of brief of Defendant/Appellant Joseph T. Netto by Earl Howard, Esquire. 11/24/98 ALLOWED to and including Jan. 29, 1999 only. By the Court (Wilkins, C.J.) jmk. notice sent. |
| 11/25/1998 | #3 | MOTION to extend to 01/29/99 filing of brief of Defendant/Appellant Nancy J. Netto by Steven J. Rappaport, Esquire. ALLOWED by the Court (Wilkins, C.J.). Notice to counsel. |

Exhibit B-2

| | |
|---|---|
| 01/27/1999 #4 | MOTION to extend to 03/01/99 filing of brief of Defendant/Appellant Nancy Netto by Steven J. Rappaport, Esquire. ALLOWED. Notice to counsel. |
| 01/27/1999 #5 | MOTION to extend to 03/18/99 filing of brief of Defendant/Appellant Nancy J. Netto by Earl Howard, Esquire. ALLOWED. Notice to counsel. |
| 03/01/1999 #6 | SERVICE of brief for Defendant/Appellant Nancy Netto by Steven J. Rappaport, Esquire. |
| 03/18/1999 #7 | MOTION to extend to 03/31/99 filing of brief of Defendant/Appellant Joseph T. Netto by Earl Howard, Esquire. ALLOWED. Notice to counsel. |
| 03/22/1999 #8 | Letter from Joseph T. Netto requesting docket. 3/24/99 Docket sent. |
| 04/01/1999 #9 | MOTION to extend to 07/29/99 filing of brief of Plaintiff/Appellee Commonwealth by Elspeth B. Cypher, A.D.A.. ALLOWED. Notice to counsel. |
| 04/05/1999 #10 | MOTION to extend to 04/12/99 filing of brief of Defendant/Appellant Joseph T. Netto by Earl Howard, Esquire. ALLOWED. Notice to counsel. |
| 04/23/1999 #11 | MOTION to extend to 05/17/99 filing of brief of Defendant/Appellant Joseph T. Netto by Earl Howard, Esquire. ALLOWED. Notice to counsel. NO Further Extentions unless Granted by the Chief Justice. jmk. notice sent. |
| 05/03/1999 #12 | Letter from Joseph T. Netto. |
| 05/18/1999 #13 | MOTION to extend time for filing brief & appendix on behalf of Joseph Netto until such time as new counsel is appointed. ALLOWED. Appellate proceedings stayed until new counsel appears. Notice to counsel. |
| 06/03/1999 #14 | MOTION for Relief, filed for Nancy J. Netto by Steven J. Rappaport, Esquire. (request stay be lifted ...) refer to single justice. sm. notice sent. |
| 06/07/1999 #15 | ORDER OF REFERENCE of Paper #14 (Motion for Relief ...) to single justice for disposition. (By the Court) sm |
| 07/07/1999 #16 | ORDER: Paper #14 (Motion for Relief) DENIED, Lynch, J.. Notice to counsel. |
| 08/26/1999 #17 | Appearance of Charles W. Rankin, Esquire for Joseph T. Netto as successor counsel. |
| 10/20/1999 #18 | Status letter from Charles W. Rankin, Esquire: Counsel requests a date 90 days from this day to file his brief. (ALLOWED, STATUS REPORTS ARE TO BE FILED AT 30 DAY INTERVALS.) Notice sent. |
| 11/19/1999 #19 | Status letter from Charles W. Rankin, Esquire: Has reviewed trial transc/files/exh. Has conferred with client in person. Will receive materials from former counsel w/i two weeks. Ordered two additional transc volumes. STATUS NOTED. Further status due 12/20/99 |
| 12/21/1999 #20 | Status letter from Charles W. Rankin, Esquire: Transcript of 12/9/93 has been prepared and submitted to Bristol Superior Court. Transcript of 4/22/94 on Commonwealth's motion for blood samples has not been prepared. Counsel expects to be filed appellant's brief on 1/19/2000. (STATUS NOTED. BRIEF DUE JANUARY 19, 2000.) Notice to counsel. |
| 01/10/2000 #21 | Status letter from Charles W. Rankin, Esquire: Transcript of 4/22/94 has bot been prepared. Attorney Sulton has contacted court reporter. (STATUS NOTED.) Notice to counsel. |
| 01/14/2000 #22 | Status letter from Charles W. Rankin, Esquire: Counsel has not yet received the transcripts of the hearing on the Commonwealth's motion for blood samples. The court reporter told him that she can get it sometime next week and complete within two weeks. Counsel also requests to extend the brief due date to 2/22/2000. (ALLOWED. NO FURTHER REQUESTS FOR EXTENSIONS IS ANTICIPATED.) Notice to counsel. |
| 01/31/2000 | Transcripts received: On Commonwealth's Motion for blood samples dated on 4/22/99 (1 vol., 2 sets). On arraignment dated on 12/9/93 (1 vol., 2 sets.) |
| 02/22/2000 #23 | Status letter from Charles W. Rankin, Esquire: Counsel has received the transcripts to complete the appellant's brief & appendix. He expects to finish within the next two weeks. Counsel also requests an extension to file appellant's brief (to 3/14/2000). (EXTENTION ALLOWED; NO FUTHER REQUESTS FOR ENLARGEMENT ARE ANTICIPATED) |
| 03/29/2000 #24 | Status letter from Charles W. Rankin, Esquire: Counsel has not been able to complete work the brief... He requests an extension to 4/17/2000 to file the appellant's brief. (ALLOWED. NO FURTHER EXTENSIONS.) Notice to counsel. |
| 06/30/2000 #25 | Status letter and Motion to enlarge time to file brief: Defendant's counsel has not been able to complete work on the brief because of the press of other business. Counsel requests a |

Exhibit B-3

|  | time extension to file a brief & appendix until 8/2/00. |
|---|---|
| 06/30/2000 | ALLOWANCE of Paper #25 to 08/02/2000 for filing of brief of Defendant/Appellant Joseph T. Netto. No further enlargements anticipated. Notice to counsel. |
| 10/11/2000 #26 | Clerk's letter requesting status of brief/appendix for defendant. |
| 10/23/2000 #27 | Status letter from Charles W. Rankin, Esquire: Counsel will complete and file the appellant's brief by 11/2/2000. (BRIEF AND APPENDIX TO BE FILED ON OR BEFORE 11/2/00. NO FURTHER ENLARGEMENT.) Notice to counsel. |
| 12/26/2000 #28 | Letter from Charles W. Rankin, Esquire: Counsel expects to file the Defendant/Appellant's brief on 1/8/2001. (12/26/00; THE WITHIN IS TREATED AS A MOTION TO ENLARGE TIME TO FILE BRIEF AND AS SUCH ALLOWED.) Notice to counsel. |
| 03/12/2001 #29 | MOTION to extend to 3/19/01 filing of brief of Joseph T. Netto by Charles W. Rankin, Esquire. |
| 03/12/2001 | ALLOWANCE of Paper #29 to 03/19/2001 for filing of brief of Defendant/Appellant Joseph T. Netto. Notice to counsel. |
| 06/29/2001 #30 | MOTION to extend to 7/31/01 filing of brief of Joseph T. Netto by Charles W. Rankin, Esquire. (6/29/01: IF BRIEF AND APPENDIX ARE NOT PROPERLY FILED ON OR BEFORE JULY 31, 2001, THIS MATTER WILL BE REFERRED TO THE SINGLE JUSTICE.) Notice to counsel. |
| 08/15/2001 #31 | MOTION to extend to August 14, 2001, filing of brief of Joseph T. Netto by Charles W. Rankin, Esquire. (ALLOWED). Upon reconsideration docket entry #30 is stricken. |
| 08/14/2001 #31.5 | MOTION to exceed page limit to seventy pages, filed for Joseph T. Netto by Charles W. Rankin, Esquire. (9/19/01: Noted. DENIED by the Court.) Notice to counsel. |
| 08/28/2001 #32 | MOTION to adopt portion of co-defendant's brief (by reference Argument I), filed for Nancy J. Netto by Steven J. Rappaport, Esquire. (8/28/01: REFERRED TO THE QUORUM) Notice to counsel. |
| 09/14/2001 #33 | MOTION to extend to 1/21/02 filing of brief of Commonwealth by Kevin Connelly, A.D.A. |
| 09/18/2001 | ALLOWANCE of Paper #33 to 01/22/2002 for filing of brief of Plaintiff/Appellee Commonwealth. Notice to counsel. |
| 01/29/2002 #34 | SERVICE of appellant's brief & appendix for Joseph T. Netto by Charles W. Rankin, Esquire, Michelle Menken, Esquire. |
| 03/04/2002 #35 | LETTER from Joseph T. Netto to request the docket entires. (Docket sheets sent to him) |
| 05/03/2002 #36 | MOTION to extend to 9/4/02 filing of brief of Commonwealth by Sharon L. Sullivan-Puccini, A.D.A.. (5/3/02: ALLOWED to AUGUST 19, 2002. MATTER IS TENTATIVELY SCHEDULED FOR SEPTEMBER OR OCTOBER ARGUMENT.) Notice to counsel. |
| 05/03/2002 #37 | Letter from Commonwealth regarding the Commonwealth's motion to extend its brief due date to 9/4/02. |
| 07/26/2002 #38 | MOTION to exceed page limit (80 pages in length), filed for Commonwealth by Sharon L. Sullivan-Puccini, A.D.A.. (7/26/02: COMMONWEALTH MAY FILE A BRIEF OF 60 PAGES.) (By the Court) Notice to counsel. |
| 08/07/2002 #39 | NOTICE of October argument sent. |
| 08/19/2002 #40 | MOTION to expand the record, filed for Commonwealth by Sharon L. Sullivan-Puccini, A.D.A.. *Referred to the quorum. |
| 08/19/2002 #41 | SERVICE of brief for Plaintiff/Appellee Commonwealth by Sharon L. Sullivan-Puccini, A.D.A.. (Re: co-def. Joseph Netto. Seperate brief file by Comm. re. Nancy Netto.) |
| 08/19/2002 #42 | SERVICE of appellee's brief for Commonwealth v Nancy Netto (co-def.) by Sharon L. Sullivan-Puccini, A.D.A.. |
| 08/30/2002 #43 | ORDERED for argument on October 11. Notice sent. |
| 09/30/2002 #44 | LETTER from Atty. Rappaport enclosing p. 24 of R.A., inadvertently ommitted from some copies. |
| 10/01/2002 #45 | MOTION for additional time for oral argument, filed for Joseph T. Netto and Nancy Netto by Charles W. Rankin, Esquire, Steven J. Rappaport, Esquire. (10/3/02: ALLOWED) (By the Court) Notice to counsel. |
| 10/02/2002 #46 | MOTION for additional time for oral argument, filed for Commonwealth by Sharon L. |

| | | |
|---|---|---|
| | | Sullivan-Puccini, A.D.A.. *ALLOWED. By the Court. Notice sent. |
| 10/07/2002 | #47 | (Copy) of Commonwealth's Motion for Additional Time for Oral Argument. |
| 10/08/2002 | #48 | SUPPLEMENTAL CITATION Newman v. Commonwealth, 437 Mass. 599 (2002) filed for Commonwealth by Sharon L. Sullivan-Puccini, A.D.A.. (Fax Copy). *Referred to the quorum. Notice sent. |
| 10/09/2002 | #49 | (Original) Supplemental cittation filed for the Commonwealth by Sharon L. Sullivan-Puccini, Esquire. *See paper #48. |
| 10/11/2002 | | Oral argument held. (CJM G C SN CY). |
| 12/30/2002 | #50 | NOTICE RE POLICY FOR EMERGENCY CANCELLATION OF COURT. |
| 02/14/2003 | #51 | RESCRIPT (Full Opinion): The armed robbery conviction as to Nancy Netto is vacated as duplicative, the remaining convictions as to both defendants are affirmed, and relief pursuant to G.L. c. 278, s33E, is declinded. (By the Court) Reasons as on file. Notice to counsel. |
| 03/19/2003 | | RESCRIPT ISSUED to trial court. |

As of 12/28/2003 14:35

Case 1:05-cv-10695-RGS     Document 7-3     Filed 09/30/2005     Page 5 of 7

Exhibit B-5

# SUPREME JUDICIAL COURT
## for Suffolk County
### Case Docket

---

## COMMONWEALTH vs. JOSEPH T. NETTO & another
### SJ-1999-M020

---

### CASE HEADER

| | | | |
|---|---|---|---|
| **Case Status** | decided: motion denied | **Status Date** | 07/06/1999 |
| **Nature** | Referred motion | **Entry Date** | 06/07/1999 |
| **Sub-Nature** | | **Single Justice** | Lynch, J. |
| **TC Ruling** | | **TC Ruling Date** | |
| **SJ Ruling** | Relief denied | **TC Number** | |
| **Pet Role Below** | | **Full Ct Number** | |
| **Lower Court** | Bristol Superior Court | **Lower Ct Judge** | Charles J. Hely, J. |

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Commonwealth**<br>Plaintiff/Appellee | Elspeth B. Cypher, Assistant District Attorney |
| **Joseph T. Netto**<br>Defendant/Appellant | Earl Howard, Esquire |
| **Nancy J. Netto**<br>Defendant/Appellant | Steven J. Rappaport, Esquire |

### DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 06/07/1999 | | Case entered. |
| 06/07/1999 | #1 | ORDER: It is hereby ORDERED that the following matter be referred to the Single Justice for disposition: Defendant Nancy Netto's Motion for Relief filed. (By the Court, Susan Mellen, Assistant Clerk) |
| 06/07/1999 | #2 | Defendant's Motion for Relief filed by Atty Steven Rappaport. |
| 06/11/1999 | | Clerk's note: ADA Cypher indicated that the Bristol D.A.'s office is opposed to lifting the stay as the case was always proceeded prosecuted jointly. She will prepare a written response if necessary. (lca) |
| 06/24/1999 | | Clerk's note: Left a message for ADA Cypher that the court is looking for further response. (lca) |
| 06/30/1999 | #3 | Commonwealth's Opposition To Defendant's Motion For Relief, And In The Alternative, Motion To Enlarge Time, filed by ADA Elspeth Cypher. |
| 06/30/1999 | #4 | Affidavit In Support Of Commonwealth's Opposition To Defendant's Motion For Relief, And In The Alternative, Motion To Enlarge Time, filed by, ADA Elspeth Cypher with Certificate of Service. |
| 07/06/1999 | #5 | ORDER: "it is ORDERED that the motion for relief be, and hereby is, denied without hearing." (Lynch, J.) |
| 07/07/1999 | #6 | Notice to counsel/parties: regarding paper # 5 filed. |

As of 12/28/2003 14:35

Exhibit B-6

# SUPREME JUDICIAL COURT
## for Suffolk County
### Case Docket

## COMMONWEALTH vs. NANCY NETTO
SJ-2004-0374

### CASE HEADER

| | | | |
|---|---|---|---|
| **Case Status** | Decided: petition denied | **Status Date** | 03/18/2005 |
| **Nature** | Gatekeeper c 278 s 33E | **Entry Date** | 09/08/2004 |
| **Sub-Nature** | Mot for New Trial | **Single Justice** | Cowin, J. |
| **TC Ruling** | Relief denied | **TC Ruling Date** | 08/11/2004 |
| **SJ Ruling** | Relief denied | **TC Number** | |
| **Pet Role Below** | Defendant in lower court | **Full Ct Number** | |
| **Lower Court** | Bristol Superior Court | **Lower Ct Judge** | Charles J. Hely, J. |

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Nancy Netto**<br>Defendant/Petitioner | Stephen Paul Maidman, Esquire |
| **Commonwealth**<br>Plaintiff/Respondent | Sharon L. Sullivan-Puccini, Assistant District Attorney |

### DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 09/08/2004 | | Case entered. |
| 09/08/2004 | #1 | MOTION to Waive Filing Fee filed by Atty Stephen Maidman with attached Notice of Assignment of Counsel Form filed. |
| 09/08/2004 | | Filing fee waived. (lca) |
| 09/08/2004 | #2 | Petition for Leave to Appeal pursuant to G.L. c. 278, s. 33E filed by Atty Stephen Maidman. |
| 09/08/2004 | #3 | Memorandum of Law in Support of Petition for Leave to Appeal filed by Atty Stephen Maidman. |
| 09/08/2004 | #4 | Certificate of service of paper #1-3 for Nancy Netto by Atty Stephen Maidman. |
| 10/18/2004 | #5 | Commonwealth's Memorandum of Law in Opposition to Defendant's Petition pursuant to G.L. c. 278, s. 33E, for Leave to Appeal from Superior Court's Denial of the Defendant's Motion for a New Trial filed by ADA Sharon Sullivan-Puccini with certificate of service. |
| 11/23/2004 | #6 | Letter to Mr. Slyva from Atty Stephen Maidman saying.."I would respectfully request that a hearing to be scheduled in the above-referenced case on Wednesday, February 23, 2005 I have conferred with Assistant District Attorney Sharon Sullivan-Puccini. We are both available for argument on that date." |
| 01/06/2005 | | Under advisement. (Cowin, J.). |
| 01/25/2005 | | Notice of Court relocation to John Adams Courthouse sent. |
| 02/22/2005 | | Under advisement. (Cowin, J.). |
| 03/18/2005 | #7 | MEMORANDUM OF DECISION: "...I conclude that the defendant has failed to raise any "new and substantial question" which out to be addressed by the full court...A judgment shall enter denying the petition." (Cowin, J.) |
| 03/18/2005 | #8 | JUDGMENT: "..It is ORDERED and ADJUDGED that the petition pursuant to G.L. c. 278, s. 33E, be and the same hereby is, denied." (Cowin, J.) |
| 03/18/2005 | #9 | Notice to counsel, regarding paper numbers 7-8 filed. |

Exhibit B-7
As of 08/18/2005 13:15

1    table.  He doesn't have to be in the first seat, but

2    I'd like him at least in the second seat.  Okay.

3              MR. STAITI:  Your Honor, on behalf of

4    Joseph Netto, I'm also requesting a Bowden

5    instruction.  I understand that they are not being

6    given.

7              I am also requesting the consciousness of

8    guilt and the instruction from Your Honor; and I'm

9    just renewing my objection to the verdict slip as

10   it's presently constituted where the jury is

11   considering guilty before it considers innocence; and

12   I believe that that shifts the burden of proof.

13             THE COURT:  All right.  Apart from that

14   objection, are all the parties satisfied with the

15   possible verdicts listed on the verdict slip?

16             MR. STAITI:  I am, Your Honor.

17             THE COURT:  No one is requesting any other

18   lesser included offense; is that correct?  No.  All

19   attorneys indicate no.  Now, I also find in this case

20   that although there might hypothetically be conceived

21   of some lesser type of offenses, lesser than armed

22   robbery, the Commonwealth for its own reasons has not

23   charged lesser offenses or asked for lesser included

24   instructions.

1          Defendants have not asked for lesser

2     included offenses or instructions; and if such

3     instructions were warranted, and I'm not sure that

4     they are, I find that there are sound tactical

5     reasons for the Defendants to have the charges go to

6     the jury as laid out in the verdict slip without any

7     additional hypothetical lesser included offenses.

8          MR. SEGADELLI:  My only suggestion with

9     that as I -- again speaking of the hypothetical and

10    what they potentially could find, I found it

11    difficult to hypothesize about a series of facts

12    being found to even warrant a guilty finding of

13    second degree murder.

14          I found that a difficult stretch, but I

15    appreciate 265, Section 1, that any -- when they

16    don't find first, that it could be a second; and I

17    believe that's the Court's basis for that.

18          THE COURT:  Right.  That is.  I mean, the

19    primary reason for including second degree murder as

20    an option is the statute traditionally for many

21    decades has stated that the degree of murder shall be

22    found by the jury.

23          And the only -- the explanation of that as

24    an alternative verdict would be a murder with malice

1  aforethought, without premeditation.  If the jury

2  found the Defendant not guilty of any of the forms of

3  first degree murder, they could consider whether the

4  Defendant is guilty of second degree murder.

5          Second degree murder is simply a murder

6  with malice aforethought.  There is no requirement

7  that there be premeditation, no requirement that

8  there be extreme atrocity or cruelty.  And I'll

9  simply tell them what malice aforethought is, okay.

10  In that case, we're ready for the jury.

11                    (Jury present.)

12          THE COURT:  Good morning, ladies and

13  gentlemen of the jury.  Welcome back.  We appreciate

14  your continued attention to your duties in this case.

15  Today will be your last day in the courtroom.  We'll

16  have the closing arguments and the judge's

17  instructions to the jury.

18          I expect we'll be in the courtroom

19  working, hearing the arguments and instructions till

20  about 12:30.  We'll have breaks in between and give

21  you a chance to get up and stretch in between the

22  arguments and the judge's instructions.  We'll pace

23  it out because you have a lot of listening to do this

24  morning.

COMMONWEALTH OF MASSACHUSETTS                    Exhibit D

BRISTOL, ss.                          SUPERIOR COURT DEPARTMENT
                                      NOS. 33618 - 33619

COMMONWEALTH

                        **FILED**

vs.                        DEC 22

NANCY NETTO        MARC J. SANTOS, ESQ.
                   CLERK MAGISTRATE

### DEFENDANT'S MOTION PURSUANT TO MASSACHUSETTS
### RULES OF CRIMINAL PROCEDURE 25(b)(2) and 30(b)

**NOW COMES** the Defendant, **NANCY NETTO**, and moves, pursuant to
Mass. Rules of Criminal Procedure 25(b)(2) and 30(b) that this
Honorable Court set aside the verdict and enter a finding of not
guilty, or in the alternative, to order a new trial, or to enter a
finding on any lesser included offense to the offenses charged.

The Defendant respectfully submits a Memorandum of Law in
Support.

                              Respectfully submitted,

                              NANCY NETTO
                              BY HER ATTORNEY,


                              _____
                              J. DREW SEGADELLI, ESQ.
                              FAGAN & GOLDRICK, P.C.
                              536 MAIN STREET
                              FALMOUTH, MA  02540
                              (508) 540-6900
                              BBO# 548168

Dated: March 20, 1996

S-3-96 Motion denied after hearing.
(Lee, J.)
Per

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                           SUPERIOR COURT DEPARTMENT
                                       NOS. 33618 - 33619

COMMONWEALTH                  *
                              *
vs.                           *
                              *
NANCY NETTO                   *


MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION PURSUANT TO MASSACHUSETTS
RULES OF CRIMINAL PROCEDURE 25(b)(2),
378 Mass. 896 (1979), and 30(b)

Massachusetts Rules of Criminal Procedure 25(b)(2) authorizes a Judge, after a guilty verdict is returned, to do any one of three (3) things (in addition to denying the Motion in its entirety):

(1)  To set aside the verdict and order a new trial;

(2)  To order the entry of a finding of not guilty; or

(3)  To order the entry of a finding of any lesser offense included within the scope of the indictments or complaints. Commonwealth v. Keough, 385 Mass. 314, 431 N.E.2d 915, 918, "Mass. R. Crim. Pro. 25(b)(2)."

A judge has the authority to act on a Defendant's post verdict motion which presents, as one alternative, that the judge enter a finding of guilty on a lesser included offense. Keough, 385 Mass. 314, 431 N.E.2d at 916.

In deciding whether to reduce a jury verdict to a finding of guilty of a lesser offense, a trial judge, acting under Rule 25(b)(2), should be guided by considerations that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require. Keough, 385 Mass. 314; 431 N.E.2d at 918; see also M.G.L. c. 278, s. 33E.

Exhibit E-2

Where, on a review of the entire record, the Court concludes that the jury's verdict should be reduced in the interests of substantial justice the Massachusetts Supreme Judicial Court has upheld the reduction of the Defendant's degree of guilt.    "On review of a judge's determination under Rule 25(b)(2) to reduce a verdict to guilty of a lesser offense, [the Supreme Court] considers only whether the judge abused his discretion or committed an error of Law".    Keough, 385 Mass. 314, 431, N.E.2d at 918; citing Commonwealth v. Gaulden, 383 Mass. 543, 420 N.E.2d 905 (1981).

Further, the first sentence of Rule 25(b)(2) permits a motion for a new trial to be presented in conjunction with the renewal of a denied motion for a required finding of not guilty.    Keough, 385 Mass. 314, 431 N.E.2d at 917.

Respectfully submitted,

NANCY NETTO
BY HER ATTORNEY

J. DREW SEGADELLI, ESQ.
FAGAN & GOLDRICK, P.C.
536 MAIN STREET
FALMOUTH, MA  02540
(508) 540-6900
BBO# 548168

Dated: March 20, 1996

Exhibit F-1

1 - 17

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                    SUPERIOR COURT DEPARTMENT
CRIMINAL I                          OF THE TRIAL COURT
                                No.  90-33618-19

COMMONWEALTH

v.

NANCY NETTO

* * * * * * * * * * * * * * *
FOR HEARING BEFORE:
HELY, J.
* * * * * * * * * * * * * * *

Brockton Superior Courthouse
72 Belmont Street
Brockton, MA 02301
May 1, 1996

Regina M. Griffin, CVR-CM
72 Belmont Street
Brockton, MA 02301
508-583-8250 Ext. 219

Exhibit F-2

2

APPEARANCES:

John P. Stapleton, Esquire
    Assistant District Attorney
    Bristol County
    5 Post Office Square
    Taunton, MA 02780
    508-823-8801
                    For the Commonwealth


J. Drew Segadelli, Esquire
    536 Main Street
    Falmouth, MA 02540
    508-540-900
                For the defendant

Exhibit F-3

3

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | May 1, 1996 |
| 3 | 11:15 a.m. |
| 4 | [In open court] |
| 5 | [Defendant present] |
| 6 | THE COURT:  The next matters for hearing, the |
| 7 | case of Commonwealth versus Nancy Netto, indictment |
| 8 | 33618 and 19.  Mr. Segadelli for the defendant.  Mr. |
| 9 | Stapleton for the Commonwealth. |
| 10 | THE COURT:  Okay.  On behalf of the defendant, |
| 11 | Mr. Segadelli.  You may be seated. |
| 12 | MR. SEGADELLI:  Good morning, your Honor. |
| 13 | THE COURT:  Good morning, Mr. Segadelli. |
| 14 | MR. SEGADELLI:  Your Honor, there are several |
| 15 | motions before you.  What I would like to first address |
| 16 | is the motion pursuant to the Rules of Criminal |
| 17 | Procedure 25(B)(2), and 30(B) -- the defendant's motion |
| 18 | pursuant to Mass. Rules 25(B)(2) and 30(B).  And I |
| 19 | submitted a memorandum.  Does the court have -- |
| 20 | THE COURT:  Yes.  I read it.  Thank you. |
| 21 | MR. SEGADELLI:  That -- that is the first |
| 22 | motion I would like to address at this time, your Honor. |
| 23 | And the court is well aware of its ability to take |
| 24 | action pursuant to that motion and that section of the |

4

1    rules to set aside the verdict and to order a new trial

2    for Ms. Nancy Netto, to order an entry of a finding of

3    not guilty and/or to order the entry of a finding of any

4    lesser offense.

5            I -- I want to reflect now, if I may, Judge,

6    on the evidence.  And I am going to shy away, as best I

7    can, from really re-giving my closing argument, as I

8    heard your Honor's few words you said to the class of

9    students.  And I saw that you -- it was still fresh in

10   your mind, the case, it was only five weeks ago, as it

11   is in mine, and I have been sitting back reflecting on

12   it again, as I have numerous times from the date we

13   ended the Netto case, speaking with Jack and reviewing

14   the evidence.  And if I may -- may take a moment to look

15   at the evidence, and -- and to look at what was

16   presented to the jury.

17           What we had, your Honor -- I've had a great

18   deal of difficulty reconciling how the jury ultimately

19   came to where it did when viewing the evidence the

20   Commonwealth's presented, even in the light most

21   favorable to them, how they could reconcile the evidence

22   to get to the ultimate verdict.

23           Now, focusing on Nancy Netto, the jury found

24   -- their theory was felony murder being the robbery, and

5

1      the murder was -- took place during the robbery.  And

2      the court will recall the last question we received from

3      the jury, and we tried to interpret or extrapolate from

4      that question where they were thinking.  And I'm not

5      trying to say that's what we're -- we should be doing

6      now, but where we're -- where we're going in the case.

7           Now, a quick review of the evidence, the

8      Commonwealth's arguments went that the time of death

9      they first proposed to them -- and I addressed this in

10      the closing argument -- was Ms. Jennifer Awad's

11      testimony between 5:30 -- between five and six o'clock,

12      at that time span when she heard the men arguing, and

13      the footsteps, and the pounding on the floor.  She

14      identified -- and she had no difficulty identifying that

15      these were men's footsteps when she heard a loud bang.

16      So the Commonwealth first proposed that to be time of

17      death.  We hear later from Michelle Griffith that same

18      type of noise, it was characterized, and that was some

19      time after ten o'clock at night when she goes in the

20      hall and she meets Joe Netto.  So this was the -- the

21      second time or the second area of the time of death of

22      the poor victim.

23           More evidence leading to the support of ten

24      o'clock being the time of death was Weiner saying --

6

1    putting the time of death.  And he put it at a span of

2    time of sometime -- if my memory serves me correctly --

3    between like nine o'clock and like 11:30.  It was that

4    time span, so it would have been the Michelle Griffin

5    noises, not the young woman's -- the -- the young woman,

6    Jennifer Awad's, noises at 5:30.

7         The other thing was the amount of blood

8    alcohol in the man.  We had the woman testify from the

9    -- from the bar saying he only got one or two or three

10   drinks.  We had Weiner say the blood alcohol in the body

11   was consistent with more having five or six -- it was in

12   that -- drinks.  It was more in that area which would

13   put the time of death where Weiner says it is, where

14   Michelle Griffin said it was, was that 9:30, 10:00 area.

15        What I'm getting at in this argument, your

16   Honor, is Nancy Netto was not there.  Nancy Netto isn't

17   put in the building until Michelle sees her there and/or

18   when she was out on the trip with Benny for groceries at

19   9:30 or 10:00 before she came back.  She -- she -- she's

20   not even there.  So that's why I -- I just wanted to

21   reflect one moment with the jury's question to us about

22   -- about -- and it went something along the lines of, We

23   are less convinced that she was there when the murder

24   took place, but we are not convinced that she took part

7

1    in the robbery.  And it was my suggestion, your Honor --

2    and -- and -- and the instructions at the time were

3    appropriate, saying that you can't, essentially -- I --

4    I'm just paraphrasing because it was long re-

5    instructions -- you can't rob from a dead person.  And

6    there was that argument about or that suggestion that

7    they do believe she came in after and she did play a

8    part in that.

9          I'd suggest the -- the theory that the

10   Commonwealth may set forth to, Hey, wait, Segadelli's

11   forgetting something, he's forgetting this part about

12   the fingerprint.  And I'm not going to overlook that

13   now, and, again, I don't want to go through my whole

14   closing argument.  But, the fingerprint -- if the

15   Commonwealth suggests that the -- that the fingerprint

16   puts her there during the murder or immediately

17   thereafter, they have to accept as true that officer's

18   testimony, and you -- and you can remember, because

19   this, I would suggest, is at least vivid in my mind --

20   when I asked the officer, You cannot put a fingerprint

21   -- you can't put a date stamp on a fingerprint?  He

22   said, You can't.  And I said -- much like the man who

23   built this building, I thought it was 104 years ago, you

24   told us this morning it was 101 -- or those students --

1    however, I do have an opinion with respect to this

2    fingerprint removed from the bathroom door wall, and

3    that's three or four days.  And then the Commonwealth

4    goes on to say, Well, you know Nancy Netto wasn't

5    allowed in that apartment for a week or two.

6            I'd suggest that isn't -- that's not competent

7    evidence.  I'd suggest that he -- he can't make that

8    suggestion.  I've dealt with the fingerprint cases, and

9    I'd suggest that that -- that can't be said with

10   accuracy.  Furthermore, where was it?  It wasn't in a

11   draw.  You remember the draws were shuffled through, and

12   -- in his bedroom and -- and everywhere.  This was in

13   the back of the bathroom door, whereas, if it did

14   support it -- if the evidence did support that her being

15   there when the man is stabbed, or that she's there

16   shuffling through the things, she's not going to go and

17   close the bathroom door.  Again, I keep harkening back

18   to my closing argument, but it's just not consistent

19   with -- Nancy Netto hasn't been put there.

20           Much was made, I know by myself, that -- that

21   holding of the case that was cited saying if you're

22   going to do -- if you're going to find joint venture

23   felony murder she had to have known likewise that he was

24   armed with a dangerous weapon when he went in to do

```
1    that.  I'd suggest there's no evidence of that -- of
2    that.  And I believe the court has that cite.  And it
3    was suggested in my jury instructions, and the court
4    rightfully --
5               THE COURT:  What do you --
6               MR. SEGADELLI:  -- found that.
7               THE COURT:  -- know about the -- can you
8    refresh me about the weapon?
9               MR. SEGADELLI:  Yes.
10              THE COURT:  The source of the weapon.
11              MR. SEGADELLI:  The -- the weapon -- and that
12   evidence came out clearly -- the police said it was
13   found in his apartment, the knife set that the knife
14   came from, that the actual murder weapon came from a
15   drawer probably from where the court officer is to -- to
16   where I --
17              THE COURT:  The witnesses recognized it as
18   belonging to the deceased?
19              MR. SEGADELLI:  Correct.
20              THE COURT:  Okay.
21              MR. SEGADELLI:  In other words -- what I would
22   suggest the evidence would point to Joe Netto picking up
23   in there prior to the stabbing, prior to the time of
24   death -- it was picked up in there.  So he never even
```

1    carried it in there.  And, again, we don't have Nancy

2    Netto there, whether it be late afternoon -- but that's

3    not consistent with the evidence; late at night, she's

4    out now grocery shopping.  So -- and, again, I want to

5    avoid jumping in the -- in the minds of the jurors, but

6    they -- they suggest that since she had either the

7    toaster or the keys or maybe the money that was his,

8    she's involved in that robbery, and that's what we think

9    she's involved in that robbery, therefore she's guilty

10   of robbery, therefore felony murder.  These jumps are

11   simply too long -- are too big a jumps.

12        They don't have her there in the robbery,

13   there just isn't the evidence.  And -- and I wanted to

14   suggest to the court -- I surely have not tried the 400

15   murder cases that a Joe Balliro has tried, or 100 that a

16   Jack Atwood has tried, but I have surely read that

17   amount, and I have never seen a case or read a case

18   where there was less evidence to hook this woman into

19   this murder one charge.  There just wasn't.  Reflecting

20   on all the evidence does not put her there.

21        Joe Netto we have there, and they found him on

22   all three theories:  premeditated, extreme atrocity and

23   felony murder.  They have his footprint there, they have

24   him there.  Nancy Netto, again, I suggest the

1    fingerprint doesn't put her there.  She -- sometime
2    after, yes.  And then they suggest that the money's on
3    her.

4            Let me suggest another thing, Judge.  If you
5    remember the pictures -- and I have -- I don't have the
6    full pack, but I have one -- and it sparks in my mind as
7    I'm listening to your other trial -- I'm looking once
8    again at the apartment.  And -- and one of the
9    suggestions and arguments I made is the first just
10   glance at any of the photographs, and you say that this
11   apartment wasn't the subject of or the scene of a
12   robbery in the classic sense that we know of, meaning --
13   I mean the stereo's there, and the -- and much was made,
14   if you recall, about the wicker baskets and the TV
15   changer and all of those things that they tried to put
16   in the Nettos' apartment, which all miraculously are in
17   his apartment.  I mean, so there isn't the connection
18   with Nancy being in there.  There just -- it isn't made,
19   it's just too big a jump in the -- and I think the jury
20   wrestled with that.  And I -- if my memory serves me
21   correctly, they were out six or seven hours.

22           I -- if your Honor has any questions, I -- you
23   know, I -- I have a good recollection of it.  This --
24   this is the crux of this argument today, that there just

```
1    isn't enough.  I'd ask the court, therefore, to -- to

2    set it aside, and/or -- it's within your discretion to

3    find a lesser degree of murder for Nancy.  I -- I just

4    don't suggest that they had the sufficient evidence to

5    -- to warrant it.  And I have read a case this morning

6    where likewise 25(B)(2), the first sentence permits a

7    motion for a new trial to be presented in conjunction

8    with a renewal of a denied motion for a required finding

9    of not guilty.  And I -- and I brought that motion for

10   required finding at the time, your Honor, which was --

11   and you allowed me to argue the same, and it was denied.

12           And -- and that really is my argument, without

13   having to go through the entire closing argument or the

14   case, your Honor, that there was not enough evidence

15   against Nancy Netto.  Would the court like me to go on

16   to my other motions, or do you want to have Mr.

17   Stapleton address that, perhaps?

18           THE COURT:  No, the other motions I can take

19   care of without any difficulty.

20           MR. SEGADELLI:  That's my withdrawal to

21   appointment of appellate attorney --

22           THE COURT:  That's allowed, following the

23   resolution of a motion for a new trial.

24           MR. SEGADELLI:  Very good.  And -- I then --
```

1    that's all I have.

2        THE COURT:  Thank you, Mr. Segadelli.  Mr.

3    Stapleton.

4        MR. STAPLETON:  Good morning, your Honor.

5    Your Honor, I would ask you to deny the defendant's

6    motion regarding setting aside the verdict, new trial or

7    reducing the verdict of first degree murder.  I'd

8    suggest that, really, it's quite simple that the jury

9    found that she was involved in an armed robbery, and

10   that, therefore, was involved in a felony murder.  I'd

11   suggest that because of these motions should be denied.

12        The facts regarding the robbery, I would

13   suggest were pretty -- pretty good -- pretty strong

14   evidence that she had motive, she had opportunity, she

15   had the evidence that was definitely the victim's

16   sometime after his body was found.  And that there was

17   also some pretty strong consciousness of guilt evidence

18   in terms of flight.  The statements that she made in the

19   presence of other witnesses regarding what she believed

20   was their knowledge of the incident.  I'm sure you

21   recall Benny White testifying that when he mentioned

22   something that he -- he talked about -- testified about

23   how when he mentioned he wouldn't tell Michelle,

24   arguably the implication was that he knew something and

1    -- and she took that as meaning she -- that he knew
2    about the murder and -- and she went -- she got quite
3    upset and had to be quieted by Joseph Netto inside the
4    bedroom.  There's no -- no way of knowing what was said
5    in there, but the evidence was that she came out and
6    went about her business.

7                    Mr. Segadelli has talked about the time
8    periods that are in question.  And I suggest that the
9    evidence is pretty strong that when Benny White and
10   Michelle Griffin returned and saw Constanzo there, there
11   was no way of knowing whether Nancy Netto and Joseph
12   Netto were in the building at that time or not.  I'd
13   suggest that there's no reason to exclude them from the
14   building and that -- and that the evidence regarding
15   Jennifer Awad and the medical examiner time of death was
16   between 5:30 and 9:30, or six and eight, or in that time
17   frame, and that that's when the death occurred, and that
18   she was present at that time, though there was no
19   evidence -- and, clearly, in the kind of situation we
20   have here where it's in the privacy of a victim's home,
21   it's difficult to know for certain how things happened
22   and the order in which they did happen.  But, the
23   evidence is real strong in the argument that she was
24   involved in the robbery.

1           I gather the court is interested in the armed

2    part, given the question regarding the knife.  John

3    Hubbard testified that he thought the knife matched that

4    inside the set.  It was found inside of -- not in the

5    kitchen area, but in the area immediately upon entering

6    into Robert Levesque's apartment.  There was also

7    testimony regarding blunt force trauma to the forehead

8    of Mr. Levesque.  So, arguably, something different from

9    a knife was used to strike him.  I don't believe --

10   there was -- I don't -- I don't believe either -- I

11   forget exactly how it turned out in terms of whether I

12   questioned Doctor Weiner regarding what kind of injury

13   that could be caused by or whether the court stopped me

14   from that, but I think clearly he testified there was

15   blunt force trauma to the head.  And you had them

16   entering the apartment.  It's tough to say who was

17   involved and -- and what knowledge you could definitely

18   say, but, clearly, the jury thought that she was

19   involved in an armed robbery, that she shared the intent

20   with Joseph Netto, and she shared the benefit of the

21   robbery with Joseph Netto.  I think the fingerprint does

22   come into play because it shows that the time period

23   that she's in the apartment hadn't been in the week

24   prior to the robbery, and that it was either no more

Exhibit F-16

16

1    than three or four days or, in Lauria's opinion --

2    Richard Lauria's opinion, probably several hours from

3    the time he arrived at that scene.

4           I'd suggest that basically the evidence was

5    real strong on the armed robbery, and that's sufficient

6    for a jury to then conclude that she's involved in a

7    first degree murder, and that their basis for doing so

8    was fair, given the evidence and given the instructions

9    by the court.  So, because of that, I'd ask you to deny

10   all of the defendant's motions regarding setting aside

11   the verdict, a new trial, or reducing the verdict from

12   first degree murder to anything at all.

13          THE COURT:  Okay.

14          MR. STAPLETON:  Thank you.

15          THE COURT:  Mr. Stapleton, thank you very

16   much.  I'll take it under advisement.  Thank you,

17   counsel.

18          [Whereupon, at or about 11:35 a.m., the

19   hearing was concluded]

20

21

22

23

24

17

1                  C E R T I F I C A T E

2

3         I hereby certify that the foregoing record,

4    Pages 1-16, is a true and accurate transcription of my

5    dictated tape recordings of the proceedings in the

6    above-captioned matter, heard in the Criminal Session

7    Without Jury at Taunton, Massachusetts, on May 1, 1996,

8    before Hely, J., to the best of my skill and ability.

9

10

11                  _Regina M. Griffin_

12                  Regina M. Griffin

13                  Official Court Reporter

14                  Certified Verbatim Reporter

15                  Certificate of Merit

16

17

18

19

20

21

22              *  *  *  *  *  *

Exhibit G

1

## ISSUES PRESENTED

1.   Whether the trial court erred in failing to allow the defendant's motion for a required finding of not guilty to the charges of murder and armed robbery at the close of the Commonwealth's case where the evidence adduced at trial failed to establish that the defendant was a joint venturer in the killing of the victim.

2.   Whether, pursuant to G.L.C. 278, § 33E, this Court should find a substantial likelihood that a miscarriage of justice occurred where the trial court failed to instruct the jury as to lesser included offenses within the charge of armed robbery which were warranted by the evidence.

3.   Whether the trial judge imposed an illegal sentence for armed robbery upon the defendant where the only theory upon which the defendant was convicted of murder was the theory of felony-murder.

## STATEMENT OF THE CASE *

On December 1, 1993, the Bristol County Grand Jury returned the following indictments:

1.   No. 33618 charging the defendant with the murder of Robert Levesque (App. 1); and,

---

*References to the Record Appendix will be noted as (App.  ), followed by the appropriate page number of the appendix. References to the trial transcript will be noted as (Tr.   ) followed by the appropriate transcript volume and page numbers.

by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

*Maintaining Competence*

[6]   To maintain the requisite knowledge and skill, a lawyer should engage in continuing study and education. If a system of peer review has been established, the lawyer should consider making use of it in appropriate circumstances.

**Model Code Comparison**

DR 6-101(A)(1) provided that a lawyer shall not handle a matter "which he knows or should know that he is not competent to handle, without associating himself with a lawyer who is competent to handle it." DR 6-101(A)(2) required "preparation adequate in the circumstances." Rule 1.1 more fully particularizes the elements of competence. Whereas DR 6-101(A)(3) prohibited the "[N]eglect of a legal matter," Rule 1.1 does not contain such a prohibition. Instead, Rule 1.1 affirmatively requires the lawyer to be competent.

## RULE 1.2    SCOPE OF REPRESENTATION

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

(c) A lawyer may limit the objectives of the representation if the client consents after consultation.

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

(e) When a lawyer knows that a client expects assistance not permitted by the rules of professional conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

**Comment**

*Scope of Representation*

[1]   Both lawyer and client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the

purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. Within those limits, a client also has a right to consult with the lawyer about the means to be used in pursuing those objectives. At the same time, a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so. A clear distinction between objectives and means sometimes cannot be drawn, and in many cases the client-lawyer relationship partakes of a joint undertaking. In questions of means, the lawyer should assume responsibility for technical and legal tactical issues, but should defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected. Law defining the lawyer's scope of authority in litigation varies among jurisdictions.

[2]   In a case in which the client appears to be suffering mental disability, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14.

*Independence from Client's Views or Activities*

[3]   Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities.

*Services Limited in Objectives or Means*

[4]   The objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. For example, a retainer may be for a specifically defined purpose. Representation provided through a legal aid agency may be subject to limitations on the types of cases the agency handles. When a lawyer has been retained by an insurer to represent an insured, the representation may be limited to matters related to the insurance coverage. The terms upon which representation is undertaken may exclude specific objectives or means. Such limitations may exclude objectives or means that the lawyer regards as repugnant or imprudent.

[5]   An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to agree to representation so limited in scope as to violate Rule 1.1, or to surrender the right to terminate the lawyer's services or the right to settle litigation that the lawyer might wish to continue.

*Criminal, Fraudulent and Prohibited Transactions*

[6]   A lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct. The fact that a client uses advice in a course of action that is criminal or fraudulent does not, of itself, make a lawyer a party to the course of action. However, a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and rec-

Exhibit H-1

ommending the means by which a crime or fraud might be committed with impunity.

[7]  When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is not permitted to reveal the client's wrongdoing, except where permitted by Rule 1.6. However, the lawyer is required to avoid furthering the purpose, for example, by suggesting how it might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposes is legally proper but then discovers is criminal or fraudulent. Withdrawal from the representation, therefore, may be required.

[8]  Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

[9]  Paragraph (d) applies whether or not the defrauded party is a party to the transaction. Hence, a lawyer should not participate in a sham transaction; for example, a transaction to effectuate criminal or fraudulent escape of tax liability. Paragraph (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last clause of paragraph (d) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

## Model Code Comparison

Paragraph (a) has no counterpart in the Disciplinary Rules of the Model Code. EC 7-7 stated: "In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client . . . ." EC 7-8 stated that "[I]n the final analysis, however, the . . . decision whether to forego legally available objectives or methods because of nonlegal factors is ultimately for the client . . . . In the event that the client in a nonadjudicatory matter insists upon a course of conduct that is contrary to the judgment and advice of the lawyer but not prohibited by Disciplinary Rules, the lawyer may withdraw from the employment." DR 7-101(A)(1) provided that a lawyer "shall not intentionally . . . fail to seek the lawful objectives of his client through reasonably available means permitted by law . . . . A lawyer does not violate this Disciplinary Rule, however, by . . . avoiding offensive tactics . . . ."

Paragraph (b) has no counterpart in the Model Code.

With regard to Paragraph (c), DR 7-101(B)(1) provided that a lawyer may, "where permissible, exercise his professional judgment to waive or fail to assert a right or position of his client."

With regard to Paragraph (d), DR 7-102(A)(7) provided that a lawyer shall not "counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." DR 7-102(A)(6) provided that a lawyer shall not "participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false." DR 7-106 provided that a lawyer shall not "advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal . . . but he may take appropriate steps in good faith to test the validity of such rule or ruling." EC 7-5 stated that a lawyer "should never encourage or aid his client to commit criminal acts or counsel his client on how to violate the law and avoid punishment therefor."

With regard to Paragraph (e), DR 2-110(C)(1)(c) provided that a lawyer may withdraw from representation if a client "insists" that the lawyer engage in "conduct that is illegal or that is prohibited under the Disciplinary Rules." DR 9-101(C) provided that "a lawyer shall not state or imply that he is able to influence improperly . . . any tribunal, legislative body or public official."

# RULE 1.3   DILIGENCE

**A lawyer shall act with reasonable diligence and promptness in representing a client.**

## Comment

[1]  A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. However, a lawyer is not bound to press for every advantage that might be realized for a client. A lawyer has professional discretion in determining the means by which a matter should be pursued. See Rule 1.2. A lawyer's work load should be controlled so that each matter can be handled adequately.

[2]  Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

[3]  Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved. If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so. For example, if a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client but has not been specifically instructed concerning pursuit of an appeal, the lawyer should advise the client of the possibility of appeal before relinquishing responsibility for the matter.

Exhibit H-2

**Model Code Comparison**

DR 6-101(A)(3) required that a lawyer not "[n]eglect a legal matter entrusted to him." EC 6-4 stated that a lawyer should "give appropriate attention to his legal work." Canon 7 stated that "a lawyer should represent a client zealously within the bounds of the law." DR 7-101(A)(1) provided that a lawyer "shall not intentionally . . . fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules . . . ." DR 7-101(A)(3) provided that a lawyer "shall not intentionally . . . [p]rejudice or damage his client during the course of the relationship . . . ."

# RULE 1.4   COMMUNICATION

**(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.**

**(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.**

**Comment**

[1]  The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. For example, a lawyer negotiating on behalf of a client should provide the client with facts relevant to the matter, inform the client of communications from another party and take other reasonable steps that permit the client to make a decision regarding a serious offer from another party. A lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case should promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable. See Rule 1.2(a). Even when a client delegates authority to the lawyer, the client should be kept advised of the status of the matter.

[2]  Adequacy of communication depends in part on the kind of advice or assistance involved. For example, in negotiations where there is time to explain a proposal, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that might injure or coerce others. On the other hand, a lawyer ordinarily cannot be expected to describe trial or negotiation strategy in detail. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation.

[3]  Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the

16

client is a child or suffers from mental disability. See Rule 1.14. When the client is an organization or group, it is often impossible or inappropriate to inform every one of its members about its legal affairs; ordinarily, the lawyer should address communications to the appropriate officials of the organization. See Rule 1.13. Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client. Practical exigency may also require a lawyer to act for a client without prior consultation.

*Withholding Information*

[4]  In some circumstances, a lawyer may be justified in delaying transmission of information when the client would be likely to react imprudently to an immediate communication. Thus, a lawyer might withhold a psychiatric diagnosis of a client when the examining psychiatrist indicates that disclosure would harm the client. A lawyer may not withhold information to serve the lawyer's own interest or convenience. Rules or court orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client. Rule 3.4(c) directs compliance with such rules or orders.

**Model Code Comparison**

Rule 1.4 has no direct counterpart in the Disciplinary Rules of the Model Code. DR 6-101(A)(3) provided that a lawyer shall not "[n]eglect a legal matter entrusted to him." DR 9-102(B)(1) provided that a lawyer shall "[p]romptly notify a client of the receipt of his funds, securities, or other properties." EC 7-8 stated that a lawyer "should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations." EC 9-2 stated that "a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client."

# RULE 1.5   FEES

**(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:**

**(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;**

**(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;**

**(3) the fee customarily charged in the locality for similar legal services;**

**(4) the amount involved and the results obtained;**

**(5) the time limitations imposed by the client or by the circumstances;**

**(6) the nature and length of the professional relationship with the client;**

**(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and**

**(8) whether the fee is fixed or contingent.**

17

Exhibit H-3

Exhibit I-1

# Model Rules of Professional Conduct

*CLIENT-LAWYER RELATIONSHIP*
**RULE 1.2 SCOPE OF REPRESENTATION AND ALLOCATION
OF AUTHORITY BETWEEN CLIENT AND LAWYER**

---

**(a)** Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

**(b)** A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

**(c)** A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

**(d)** A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

# Model Rules of Professional Conduct

*CLIENT-LAWYER RELATIONSHIP*
**RULE 1.2 SCOPE OF REPRESENTATION AND ALLOCATION
OF AUTHORITY BETWEEN CLIENT AND LAWYER**

---

**Comment**

**Allocation of Authority between Client and Lawyer**

[1] Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. The decisions specified in paragraph (a), such as whether to settle a civil matter, must also be made by the client. See Rule 1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions. With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client as required by Rule 1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation.

[2] On occasion, however, a lawyer and a client may disagree about the means to be used to accomplish the client's objectives. Clients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters. Conversely, lawyers usually defer to the client regarding such questions as the expense to be incurred and concern for third persons who might be adversely affected. Because of the varied nature of the matters about which a lawyer and client might disagree and because the actions in question may implicate the interests of a tribunal or other persons, this Rule does not prescribe how such disagreements are to be resolved. Other law, however, may be applicable and should be consulted by the lawyer. The lawyer should also consult with the client and seek a mutually acceptable resolution of the disagreement. If such efforts are unavailing and the lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation. See Rule 1.16(b)(4). Conversely, the client may resolve the disagreement by discharging the lawyer. See Rule 1.16(a)(3).

[3] At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation. Absent a material change in circumstances and subject to Rule 1.4, a lawyer may rely on such an advance authorization. The client may, however, revoke such authority at any time.

[4] In a case in which the client appears to be suffering diminished capacity, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14.

**Independence from Client's Views or Activities**

[5] Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities.

**Agreements Limiting Scope of Representation**

[6] The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. When a lawyer

has been retained by an insurer to represent an insured, for example, the representation may be limited to matters related to the insurance coverage. A limited representation may be appropriate because the client has limited objectives for the representation. In addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent.

[7] Although this Rule affords the lawyer and client substantial latitude to limit the representation, the limitation must be reasonable under the circumstances. If, for example, a client's objective is limited to securing general information about the law the client needs in order to handle a common and typically uncomplicated legal problem, the lawyer and client may agree that the lawyer's services will be limited to a brief telephone consultation. Such a limitation, however, would not be reasonable if the time allotted was not sufficient to yield advice upon which the client could rely. Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. See Rule 1.1.

[8] All agreements concerning a lawyer's representation of a client must accord with the Rules of Professional Conduct and other law. See, e.g., Rules 1.1, 1.8 and 5.6.

**Criminal, Fraudulent and Prohibited Transactions**

[9] Paragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud. This prohibition, however, does not preclude the lawyer from giving an honest opinion about the actual consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is criminal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.

[10] When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See Rule 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. See Rule 4.1.

[11] Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

[12] Paragraph (d) applies whether or not the defrauded party is a party to the transaction. Hence, a lawyer must not participate in a transaction to effectuate criminal or fraudulent avoidance of tax liability. Paragraph (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last clause of paragraph (d) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

[13] If a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law or if the lawyer intends to act

contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct. See Rule 1.4(a)(5).

Exhibit I-5

# Model Rules of Professional Conduct

*CLIENT-LAWYER RELATIONSHIP*
**RULE 1.4 COMMUNICATION**

---

**(a) A lawyer shall:**

**(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;**

**(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;**

**(3) keep the client reasonably informed about the status of the matter;**

**(4) promptly comply with reasonable requests for information; and**

**(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.**

**(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.**

Exhibit I-6

# Model Rules of Professional Conduct

*CLIENT-LAWYER RELATIONSHIP*
**RULE 1.4 COMMUNICATION**

---

**Comment**

[1] Reasonable communication between the lawyer and the client is necessary for the client effectively to participate in the representation.

**Communicating with Client**

[2] If these Rules require that a particular decision about the representation be made by the client, paragraph (a)(1) requires that the lawyer promptly consult with and secure the client's consent prior to taking action unless prior discussions with the client have resolved what action the client wants the lawyer to take. For example, a lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case must promptly inform the client of its substance unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer. See Rule 1.2(a).

[3] Paragraph (a)(2) requires the lawyer to reasonably consult with the client about the means to be used to accomplish the client's objectives. In some situations — depending on both the importance of the action under consideration and the feasibility of consulting with the client — this duty will require consultation prior to taking action. In other circumstances, such as during a trial when an immediate decision must be made, the exigency of the situation may require the lawyer to act without prior consultation. In such cases the lawyer must nonetheless act reasonably to inform the client of actions the lawyer has taken on the client's behalf. Additionally, paragraph (a)(3) requires that the lawyer keep the client reasonably informed about the status of the matter, such as significant developments affecting the timing or the substance of the representation.

[4] A lawyer's regular communication with clients will minimize the occasions on which a client will need to request information concerning the representation. When a client makes a reasonable request for information, however, paragraph (a)(4) requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer, or a member of the lawyer's staff, acknowledge receipt of the request and advise the client when a response may be expected. Client telephone calls should be promptly returned or acknowledged.

**Explaining Matters**

[5] The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. Adequacy of communication depends in part on the kind of advice or assistance that is involved. For example, when there is time to explain a proposal made in a negotiation, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that are likely to result in significant expense or to injure or coerce others. On the other hand, a lawyer ordinarily will not be expected to describe trial or negotiation strategy in detail. The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation.

In certain circumstances, such as when a lawyer asks a client to consent to a representation affected by a conflict of interest, the client must give informed consent, as defined in Rule 1.0(e).

[6] Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers from diminished capacity. See Rule 1.14. When the client is an organization or group, it is often impossible or inappropriate to inform every one of its members about its legal affairs; ordinarily, the lawyer should address communications to the appropriate officials of the organization. See Rule 1.13. Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client.

**Withholding Information**

[7] In some circumstances, a lawyer may be justified in delaying transmission of information when the client would be likely to react imprudently to an immediate communication. Thus, a lawyer might withhold a psychiatric diagnosis of a client when the examining psychiatrist indicates that disclosure would harm the client. A lawyer may not withhold information to serve the lawyer's own interest or convenience or the interests or convenience of another person. Rules or court orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client. Rule 3.4(c) directs compliance with such rules or orders.



MA R S CT RULE 3:07 Rule 1.2                                                        Page 1
S.J.C.Rule 3:07, Rules of Prof.Conduct and Comments, Rule 1.2

C

## WEST'S MASSACHUSETTS RULES OF COURT
## RULES OF THE SUPREME JUDICIAL COURT
### CHAPTER THREE. ETHICAL REQUIREMENTS AND RULES CONCERNING THE PRACTICE OF LAW
### RULE 3:07 MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND COMMENTS
### CLIENT-LAWYER RELATIONSHIP

Copr. © West Group 2003. All rights reserved.

Current with amendments received through 9/1/2003

RULE 1.2 SCOPE OF REPRESENTATION

(a) A lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law and these rules. A lawyer does not violate this rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his or her client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify.

(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities.

(c) A lawyer may limit the objectives of the representation if the client consents after consultation.

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

(e) When a lawyer knows that a client expects assistance not permitted by the rules of professional conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

Adopted June 9, 1997, effective January 1, 1998.

Comment

*Scope of Representation*                                          .

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

MA R S CT RULE 3:07 Rule 1.2                                                             Page 2
S.J.C.Rule 3:07, Rules of Prof.Conduct and Comments, Rule 1.2

[1] A lawyer should seek to achieve the lawful objectives of a client through permissible means. This does not prevent a lawyer from observing such rules of professional courtesy as those listed in Rule 1.2(a). The specification of decisions subject to client control is illustrative, not exclusive. In general, the client's wishes govern the conduct of a matter, subject to the lawyer's professional obligations under these Rules and other law, the general norms of professional courtesy, specific understandings between the lawyer and the client, and the rules governing withdrawal by a lawyer in the event of conflict with the client. The lawyer and client should therefore consult with one another about the general objectives of the representation and the means of achieving them. As the Rule implies, there are circumstances, in litigation or otherwise, when lawyers are required to act on their own with regard to legal tactics or technical matters and they may and should do so, albeit within the framework of the objectives of the representation.

[2] In a case in which the client appears to be suffering mental disability, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14.

*Independence from Client's Views or Activities*

[3] Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities.

*Services Limited in Objectives or Means*

[4] The objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. For example, a retainer may be for a specifically defined purpose. Representation provided through a legal aid agency may be subject to limitations on the types of cases the agency handles. When a lawyer has been retained by an insurer to represent an insured, the representation may be limited to matters related to the insurance coverage. The terms upon which representation is undertaken may exclude specific objectives or means. Such limitations may exclude objectives or means that the lawyer regards as repugnant or imprudent.

[5] An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to agree to representation so limited in scope as to violate Rule 1.1, or to surrender the right to terminate the lawyer's services or the right to settle litigation that the lawyer might wish to continue.

*Criminal, Fraudulent and Prohibited Transactions*

[6] A lawyer is required to give an honest opinion about the actual consequences that appear likely to result from a client's conduct. The fact that a client uses advice in a course of action that is criminal or fraudulent does not, of itself, make a lawyer a party to the course of action. However, a lawyer may not knowingly assist a client in criminal or fraudulent conduct. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.

[7] When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is not permitted to reveal the client's wrongdoing, except where permitted by Rule 1.6 or required by Rule 3.3, 4.1, or 8.3. [FN*] However, the lawyer is required to avoid furthering the purpose, for example, by suggesting how it might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposes is legally proper but then discovers is criminal or fraudulent. See the discussion of the meaning of "assisting" in Comment 3 to Rule 4.1 and the special meaning in Comment 2A to Rule 3.3. Withdrawal from the representation, therefore, may be required. But see Rule 3.3(e).

**FN * Pub. Note: This sentence was amended December 30, 1997, effective March 1, 1998, by**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Exhibit J-3

MA R S CT RULE 3:07 Rule 1.2                                                                          Page 3
S.J.C.Rule 3:07, Rules of Prof.Conduct and Comments, Rule 1.2

adding the reference to Rule 8.3. The amending order provided that, "The amendments accomplished by this order shall . . . apply only to conduct which occurs on or after [March 1, 1998]."

[8] Where the client is a fiduciary, the lawyer may be charged with special obligations in dealings with a beneficiary.

[9] Paragraph (d) applies whether or not the defrauded party is a party to the transaction. Hence, a lawyer should not participate in a sham transaction; for example, a transaction to effectuate criminal or fraudulent escape of tax liability. Paragraph (d) does not preclude undertaking a criminal defense incident to a general retainer for legal services to a lawful enterprise. The last clause of paragraph (d) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

Corresponding ABA Model Rule. Identical to Model Rule 1.2, except the first two sentences of (a) replace the first sentence of the Model Rule.

Corresponding Former Massachusetts Rule. (a) and (b) no counterpart, except that the first sentence of (a) comes from DR 7-101(A); (c) DR 7-101(B)(1); (d) DR 7-102(A)(6) and (7), DR 7-106, S.J.C. Rule 3:08, DF 7; (e) DR 2- 110(C)(1)(c), DR 9-101(C).

S.J.C. Rule 3:07, Rules of Prof. Conduct and Comments, Rule 1.2

MA R S CT RULE 3:07 Rule 1.2

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



MA R S CT RULE 3:07 Rule 1.4                                                                                                      Page 1
S.J.C.Rule 3:07, Rules of Prof.Conduct and Comments, Rule 1.4

c
## WEST'S MASSACHUSETTS RULES OF COURT
## RULES OF THE SUPREME JUDICIAL COURT
## CHAPTER THREE. ETHICAL REQUIREMENTS AND RULES CONCERNING THE PRACTICE OF LAW
## RULE 3:07 MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND COMMENTS
## CLIENT-LAWYER RELATIONSHIP

Copr. © West Group 2003. All rights reserved.

Current with amendments received through 9/1/2003

RULE 1.4 COMMUNICATION

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Adopted June 9, 1997, effective January 1, 1998.

Comment

[1] The client should have sufficient information .to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. For example, a lawyer negotiating on behalf of a client should provide the client with facts relevant to the matter, inform the client of communications from another party and take other reasonable steps that permit the client to make a decision regarding a serious offer from another party. A lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case should promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable. See Rule 1.2(a). Even when a client delegates authority to the lawyer, the client should be kept advised of the status of the matter.

[2] Adequacy of communication depends in part on the kind of advice or assistance involved. For example, in negotiations where there is time to explain a proposal, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that might injure or coerce others. On the other hand, a lawyer ordinarily cannot be expected to describe trial or negotiation strategy in detail. The guiding principle is set forth in the comment to Rule 1.2(a).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

MA R S CT RULE 3:07 Rule 1.4                                                                    Page 2
S.J.C.Rule 3:07, Rules of Prof.Conduct and Comments, Rule 1.4

[3] Ordinarily, the information to be provided is that appropriate for a client who is a comprehending and responsible adult. However, fully informing the client according to this standard may be impracticable, for example, where the client is a child or suffers from mental disability. See Rule 1.14. When the client is an organization or group, it is often impossible or inappropriate to inform every one of its members about its legal affairs; ordinarily, the lawyer should address communications to the appropriate officials of the organization. See Rule 1.13. Where many routine matters are involved, a system of limited or occasional reporting may be arranged with the client. Practical exigency may also require a lawyer to act for a client without prior consideration.

*Withholding Information*

[4] In some circumstances, a lawyer may be justified in delaying transmission of information when the client would be likely to react imprudently to an immediate communication. Thus, a lawyer might withhold a psychiatric diagnosis of a client when the examining psychiatrist indicates that disclosure would harm the client. A lawyer may not withhold information to serve the lawyer's own interest or convenience. Rules or court orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client. Rule 3.4(c) directs compliance with such rules or orders.

*Alternate Dispute Resolution*

[5] There will be circumstances in which a lawyer should advise a client concerning the advantages and disadvantages of available dispute resolution options in order to permit the client to make informed decisions concerning the representation.

Corresponding ABA Model Rule. Identical to Model Rule 1.4.

Corresponding Former Massachusetts Rule. None.

S.J.C. Rule 3:07, Rules of Prof. Conduct and Comments, Rule 1.4

MA R S CT RULE 3:07 Rule 1.4

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

not likely to be educated in or familiar with the controlling law. The lawyer's responsibility to know the law is a challenging one, given the rapid pace of change in many areas of criminal law and procedure.

The decision to plead guilty can be an intelligent one only if the defendant has been advised fully as to his or her rights and as to the probable outcome of alternative choices. Once the lawyer has concluded that it is in the best interests of the accused to enter a guilty plea, it is proper for the lawyer to use reasonable persuasion to guide the client to a sound decision. However, defense counsel should recognize and should make clear to the client that he or she has the right to put the prosecution to its proof and that the decision whether or not to enter a guilty plea is ultimately for the client—not defense counsel—to make.[2]

A lawyer's advice to a defendant to plead guilty merely because the defendant has admitted guilt to the lawyer, without exploring relevant facts or attempting to determine whether the prosecution can establish guilt, is improper. Because of the elements of uncertainty that surround any estimate of probable outcome, the lawyer who has fulfilled the duties of investigation and analysis should not be faulted when subsequent events show that the lawyer's prediction was incorrect.

The matters on which the defendant needs advice before entering a plea go beyond appraisal of the likelihood of conviction or acquittal. Counsel should inform the defendant of the maximum and minimum sentences that can be imposed, but counsel should also be aware of the actual sentencing practices of the court and advise the defendant, when that is possible, what sentence is likely.[3] If a decision is made to enter a plea, counsel should carefully review with the defendant the various subjects on which the court is likely to question the defendant when the plea is offered.

### Misrepresenting the Risks, Hazards, or Prospects

Misrepresenting the prospects of the case to a client considering a plea for any reason, including counsel's desire to obtain employment or to charge a larger fee, is highly improper and prohibited by these Standards. Considerations related to counsel's fee, moreover, should never influence a lawyer's decisions or advice.

---

2. *See* Standard 4-5.2(a).
3. *See* Standard 4-8.1(a).

MASS. TRIAL COURT
HAMPDEN LAW LIBRARY
50 STATE STREET

---

### Cautioning the Client

It is improper for a lawyer to communicate in any way with jurors before and during trial or with prospective jurors about the trial or any other subject, no matter how trivial,[4] and, of course, it is equally improper for the client to do so. Since the accused may be unaware that even casual communication with a juror is an impropriety, the accused should be so cautioned in order to avoid even the appearance of impropriety.

The client's relations with witnesses can pose complex problems. Often persons to be called as witnesses are relatives, friends, or fellow workers with whom normal communication cannot be avoided. The defendant's familiarity with witnesses and their whereabouts may require the defendant's participation in locating them, and the defendant's aid may be needed in securing their willingness to discuss the case with defense counsel and their appearance at trial. Contact by the accused with witnesses involves the risk that something may be said that could later give rise to embarrassment or misunderstanding. The lawyer should caution the defendant to avoid contact or communication with alleged victims or witnesses where this is feasible (it may not be in cases involving family members, for example) unless the lawyer has been consulted and has given approval.

Obviously, just as it is the lawyer's duty to tell all witnesses to tell the truth under all circumstances, so it is the lawyer's duty to admonish the client to so advise any witnesses the client may contact. Counsel should make clear to the client that any conduct of the client's that has even the appearance of an effort to influence or color the testimony of a witness may provide ammunition that the prosecution can use at trial to suggest a consciousness of guilt. Such conduct may also be used to impeach the credibility of the witness. At worst, improper conduct by the client could lead to a charge of obstructing justice or suborning perjury.

## Standard 4-5.2    Control and Direction of the Case

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:

---

4. *See* Standard 4-7.3(a).

Exhibit K-1

(i)  what pleas to enter;
(ii)  whether to accept a plea agreement;
(iii)  whether to waive jury trial;
(iv)  whether to testify in his or her own behalf; and
(v)  whether to appeal.
(b)  Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.
(c)  If a disagreement on significant matters of tactics or strategy arises between defense counsel and the client, defense counsel should make a record of the circumstances, counsel's advice and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relationship.

### History of Standard

Section (a) has been revised to replace the word "are" with the word "include" in the second sentence in order to make it clear that this list is not deemed to be exclusive. Moreover, subsections (ii) and (v) are new to this edition; the remaining subsections have been renumbered accordingly. Section (b) has been revised stylistically, and changes parallel to those made in section (a) have been made to make clear that the list of decisions is not intended to be exclusive. The language "where feasible and appropriate" was added in section (b) to reflect the fact that sometimes consultation is virtually impossible, e.g., in the middle of cross-examination. The decision as to "what evidence should be introduced" was also added to the list contained in section (b). Section (c) has been revised stylistically.

### Related Standards

ABA Model Code of Professional Responsibility EC 5-12; EC 7-7 (1969)
ABA Model Rules of Professional Conduct 1.2(a) (1983)
ABA Standards for Criminal Justice 4-8.3(d)(3d ed. 1993)

ABA Standards for Criminal Justice 14-1.3; 14-3.2; 15-1.2; 15-1.3 (2d ed. 1980)

### Commentary

#### Allocation of Decision-making Power

Certain basic decisions have come to belong to the client while others fall within the province of the lawyer.[1] The requirement that the defendant personally enter a guilty plea and that it be voluntary and informed carries the implication that it is the defendant who must make the choice as to the plea to be entered and, concomitantly, whether to accept a proffered plea agreement. Similarly, the decisions whether to waive a jury trial or whether to take an appeal have long been considered to belong to the defendant.[2] With respect to the decision whether the defendant should testify, the lawyer should give his or her client the benefit of his or her advice and experience, but the ultimate decision must be made by the defendant, and the defendant alone.[3] In making each of these decisions—whether to plead guilty, whether to accept a plea agreement, whether to waive jury trial, whether to testify, and whether to appeal—the accused should have the full and careful advice of counsel. Although it is highly improper for counsel to demand that the defendant follow what counsel perceives as the desirable course or for counsel to coerce a client's decision through misrepresentation or undue influence,[4] counsel is free to engage in fair persuasion and to urge the client to follow the proffered professional advice. Ultimately, however, because of the fundamental nature of decisions such as these, so crucial to the accused's fate, the accused must make the decisions himself or herself.

#### Strategy and Tactics

In general, the power of decision in matters of trial strategy and tactics rests with the lawyer, after consultation with the client when such consultation is, in the lawyer's judgment, both feasible and appropriate. The lawyer should determine which witnesses should be called on behalf of the defendant. Similarly, the lawyer should decide what evidence

1. *See* ABA Model Rule of Professional Conduct 1.2(a).
2. *See* Jones v. Barnes, 463 U.S. 745, 751, 753 n.6 (1983).
3. *Cf.* Rock v. Arkansas, 483 U.S. 44 (1987).
4. *See* Standard 4-5.1(b) (counsel should not exert undue influence on the accused's decision as to his or her plea).

MASS. TRIAL COURT
HAMPDEN LAW LIBRARY
50 STATE STREET

Exhibit K-2

should be introduced, whether to object to the admission of evidence, whether and how a witness should be cross-examined, and whether to stipulate to certain facts.

Many of the rights of an accused, including constitutional rights, are such that only trained experts can comprehend their full significance, and an explanation to any but the most sophisticated client would be futile. Numerous strategic and tactical decisions must be made in the course of a criminal trial, many of which are made in circumstances that do not allow extended, if any, consultation. Every experienced advocate can recall the disconcerting experience of trying to conduct the examination of a witness or follow opposing arguments or the judge's charge while the client "plucks at the attorney's sleeve" offering gratuitous suggestions. Some decisions, especially those involving which witnesses to call, can be anticipated sufficiently so that counsel can ordinarily consult with the client concerning them. Because these decisions require the skill, training, and experience of the advocate, the power of decision on them should rest with the lawyer. The lawyer should seek to maintain a professional relationship at all stages while maintaining the ultimate choice and responsibility for the strategic and tactical decisions in the case.

It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.

### Record of Advice

A disagreement between counsel and the accused on a significant decision to be made before or during the trial may be the subject of postconviction proceedings questioning the effectiveness of the lawyer's performance. Rather than leave the matter to be determined on the strength of the memories of the lawyer and client, which are invariably in conflict if the issue arises, some record should be made. This may be accomplished by a memorialization of the nature of the disagreement as to such significant decision, the advice given, and the action taken.

# PART VI.

# DISPOSITION WITHOUT TRIAL

### Standard 4-6.1   Duty to Explore Disposition Without Trial

(a) Whenever the law, nature, and circumstances of the case permit, defense counsel should explore the possibility of an early diversion of the case from the criminal process through the use of other community agencies.

(b) Defense counsel may engage in plea discussions with the prosecutor. Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial.

### History of Standard

Section (a) has been revised stylistically and the word "law" added in recognition of the fact that such diversion may not be lawful in every case in every jurisdiction. In section (b), the clause at the end of the first sentence in the previous edition was deleted ("although ordinarily the client's consent to engage in such discussions should be obtained in advance"). Further, the word "appropriate" in the second sentence was substituted for the phrase "a full."

### Related Standards

ABA Standards for Criminal Justice 3-4.1; 4-4.1(a) (3d ed. 1993)
ABA Standards for Criminal Justice 11-5.2; 14-3.2 (2d ed. 1980)

### Commentary

#### Exploring Early Diversion

The criminal process is only one of a number of methods society uses to deal with antisocial conduct. But in many cases involving law violations, it may not be in the best interests of either society or the accused to pursue criminal prosecution. Prosecutors long have exercised their

MASS. TRIAL COURT
HAMPDEN LAW LIBRARY
50 STATE STREET

Exhibit K-3

defendant to plead guilty merely because the defendant has admitted guilt to the lawyer, without exploring all of the relevant facts or attempting to determine whether the prosecution can establish guilt, is improper.[5] Because of the elements of uncertainty that surround any estimate of probable outcome, the lawyer who has fulfilled the duties of investigation and analysis should not be faulted when subsequent events show that the lawyer's prediction was incorrect.

The matters on which the defendant needs advice before entering a plea go beyond appraisal of the likelihood of conviction or acquittal. Counsel should inform the defendant of the maximum and minimum sentences that can be imposed, but counsel should also be aware of the actual sentencing practices *of the court* and advise *the defendant*, where that is possible, what sentence is likely. If a decision is made to enter a plea, counsel should carefully review with the defendant the various subjects the court is likely to question the defendant on when the plea is offered.[6]

### Misrepresenting the Risks, Hazards, or Prospects

Overreaching the client by misrepresenting the prospects of the case in order to obtain employment as counsel or to charge a larger fee is unprofessional conduct requiring disciplinary sanction, and the courts have so held.[7] Considerations related to counsel's fee, moreover, should never influence a lawyer's decisions or advice.

### Cautioning the Client

It is improper for a lawyer to communicate in any way with jurors before and during trial or with prospective jurors about the trial or any other subject, no matter how trivial,[8] and, of course, it is equally im-

5. *See* Cole v. Slayton, 378 F. Supp. 364 (W.D. Va. 1974); Wray v. Hopper, 377 F. Supp. 653 (M.D. Ga. 1974). *But see* Clark v. Western Dist. of Okla., 399 F. Supp. 305 (W.D. Okla. 1975).

6. For the advice recommended to be given to defendants when a plea is tendered, see standard 14-1.4.

7. State Bd. of Law Examiners v. Sheldon, 43 Wyo. 522, 7 P.2d 226 (1932); *see* United States v. Stringer, 124 F. Supp. 705 (D. Alas. 1954); *In re* Karp, 240 App. Div. 388, 270 N.Y.S. 113, *aff'd* 266 N.Y. 473, 195 N.E. 160 (1934). *See also* People *ex rel.* Chicago Bar Ass'n v. Green, 353 Ill. 638, 187 N.E. 811 (1933).

8. *See* standard 4-7.3(a).

---

proper for the client to do so. Since the accused may be unaware that even casual communication with a juror is an impropriety, the accused should be so cautioned in order to avoid even the appearance of impropriety.

The client's relations with witnesses can pose complex problems. Often persons to be called as witnesses are relatives, friends, or fellow workers with whom normal communication cannot be avoided. The defendant's familiarity with witnesses and their whereabouts may require the defendant's participation in locating them, and the defendant's aid may be needed in securing their willingness to discuss the case with defense counsel and their appearance at trial. Contact by the accused with witnesses involves the risk that something may be said that could later give rise to embarrassment or misunderstanding. The lawyer should caution the defendant to avoid communication with witnesses unless approved by the lawyer.

Obviously, just as it is the lawyer's duty to tell all witnesses to tell the truth under all circumstances, so it is the lawyer's duty to admonish the client to so advise any witnesses the client may contact. Counsel should make clear to the client that any conduct of the client's that has even the appearanace of an effort to influence or color the testimony of a witness may provide ammunition that the prosecution can use at trial to suggest a consciousness of guilt. Such conduct may also be used to impeach the credibility of the witness. At worst, improper conduct by the client could lead to a charge of obstructing justice or suborning perjury.

## Standard 4-5.2. Control and direction of the case

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:

(i) what plea to enter;

(ii) whether to waive jury trial; and

(iii) whether to testify in his or her own behalf.

(b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical

Exhibit L-1

decisions are the exclusive province of the lawyer after consul[ta]tion with the client.

(c) If a disagreement on significant matters of tactics or strateg[y] arises between the lawyer and the client, the lawyer should mak[e] a record of the circumstances, the lawyer's advice and reasons, an[d] the conclusion reached. The record should be made in a manne[r] which protects the confidentiality of the lawyer-client relation[ship].

### History of Standard

There are stylistic changes only.

### Related Standards

ABA, Standards for Criminal Justice 14-1.3, 14-3.2, 15-1.2, 15-1[ ]

### Commentary

#### Allocation of Decision-making Power

As established by the history of the criminal justice process and th[e] rights vested in an accused under the Constitution, certain basic deci[sions] have come to belong to the client while others fall within the province of the lawyer. The requirement that the defendant personall[y] enter a guilty plea and that it be voluntary and informed carries th[e] implication that it is the defendant who must make the choice.[1] Simi[larly], the decision whether to waive a jury trial has been considered t[o] belonging to the defendant.[2] With respect to the decision whether th[e] defendant should testify, the lawyer "should give his client the benefi[t] of his advice and experience, but the ultimate decision must be mad[e] by the defendant, and the defendant alone."[3] In making each of the[se] decisions — whether to plead guilty, whether to waive jury trial, an[d] whether to testify — the accused should have the full and careful advi[ce]

1. *See* Boykin v. Alabama, 395 U.S. 238 (1969); Machibroda v. United States, 368 U.S. 487 (1962); Kercheval v. United States, 274 U.S. 220 (1927).

2. *See* Patton v. United States, 281 U.S. 276, 298 (1930).

3. Levy, *Some Comments on the Trial of a Criminal Case*, 10 Rec. Assn. B. City N.Y. 203, 2[ ] (1955), *accord*, Steinberg & Paulsen, *A Conversation with Defense Counsel on Problems of a Crimi[nal] Defense*, 7 Prac. Law. 25, 37 (May 1961).

4 · 66

of counsel. Although counsel should not demand that the defendant follow what counsel perceives as the desirable course, counsel is free to engage in fair persuasion and to urge the client to follow the proffered professional advice. Ultimately, however, because of the fundamental nature of these three decisions, so crucial to the accused's fate, the accused must make the decisions.

Some other significant decisions fall into a gray zone. The Supreme Court has indicated, for example, that on a petition for habeas corpus the federal courts should hold the petitioner to have waived a constitutional right only if it is established that the petitioner deliberately bypassed the available state procedure. The court emphasized that the waiver would be found only if the defendant made the choice.[4] The Court also has stated that the defendant would be bound by the attorney's deliberate choice of a trial strategy to forgo an objection available on constitutional grounds.[5]

#### Strategy and Tactics

In general, however, it may be said that the power of decision in matters of trial strategy and tactics rests with the lawyer.[6] The lawyer must be allowed to determine which witnesses should be called on behalf of the defendant.[7] Similarly, the lawyer must be allowed to decide whether to object to the admission of evidence,[8] whether and how a witness should be cross-examined,[9] and whether to stipulate to certain facts.[10] Cases that have reversed convictions for failure of counsel to call certain witnesses, cross-examine, object to evidence, and the like, have been decided not on the ground that counsel should have heeded the client's wishes on such matters, but on a determination that these actions of counsel in these cases were not strategic or tactical decisions but, rather, revealed ineptitude, inexperience, lack of prepara-

4. Fay v. Noia, 372 U.S. 391, 438-439 (1963).

5. Henry v. Mississippi, 379 U.S. 443, 451-452 (1965); Curry v. Wilson, 405 F.2d 110 (9th Cir. 1968), *cert. denied*, 397 U.S. 973 (1970).

6. *See* Henry v. Mississippi, 379 U.S. 443 (1965); Nelson v. California, 346 F.2d 73 (9th Cir. 1965), *cert. denied*, 382 U.S. 964 (1965).

7. *See* Vess v. Peyton, 352 F.2d 325 (4th Cir. 1965).

8. *See* Hester v. United States, 303 F.2d 47 (10th Cir. 1962); People v. Rideaux, 61 Cal. 2d 537, 393 P.2d 703, 39 Cal. Rptr. 391 (1964).

9. *See* O'Malley v. United States, 285 F.2d 733 (6th Cir. 1961).

10. *See* People v. Woods, 23 Ill. 2d 471, 179 N.E.2d 11 (1961).

4 · 67

Exhibit L-2

tion, or unfamiliarity with basic legal principles amounting to ineffective assistance of counsel.[11]

Many of the rights of an accused, including constitutional rights, are
such that only trained experts can comprehend their full significance,
and an explanation to any but the most sophisticated client would be
futile. Numerous strategic and tactical decisions must be made in the
course of a criminal trial, many of which are made in circumstances that
do not allow extended, if any, consultation. Every experienced advocate
can recall the disconcerting experience of trying to conduct the examination of a witness or follow opposing arguments or the judge's charge
while the client "plucks at the attorney's sleeve" offering gratuitous
suggestions. Some decisions, especially those involving which witnesses
to call and in what sequence and what should be said in argument to
the jury, can be anticipated sufficiently so that counsel can ordinarily
consult with the client concerning them. Because these decisions require
the skill, training, and experience of the advocate, the power of decision
on them must rest with the lawyer, but that does not mean that the
lawyer should completely ignore the client in making them. The lawyer
should seek to maintain a cooperative relationship at all stages while
maintaining the ultimate choice and responsibility for the strategic and
tactical decisions in the case.

It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the
trial court may be willing to submit to the jury. Indeed, because this
decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be
the one to decide whether to seek submission to the jury of lesser
included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the
court should be asked to submit to the jury the lesser included
offense of manslaughter.

### Record of Advice

A disagreement between counsel and the accused on a decision to
be made before or during the trial may be the subject of postconvic

11. *See* Bell v. Georgia, 554 F.2d 1360 (5th Cir. 1977); Pinnell v. Cauthron, 540 F.2d
(8th Cir. 1976); United States *ex rel.* Rosner v. Commr., N.Y. State Dept. of Correction,
421 F. Supp. 781 (S.D.N.Y. 1976).

tion proceedings questioning the effectiveness of the lawyer's performance. Rather than leave the matter to be determined on the
strength of the memories of the lawyer and client, which are invariably in conflict if the issue arises, some record should be made. This
may be accomplished by a notation of the nature of the disagreement,
the advice given, and the action taken, either in the lawyer's file or by
letter to the client, depending on the gravity of the problem. If advisory councils are established,[12] a new means will be available to lawyers to meet this problem.*

12. *See* standard 4-1.4.

*Note on the deletion of original standard 5.3.* — Essentially, original standard 5.3 provided
that if a defendant seeks to plead guilty, acknowledging guilt in open court but privately
maintaining to defense counsel that he or she is innocent, counsel is obliged to inform
the court of the defendant's true position. This standard is unnecessary if the court is
willing to accept a guilty plea even though the defendant claims innocence. Such pleas
may be accepted by trial judges, as the Supreme Court made clear in *North Carolina v. Alford*,
400 U.S. 25 (1970), and the chapter on Pleas of Guilty recommends that such pleas not
be refused in the absence of "specific reasons for doing so which are made a matter of
record." *See* standard 14-1.6. If, however, a so-called *Alford* plea is either not accepted by
the court or is not offered by the defendant, it does not follow that defense counsel should
be required to reveal to the court that the defendant privately denies guilt to counsel. As
long as the defendant openly acknowledges guilt to the court and a factual basis for the
plea is present, this is deemed sufficient. If counsel were to tell the court that the defendant
privately insists that he or she is innocent, the result is likely to be unsatisfactory. The
defendant will most likely insist to the court that he or she is, in fact, guilty because the
defendant wants the plea to be accepted; and that any statements previously made to
counsel were false. It is probable, moreover, that prior to entry of the guilty plea, defense
counsel will have devoted considerable effort to convincing the defendant to do just what
the defendant has finally done — to openly admit wrongdoing. When the defendant
finally does plead guilty, and defense counsel then reports to the court that the defendant
privately maintains innocence, the defendant is likely to find counsel's actions baffling.
Meanwhile, acceptance of the guilty plea will be jeopardized, despite the presence of a
factual basis and the defendant's public admission of guilt. The attorney-client relationship will also probably have been destroyed. As a matter of practice among defense
counsel, it is believed that adherence to original standard 5.3 was virtually nonexistent.
Under no circumstances, however, should a lawyer recommend to a defendant acceptance
of a plea unless a full investigation and study of the case has been completed, including
an analysis of controlling law and the evidence likely to be introduced at trial. *See* standards 4-4.1, 4-5.1(a), and 4-6.1(b).

If the defendant is placed under oath when the plea is offered, the problem for defense
counsel seemingly becomes more difficult because the defendant's statements will be
perjurious. This situation obviously is similar to that confronted when a defendant seeks
to lie under oath at his or her trial. This chapter, however, does not address the so-called
client perjury problem. *See* the editorial note to 4-7.7.

Exhibit L-3

Exhibit M-1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                    SUPERIOR COURT
                                           NO. 33618-33619

COMMONWEALTH

v.

NANCY NETTO

MOTION FOR NEW TRIAL

Now comes the Defendant by and through her undersigned counsel in the above-referenced matter and hereby moves this Honorable Court for a new trial pursuant to Rule 30(b) of the Massachusetts Rules of Criminal Procedure.

In accordance with Superior Court Rule 61A (A), the Defendant states that she was convicted of first-degree murder in this Court in the above-referenced case on March 19, 1996 and then sentenced by Judge Charles J. Hely to life imprisonment.

On March 22, 1996, the Defendant filed a motion pursuant to Rule 25 (b)(2) and Rule 30(b) of the Massachusetts Rules of Criminal Procedure seeking to set aside the verdicts and the entry of findings of not guilty, or in the alternative, seeking a new trial or the entry of a finding on any lesser included offense to the offenses charged. Judge Hely denied the Defendant's motion on May 3, 1996.

The Supreme Judicial Court reviewed the judgment of conviction in accordance with G.L. c. 278, § 33E and, on February 14, 2003, it affirmed the conviction without any reduction in the sentence. Commonwealth v. Netto, 438 Mass. 686, 707 (2003).

As facts and grounds for this motion, the Defendant states that she has been denied the effective assistance of counsel and the due process of law guaranteed by the Sixth Amendment and the Fourteenth Amendments to the United States Constitution and by Article 1, Article 10, and Article 12 of the

Massachusetts Declaration of Rights and by c. 1, § 1,
art. 4 of the second part of the state constitution.

     More specifically, with respect to her federal and
state claims of ineffective assistance of counsel, the
Defendant avers as follows:

     1.   Since the decision whether to forgo a lesser
          included offense instruction is an important
          decision in a criminal case which is the
          functional equivalent of a fundamental
          decision and this decision could only be
          made by the Defendant after consultation
          with Counsel, the Defendant received
          ineffective assistance of counsel under
          Strickland v. Washington because her Counsel
          did not permit her to make the decision or
          even consult with her about the decision
          whether to undertake an all-or-nothing
          defense and to forgo lesser included offense
          instructions.

     2.   Since the decision whether to forgo a lesser
          included offense instruction is an important
          decision in a criminal case, the Defendant
          received ineffective assistance of counsel
          under Strickland v. Washington because her
          Counsel did not even consult with her about
          the decision he made to undertake an all-or-
          nothing defense and to forgo lesser included
          offense instructions.

     3.   The Defendant must be granted a new trial
          because minimum state constitutional
          standards of attorney performance required
          Counsel to at least consult with the
          Defendant regarding the decision he made
          to undertake an all-or-nothing defense
          and to forgo lesser included offense
          instructions.

     As further facts and grounds for this motion, the
Defendant states that the Commonwealth's presentation
of "fresh fingerprint" testimony resulted in a
substantial risk of a miscarriage of justice because it
was based on outrageously flawed forensic evidence.

This error also deprived the Defendant of her rights to
a fair trial and to the due process of law guaranteed
by the Sixth and the Fourteenth Amendments to the
federal constitution and by Article 1, Article 10, and
Article 12 of the Massachusetts Declaration of Rights
and by c. 1, § 1, art. 4 of the second part of the
state constitution.   To the extent the Defendant's
Counsel did not do anything to challenge the "fresh
fingerprint" testimony as being premised on flawed
forensics, the Defendant was denied the effective
assistance of counsel guaranteed by the Sixth and
Fourteenth Amendments to the federal constitution and
by Article  12 of the Massachusetts Declaration of
Rights.

     A comprehensive memorandum of law accompanies this
motion along with affidavits from the Defendant, Nancy
Netto; the Defendant's trial counsel, Attorney J. Drew
Segadelli; and nationally recognized fingerprint
expert, Kenneth R. Moses.

     The Defendant respectfully requests an evidentiary
hearing on all matters raised by this motion.

               NANCY NETTO

               By her Attorney,


               _Stephen Paul Maidman_
               STEPHEN PAUL MAIDMAN, ESQUIRE
               1145 Main Street, Suite 417
               Springfield, Massachusetts  01103
               (413) 731-7300
               Maidman@Prodigy.net
               BBO No. 631882

Exhibit M-4

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                    SUPERIOR COURT
                                           NO. 33618-33619


COMMONWEALTH

v.

NANCY NETTO


AFFIDAVIT OF NANCY NETTO

I, Nancy Netto, depose and say as follows:

1. I am the Defendant in this case.

2. Attorney Segadelli was my lawyer for the trial of this case.

3. I attended my trial and listened carefully to the testimony.

4. I was convicted of first-degree murder and armed robbery.

5. My first-degree murder conviction was based on felony-murder with armed robbery as the felony.

6. At the time of trial, I knew that that if the jury returned a verdict finding me guilty of first-degree murder, I would be sentenced to prison for the rest of my life with no chance for parole.

7. Attorney Segadelli did not tell me anything about lesser included offenses which might be available in my case.

8. Attorney Segadelli did not tell me that he could ask the judge to instruct the jury on the crime of unarmed robbery.

9. Attorney Segadelli did not tell me he could ask the judge to instruct the jury on the crime of larceny.

10. Attorney Segadelli did not explain to me the potential advantages and the potential disadvantages of asking for the judge to instruct the jury on lesser included offenses in my case.

11. Attorney Segadelli did not give me the opportunity to make the decision on whether or not to ask the judge to instruct the jury on lesser included offenses that might be available in my case.

12. Attorney Segadelli did not ask me for my opinion on whether I wanted him to ask the judge to instruct the jury on lesser included offenses.

13. I now know that if I had been convicted of a lesser included offense, I might have been convicted of a crime which would have at least offered me a chance at parole.

14. Based upon what I now know about lesser included offenses, if I had been asked at the time of trial to make the decision whether I wanted the jury instructed on lesser included offenses, I would have told Attorney Segadelli that my choice would have been to ask the judge to instruct the jury on lesser included offenses.

15. Based upon what I now know about lesser included offenses, if Attorney Segadelli had asked me at the time of trial for my opinion on whether I wanted the jury instructed on lesser included offenses, I would have told Attorney Segadelli that I wanted him to ask the judge to instruct the jury on lesser included offenses.

16. Based upon what I now know about lesser
    included offenses, at the time of trial I
    would have never gambled on the jury
    returning a not guilty verdict for first-
    degree murder based on armed robbery with
    absolutely no chance for parole when it was
    possible to ask the judge to instruct the
    jury on lesser included offenses which might
    have still resulted in a guilty verdict for
    me but which would have at least given me a
    chance for parole.

      SIGNED UNDER THE PAINS AND PENALTIES OF
PERJURY THIS _7th_ DAY OF APRIL, 2004.


                    _Nancy Netto_____
                    Nancy Netto

Exhibit M-7

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                                        SUPERIOR COURT
                                                               No. 33618-33619

COMMONWEALTH

vs.

NANCY NETTO

**AFFIDAVIT OF ATTORNEY J. DREW SEGADELLI**

I, Attorney J. Drew Segadelli, being duly sworn, depose and state the following:

1.    I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I am an attorney in good standing with the bar and sworn in on December 17, 1986.

2.    I was requested by the Committee for Public Counsel Services to represent the defendant at trial in this case as it related to an indictment charging first degree murder.

3.    I accepted the appointment and represented the defendant at her trial held in the Taunton Superior Court.

4.    Pursuant to my representation and presentation of the defendant's case, I did not retain the services of a fingerprint expert to assist me prior to trial.

5.    The defendant and I at no time discussed the decision on whether to ask the trial judge to instruct the jury on any lessor included offense.

6.    Therefore, the defendant was not given the opportunity to make the decision with regard to an instruction to the jury on any lesser included offense.

Respectfully submitted and signed under the pains and penalties of perjury this 30th day of March, 2004.

J. Drew Segadelli, Esquire
Fagan, Goldrick & Segadelli, P.C.
536 Main Street
Falmouth, MA 02540
(508) 540-6900
BBO# 548168

FAGAN, GOLDRICK
& SEGADELLI, P.C.
ATTORNEYS AT LAW
536 MAIN STREET
FALMOUTH, MA 02540
(508) 540-6900

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                    SUPERIOR COURT
                                           NO. 33618-33619


COMMONWEALTH

v.

NANCY NETTO


AFFIDAVIT OF KENNETH R. MOSES

I, Kenneth R. Moses, depose and say as follows:

1. I am a nationally recognized fingerprint
   expert based in San Francisco, California.

2. I have over thirty years experience in
   evaluating forensic evidence including
   fingerprint evidence.

3. I was employed for more than twenty-five years
   as a latent print examiner and crime scene
   investigator for the San Francisco Police
   Department.

4. I have been involved in the investigation of
   over 17,000 crime scenes including
   approximately 500 homicide crime scenes.

5. I have testified as a forensic expert in over
   750 cases in both state and federal courts.

6. I am a member of the American Academy of
   Forensic Sciences and the International
   Association for Identification.

7. I am certified as a Latent Print Examiner by the International Association for Identification.

8. I have reviewed pages 85 through 89 of Volume III of the trial transcript in the above-referenced case wherein the Commonwealth's fingerprint expert, Trooper Richard Lauria of the Massachusetts State Police, testified that the fingerprint found on the door was "a fairly fresh print" and probably no more than three or four days old.

9. Trooper Lauria's testimony regarding the "freshness" of the Defendant's fingerprint expresses an opinion that is not shared by the peer community and is contrary to empirical experience and testing.

10. Wide variations exist in the ability of a latent print to survive even under harsh conditions.  As a result, development of a latent print at a crime scene is no guarantee of its having been recently placed.

11. No reliable indication of a print's freshness can be obtained from its rate of development or appearance after it is developed.

12. The estimation of·the age of a latent print is fraught with danger and may result in a wrongful conviction.


      SIGNED UNDER THE PAINS AND PENALTIES OF
PERJURY THIS /9 DAY OF MARCH, 2004.


                        _____
                        KENNETH R. MOSES

Exhibit N-1

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                     SUPERIOR COURT
                                            NO. 33618-33619


COMMONWEALTH

v.

NANCY NETTO


## MOTION FOR FUNDS FOR FINGERPRINT EXPERT

Now comes the Defendant by and through her
undersigned counsel in the above-referenced matter and
respectfully moves this Honorable Court, pursuant to
Rule 30(c)(5) of the Massachusetts Rules of Criminal
Procedure and G.L. c. 261, § 27(c), to authorize funds
for payment by the Commonwealth of expenses not to
exceed $5,000.00 so that the Defendant can secure the
services of a fingerprint expert.

The Defendant wishes to utilize the services of
nationally recognized fingerprint expert Kenneth R.
Moses of San Francisco, California in the preparation
and presentation of her motion for new trial to this
Court.  The amount requested is expected to cover Mr.
Moses' professional fees for his services and his
travel expenses to and from Massachusetts.

The Defendant states that the services of a
fingerprint expert are necessary for the proper
preparation and presentation of her motion for new
trial to this Court.  The Defendant further states that
the requested funds are "reasonably necessary to assure
[him] as effective . . . a defense as he would have if
he were financially able to pay."  Commonwealth v.
Lockley, 381 Mass. 156, 160 (1980); G.L. c. 261,
§ 27(c).

The allowance of the funds necessary to pay for
the services of a fingerprint expert is entirely
appropriate under the circumstances of her case because
it will permit the Defendant to fully develop a well
founded basis for granting the Defendant's motion for
new trial.  See Substantive Argument II set forth in
the Defendant's Memorandum of Law In Support of Motion

for New Trial at 59-62; Affidavit of Kenneth R. Moses. See also Commonwealth v. Mitchell, 437 Mass. 535, 555, cert. denied, __U.S.__, 123 S.Ct. 2253 (2003)(applying Rule 30(c)(5)); Reporters' Notes to Mass. R. Crim. P. 30(c)(5), Mass. Rules of Court - State at 193 (West 2003)("In making the decision to allow costs associated with a new trial motion, the judge should take into account the likelihood that the expenditure will result in the defendant's being able to present a meritorious ground for a new trial.").

This allocation of funds is also required in order to protect the Defendant's rights to the equal protection of the law and to due process, as well as her right to present a defense, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by Article 1, Article 10, and Article 12 of the Massachusetts Declaration of Rights and by c. 1, § 1, art. 4 of the second part of the state constitution.

An Affidavit of Counsel accompanies this motion.

NANCY NETTO

By her Attorney,


STEPHEN PAUL MAIDMAN, ESQUIRE
1145 Main Street, Suite 417
Springfield, Massachusetts  01103
(413) 731-7300
Maidman@Prodigy.net
BBO No. 631882

Exhibit N-3

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                                        SUPERIOR COURT
                                               NO. 33618-33619

COMMONWEALTH

v.

NANCY NETTO

AFFIDAVIT OF COUNSEL

I, Stephen Paul Maidman, depose and say:

    1.  I am an attorney licensed to practice law
       in the Commonwealth of Massachusetts.

    2.  The Defendant is presently incarcerated
       at MCI/Framingham and is serving her life
       sentence for first-degree murder.

    3.  The Committee for Public Counsel Services
       (CPCS) assigned me to represent the
       Defendant on July 16, 2003.  A copy of
       the Notice of Assignment of Counsel (NAC
       C8001277-4) is attached hereto.

    4.  I need the services of a fingerprint
       expert to prepare for and to offer
       testimony at an evidentiary hearing on
       the Defendant's motion for new trial.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
THIS 12th DAY OF APRIL 2004.

_Stephen Paul Maidman_

STEPHEN PAUL MAIDMAN, ESQUIRE
1145 Main Street, Suite 417
Springfield, Massachusetts  01103
(413) 731-7300
Maidman@Prodigy.net
BBO No. 631882

Exhibit N-4

| NOTICE OF ASSIGNMENT OF COUNSEL | Assignment Number C8001277-4 | COMMONWEALTH OF MASSACHUSETTS |
|---|---|---|
| **Date of Assignment** 7/16/2003 | **Judge** CPCS | **Court** 471  Bristol Superior Court | **JurySession** ☐ |

**Name of Person for whom counsel assigned**
Nancy Netto

**Juv/Adult**

The court has found the above-named person:

**Docket No.**    33618

**Incarceration Status**
MCI-Framingham

**Indigent**    ☑
**Contribution**

**Post-Trial Criminal Case Purpose Of Assignment**
NTM

**Offense / Charge**
601    Murder

**Attorney Assigned**

| **BBO** | 631882 |
|---|---|
| **Name** | Stephen Maidman |
| **Address** | 1145 Main St Ste 417 |
| | Springfield, MA  01103 |
| **Phone** | (413) 731-7300 |

**Authorized Signature**    *Denise Simonini*
Denise Simonini

Wednesday, July 16, 2003

Exhibit O-1

Commonwealth of Massachusetts
Superior Court

Bristol, ss.                                                Ind. 33618 & 33619

```
BRISTOL, SS SUPERIOR COURT
          FILED

        AUG 1 1 2004

    MARC J. SANTOS, ESQ.
      CLERK/MAGISTRATE
```

COMMONWEALTH

v.

NANCY J. NETTO

MEMORANDUM OF DECISION AND
ORDER ON MOTION FOR NEW TRIAL

A.  Introduction

In March, 1996, a jury in the Superior Court found the defendant guilty of murder

in the first degree by armed robbery felony murder.  A few days after the trial, the

defendant filed a motion for a new trial or for a finding of guilty of a lesser offense.  The

trial judge denied the motion.  In her appeal, the Supreme Judicial Court affirmed the

defendant's murder conviction.  *Commonwealth v. Netto*, 438 Mass. 686 (2003).

The defendant was represented at her trial and in her first motion for a new trial

by Attorney J. Drew Segadelli.  The defendant was represented in her appeal by

Attorney Steven J. Rappaport.  The defendant is now represented by a third attorney.

In April, 2004, the defendant filed a second motion for a new trial.  This motion is

denied.

The issues raised in the motion for a new trial have been waived by the

defendant's failure to raise them at the trial, in a prior motion for a new trial, and in the

prior appeal.  *Commonwealth v. Pisa*, 384 Mass. 362, 366 (1981).  The defendant's

present claim that Attorney Segadelli deprived her of the effective assistance of counsel

Exhibit O-2

2

at the trial could have been raised by Attorney Rappaport in the appeal or by filing a motion for a new trial on this ground while the appeal was pending. The defendant's present motion for a new trial and memorandum do not argue that Attorney Rappaport was ineffective in his representation of the defendant during the appeal.

The motion for a new trial is denied because the claim of ineffective assistance of counsel has been waived by the defendant's failure to raise it while her appeal was pending and while she was represented by Attorney Rappaport. The motion is also denied for the independent reason that Attorney Segadelli provided skillful, competent representation of the defendant during the trial. He did not deprive the defendant of her constitutional right to the effective assistance of counsel.

Ineffective assistance of counsel means "serious incompetency, inefficiency or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The defendant must also show that counsel's behavior "likely deprived the defendant of an otherwise available, substantial ground of defence." *Id.* Counsel's tactical judgments are not evidence of incompetence unless they are "'manifestly unreasonable.'" *Commonwealth v. White,* 409 Mass. 266, 273 (1991).


B. Lesser Included Offense Instruction

Trial counsel's tactical decision to not request an instruction on unarmed robbery and felony murder by unarmed robbery was not ineffective assistance of counsel, whether or not counsel fully consulted the defendant on this issue. The decision to not request the instruction was not manifestly unreasonable. The Supreme Judicial Court

Exhibit O-3

3

has ruled in this case that counsel's decision "was a reasonable tactical decision." 438 Mass. at 707.

The Supreme Judicial Court has also determined in this case that the lack of an instruction on unarmed robbery and felony murder by unarmed robbery did not create a substantial risk of a miscarriage of justice. 438 Mass. at 704-07. In my judgment based on the evidence at the trial, counsel's decision did not deprive the defendant of a substantial ground of defense. See *Commonwealth v. Silva*, 25 Mass. App. Ct. 220, 227-28 (1987) (discussing the relationship between on an ineffective counsel claim and a prior appellate ruling that there was no substantial risk of a miscarriage of justice).

Assuming that trial counsel had consulted with the defendant and had requested and received such an instruction, there was still "abundant evidence" that the defendant committed the robbery with a conscious disregard of the risk to human life. 438 Mass. at 705. Counsel reasonably chose to focus on the more promising argument that the defendant was not a participant in the robbery and killing rather than trying to also pursue the unlikely theory that as a participant she did not have a conscious disregard of the risk to human life. "It would not have aided the defense to have the judge tell the jury that what was being argued to them as a fatal weakness in the Commonwealth's evidence was not in fact an impediment to the jury's finding her guilty of felony-murder in the first degree." 438 Mass. at 707. This was not ineffective assistance by trial counsel.

There was also no ineffectiveness of counsel or loss of a substantial ground of defense regarding a possible instruction on the lesser offense of larceny. The jury submitted a question about the issue of whether Nancy Netto was present in the

4

victim's apartment at the time he was killed.  See 428 Mass at 706 n. 19.  The trial

judge's instructions in response to this question included an instruction that if the joint

venturer did not become involved until after the victim had already been killed, the joint

venturer would not be guilty of armed robbery or of any form of murder.  *Id.*  After

considering these instructions, the jury found unanimously and beyond a reasonable

doubt that the defendant participated as a joint venturer in an armed robbery and that

the killing was incidental to and the natural and probable consequence of the armed

robbery.  *Id.*  In these circumstances, the absence of a larceny instruction, with or

without consultation with the defendant, was not likely to have deprived the defendant

of a substantial ground of defense.  *Saferian, supra.*


## C.  Fingerprint Evidence

At the trial, the defendant did not dispute the fact that the latent fingerprint on the

inside bathroom door handle of the victim's apartment matched her own right

thumbprint.  The defendant did not dispute at the trial, and she does not dispute now,

that it was she who left this thumbprint on the inside of the bathroom door.  The

defendant's post-trial fingerprint expert takes issue only with the opinion of State Police

Trooper Richard Lauria that the latent print was "fairly fresh, probably within two or

three days."  The affidavit of the newly acquired defense expert, Kenneth R. Moses,

gives his opinion that "[n]o reliable indication of a print's freshness can be obtained from

its rate of development or appearance after it is developed."

The lack of similar defense expert evidence at the trial does not show "serious

incompetency, inefficiency or inattention" by Attorney Segadelli. It likewise does not

5

show the loss of a substantial ground of defense. *Commonwealth v. Saferian*, *supra*. Trooper Lauria's opinion that the latent print was fairly fresh was not based solely on how quickly and clearly the print became visible when treated with the brush and powder. His opinion was also based on the location of the print on the inside bathroom door handle. The jury readily understood that frequent touchings on an inside bathroom door handle would naturally eliminate or damage any latent print except one that had been left fairly recently.

The absence of a defense fingerprint expert at the trial falls short of showing that Attorney Segadelli's representation was below the range of an ordinary fallible attorney. More importantly, with or without a defense expert, there was no avoiding the location of the defendant's thumbprint. The location of the print alone supported the conclusion that it was fairly fresh. As noted in the Supreme Judicial Court's opinion, there was evidence that Nancy Netto had not been welcome in the victim's apartment for one week before his murder. 438 Mass. at 688, 703. Considering the likelihood that Mr. Levesque and possibly other guests handled the inside bathroom door handle numerous times in the prior week, it is highly unlikely that a Nancy Netto thumbprint would have remained undamaged on the inside handle for more than a week. The defendant was not deprived of a substantial ground of defense by the absence of a defense expert opinion on whether the freshness of the print could be determined in part by its rapid and clear response to testing.

6

D.  Order

The motion for a new trial is denied.

August 11, 2004

Charles J. Hely
Justice

Exhibit P

COMMONWEALTH OF MASSACHUSETTS

BRISTOL                          SUPREME JUDICIAL COURT
                                 NO. SJ-2004-*0374*

                                 BRISTOL COUNTY SUPERIOR COURT
                                 NOS. 33618-33619

             COMMONWEALTH

                  v.

             NANCY NETTO

RECEIVED

SEP - 8 ____

MAURA S. DOYLE
CLERK OF THE
SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

<u>PETITION FOR LEAVE TO APPEAL</u>

Now comes the Defendant by and through her

undersigned counsel in the above-captioned matter and

hereby petitions this Honorable Court pursuant to G.L.

c. 278, § 33E for leave to appeal the denial of her

Motion for New Trial. As grounds therefor, the

Defendant states that her appeal presents new and

substantial questions which ought to be determined by

the full court.

                    NANCY NETTO
                    By her Attorney,


                    STEPHEN PAUL MAIDMAN, ESQUIRE
                    1145 Main Street, Suite 417
                    Springfield, Massachusetts  01103
                    (413) 731-7300
                    maidman@prodigy.net
                    BBO #631882

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPREME JUDICIAL COURT
                                     FOR SUFFOLK COUNTY
                                     NO.  SJ-2004-0374

                                     BRISTOL SUPERIOR COURT
                                     NOS: 33618-33619


                        COMMONWEALTH

                            vs.

                       NANCY NETTO.


                  MEMORANDUM OF DECISION

     This matter is before me pursuant to G. L. c. 278, § 33E, on

the defendant's petition for leave to appeal the denial of her

second motion for a new trial.  On March 19, 1996, the defendant

was convicted of murder in the first degree on a theory of

felony-murder and of armed robbery, and filed a timely notice of

appeal.  The defendant filed a motion to set aside the verdicts

or for a new trial on March 22, 1996, which was denied by the

trial judge.  The defendant was represented by new counsel on

appeal, and this court affirmed the first degree murder

conviction, but dismissed the armed robbery conviction as

duplicative.  Commonwealth v. Netto, 438 Mass. 686 (2003).  The

defendant then filed a second motion for a new trial on April 13,

2004.  The motion judge (also the trial judge) denied that

motion, and the present petition followed.  I conclude that the

defendant has failed to raise any "new and substantial question"

which ought to be addressed by the full court.  See G. L. c. 278,

2

§ 33E.

The defendant asserts that her trial counsel was ineffective because he failed to permit her to make the decision, or even to consult with her, as to whether to request that the trial judge instruct the jury on the lesser included offenses of unarmed robbery and larceny. This argument is not new. "An issue is not 'new' within the meaning of G. L. c. 278, § 33E, where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review." Commonwealth v. Ambers, 397 Mass. 705, 707 (1986). The defendant raised on direct appeal the issue whether her trial counsel should have consulted with her about the decision not to ask for lesser included offense instructions. The defendant maintains that the record on direct appeal was inadequate to raise such a claim, but gives no description of the inadequacies which would have prevented it, and this argument is belied by the defendant's statement in her original appellate brief that there was no indication that trial counsel had consulted with her on this issue.

Nor is this argument substantial. Even assuming without deciding that it was conduct falling measurably below that expected from an ordinary fallible lawyer for the defense counsel in this case not to consult with his client on this subject, see Commonwealth v. Donlan, 426 Mass. 329, 334-335 (2002) (not

deciding whether decision to request an instruction on a lesser included offense is one as to which defendant has the ultimate authority), a decision by the defendant to request instructions on unarmed robbery would not have made a difference in the outcome of the case.  Unarmed robbery, "if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life," may operate as the predicate felony for felony murder.  Commonwealth v. Netto, supra at 705 (2003), quoting Commonwealth v. Moran, 387 Mass. 644, 651 (1982). On direct appeal, this court concluded that "had they been requested, instructions on the lesser included offense of unarmed robbery, and corresponding instructions on felony murder predicated on unarmed robbery, would have been required." Commonwealth v. Netto, supra at 704.  However, this court also noted that

> "Here, there was abundant evidence on which the jury
> could have concluded that this particular robbery, even
> assuming that it was initially undertaken by Nancy Netto in
> the belief that it was an unarmed robbery, was committed
> with a conscious disregard of the risk to human life. . . .
> Had the jury been instructed on the requirements for felony-
> murder predicated on unarmed robbery, the Commonwealth had
> readily met its burden of proving the additional requirement
> of a conscious disregard of the risk to human life in the
> circumstances of this particular robbery."

Id. at 705.  This issue has already been resolved on direct appeal, where we concluded that instructions on unarmed robbery would not have prevented the jury from convicting the defendant of felony-murder.  Id.  Thus, the defendant was not deprived of

"an otherwise available, substantial ground of defence," and did
not lack the effective assistance of counsel. <u>Commonwealth</u> v.
<u>Saferian</u>, 366 Mass. 89, 96 (1974).

Likewise, trial counsel's failure to consult with the
defendant about requesting an instruction on the lesser included
offense of larceny does not raise a substantial question. Even
assuming that trial counsel should have consulted with the
defendant on this issue, see <u>Commonwealth</u> v. <u>Donlan</u>, <u>supra</u> at
334-335, his failure to do so was not likely to have deprived her
of a substantial ground of defense. On the facts of this case,
conviction of larceny would mean that she was not involved in the
killing but only took the property after the victim was killed.
The jury rejected this version of events. In response to a jury
question whether joint venture felony-murder required the
defendant to be present at the time of the stabbing, the judge
instructed, <u>inter alia</u>, that if the joint venturer had only
become involved after the victim had been killed, she would not
be guilty of armed robbery or any form of murder. <u>Commonwealth</u>
v. <u>Netto</u>, <u>supra</u> at 706, n. 19. The jury found that the defendant
was guilty of felony murder as a joint venturer in an armed
robbery and that the killing was incidental to and a natural and
probable consequence of the armed robbery. <u>Id</u>. In so doing, the
jury found as a matter of fact that the defendant did not merely
steal the victim's possessions after the killing, but rather was

a participant in the venture which led to his death.  Had the
jury believed that the defendant only committed larceny, in
accord with the judge's supplemental instruction they would have
acquitted her of murder and armed robbery.  The motion judge
correctly concluded that "the absence of a larceny instruction,
with or without consultation with the defendant, was not likely
to have deprived the defendant of a substantial ground of
defense."  See Commonwealth v. Saferian, supra at 96.

     The defendant also argues that testimony by a Commonwealth
expert that a fingerprint of the defendant found on the inside
bathroom door handle of the victim's apartment was "fairly
fresh," created a substantial risk of a miscarriage of justice
because it "was based on outrageously flawed forensic evidence
and undoubtedly made a difference in the jury's conclusion."  The
expert based his evaluation both on how quickly and clearly the
print became visible when treated, and on its presence in a
location that frequently would be touched.  The defendant has
submitted an expert affidavit that the speed with which a
fingerprint develops and its clarity is unrelated to its age.
This issue is not new, as the defendant could have raised it in
her direct appeal.  See Commonwealth v. Ambers, supra at 707.
Nor is it substantial.  As this court noted, there was evidence
that the defendant had not been welcome in the victim's apartment
for one week before the murder.  Commonwealth v. Netto, supra at

702.  The motion judge concluded that, given the likelihood that

the victim (or potential guests) touched the door handle multiple

times in the prior week, it is highly unlikely that the

defendant's fingerprint would remain undamaged for such a period.

Thus, even apart from the issue of the speed with which the print

developed, there was ample justification for the Commonwealth's

expert's conclusion that the print was probably between two and

four days old.  Furthermore, the expert testified that there was

"no specific way to tell" the age of a fingerprint and that he

could only estimate its age.[1]  Nor was the defendant harmed by

trial counsel's failure to call an opposing expert.  Since the

evidence clearly established that the fingerprint was the

defendant's, trial counsel chose to attack the freshness of the

print by cross-examination of the Commonwealth's expert, rather

than hiring a defense expert.  This argument is not substantial,

especially given the other evidence linking the defendant to the

crime.

     A judgment shall enter denying the petition.

---

[1] The defendant also claims that the fresh fingerprint
evidence went to the heart of the Commonwealth's case.  Yet, the
testimony was elicited only on redirect examination, after
defense counsel raised an issue about the print's freshness on
cross-examination.

Exhibit Q-7

7

By the Court

Judith A. Cowin
Associate Justice

Entered: March 18, 2005