**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                              )
NANCY NETTO                   )
            Petitioner,       )
                              )
v.                            )        Civil Action No. 05-10695-RGS
                              )
LYNN BISSONNETTE              )
            Respondent.       )
_____)

**RESPONDENT'S MEMORANDUM IN OPPOSITION**
**TO THE PETITION FOR HABEAS CORPUS**

The respondent, Lynn Bissonnette, through counsel, hereby submits his
memorandum of law in opposition to the petition for a writ of habeas corpus filed by
Nancy Netto ("the petitioner").  As argued in this memorandum, the petition should be
denied where it contains procedurally defaulted claims and where the state court's
adjudication of the preserved claim was not an unreasonable application of clearly
established Supreme Court law.

**PRIOR PROCEEDINGS**

On December 1, 1993, a Bristol County grand jury indicted co-defendants and
spouses Joseph and Nancy Netto, charging them with murder in the first degree and
armed robbery.  On March 12, 1996, a joint jury trial commenced in New Bedford Superior
Court, Hely, J., presiding.  On March 19, 1996, the jury found the petitioner guilty of first
degree murder (on a theory of felony murder) and armed robbery.  She was sentenced to
the statutorily required term of life imprisonment on the murder conviction and a concurrent
term of nine to ten years on the armed robbery charge.[1]

_____

[1] The jury also found the co-defendant Joseph Netto guilty of both charges.

On March 22, 1996, the petitioner filed a Motion to set aside the verdict or for New trial pursuant to Mass. R. Crim. P. 25(b)(2) and 30(b).  This motion was denied, following a hearing, on May 3, 1996.  On appeal to the Supreme Judicial Court (SJC) from her convictions and from the denial of the motion, the petitioner raised four claims: 1) the evidence was insufficient to establish the elements of joint venture felony murder; 2) jury instructions on the lesser included offenses of unarmed robbery and unarmed robbery felony murder should have been given; 3) the trial judge imposed an illegal sentence because the two convictions were duplicative; and 4) the motion to suppress should have been allowed.  The SJC affirmed the murder conviction and dismissed the armed robbery conviction as duplicative on February 14, 2003.  *Commonwealth v. Netto*, 438 Mass. 686, 783 N.E.2d 439 (2003) (S.A. Ex. 4).

On April 13, 2004, the petitioner filed a second motion for new trial alleging ineffective assistance of counsel for failing to consult with her as to whether to request an instruction on lesser included offenses (S.A. Ex. 1).  The trial judge denied this motion on August 11, 2004 (S.A. Ex. 1).  The petitioner then filed an application for leave to appeal pursuant to Mass. Gen. L. c. 278, § 33E on September 8, 2004 (S.A. Ex. 5).  Justice Judith Cowin denied the application on March 18, 2005 (S.A. Ex. 6).

On April 7, 2005, the petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondent filed an answer and supplemental answer on June 10 and June 13, 2005.  On September 30, 2005 the petitioner filed a memorandum on law in support of the habeas corpus petition.

## STATEMENT OF FACTS

The Massachusetts Supreme Judicial Court's recitation of the facts of the petitioner's crimes is entitled to the presumption of correctness under 28 U.S.C. §2254(e)(1).  *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1sr Cir. 2000).  The AEDPA presumption of correctness applies to all "basic, primary, or historical facts" underlying the state court's conclusion.  *Gunter v. Maloney*, 291 F.3d at 76; *Sanna v. DiPaolo*, 265 F.3d at 7.  In addition, the presumption of correctness extends to factual determinations made by both state trial and appellate courts.  *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002), and to any factual findings implicit in the state court's ruling.  *LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1972); *Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir.), *cert. denied*, 531 U.S. 1003 (2000).  As the First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings."  *Mastracchio v. Vose*, 274 F.3 590, 598 (1st Cir. 2001).  The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254 (e)(1).

The Supreme Judicial Court found the following facts concerning the petitioner's crimes:

> The victim, Robert Levesque, lived alone in a second-floor apartment at 837 Second Street in Fall River.  He operated a restaurant located nearby, and was known to carry a significant amount of cash on his person. He also loaned money to many people, taking as pledges various items of personal property.  As a result, he possessed a quantity of jewelry, belonging either to himself or to persons who owed him money.
>
> The defendants, Joseph and Nancy Netto, husband and wife, lived in the apartment next to Levesque, having moved in only a few weeks prior to Levesque's murder.

3

Another apartment on the second floor was occupied by Michelle Griffin and Bennie White, who were friends of the Nettos. The Nettos were impoverished and addicted to heroin. They had few possessions and, much of the time, no food. They received a Social Security check at the beginning of each month, but spent most of the little money they had on heroin.

Levesque had helped the Nettos acquire their apartment and, for some brief period after they moved in, the Nettos had been on friendly terms with Levesque. Nancy Netto would visit Levesque in his apartment on occasion. However, approximately one week prior to his murder, there had been some friction between Levesque and Nancy Netto; as a result, she was no longer welcome in his apartment.[2] At some point prior to the murder, Joseph Netto told Bennie White that he did not like Levesque, predicting that Levesque would "end up with a knife in his back."

On November 18, 1993, the day before the murder, the police were summoned to the Nettos' apartment in response to a report of some disturbance. Joseph Netto mistakenly believed that it was Levesque who telephoned the police,[3] and Joseph Netto expressed anger that Levesque had done so.

As of the next morning, Friday, November 19, the Nettos were in desperate need of money for heroin. Nancy Netto was described as "very dope sick," suffering withdrawal to the point that she was drooling. She asked Griffin and White for money, telling them that she had not eaten in three days. She promised to pay them back when her next Social Security check arrived. Both Griffin and White refused to lend her any money. She asked to use their telephone (as the Nettos had no telephone in their apartment), and Griffin overheard her making telephone calls to other friends in a vain effort to obtain money from them.

In the late afternoon, Levesque had closed up his restaurant and stopped in at a local club that he often patronized. At the club, he was seen with significant cash, including many one hundred dollar bills. He left the club at approximately 5:30 P.M. Sometime shortly thereafter, a neighbor in the apartment below Levesque's heard loud noises coming from Levesque's apartment. She heard men's voices yelling, the sounds of furniture being moved, and objects breaking. There was then a loud crash on the floor. Next, she heard rapid footsteps going in and out of Levesque's apartment, up and down the stairway, and in and out of the building's front door.

---

[2] In footnote 3 of its opinion, the SJC stated: The Commonwealth attempted to introduce evidence that the reason for that friction was Levesque's suspicion that Nancy Netto was trying to steal things from him, but the judge sustained the defendant's objection to that evidence.

[3] In footnote 4 of its opinion, the SJC stated: In fact, it was Bennie White who had telephoned the police, not Levesque.

Over the course of the evening, she also heard foot traffic going from Levesque's apartment toward the back of the building, where the Nettos' apartment was located.

At approximately 6 P.M., Nancy Netto telephoned a friend, one John Costanzo, asking him to come over and give her a ride. Sometime later, Costanzo arrived at the defendants' apartment, where he saw Joseph Netto with several one hundred dollar bills in his hands. On seeing the money, Costanzo asked to be paid back on an earlier loan. Joseph Netto said that the money was not his, and that he would repay Costanzo in a few days. Costanzo then drove Nany Netto to Providence, where she purchased at least twenty bags of heroin, costing approximately $140. She also bought cigarettes and gave Costanzo twenty dollars for gasoline.

While they were out, Michelle Griffin stopped in briefly at the Nettos' apartment. Joseph Netto was there, barefoot and wearing nothing but shorts. Griffin saw miscellaneous items on the kitchen table, which was odd because the Nettos had very few possessions. After Griffin left, White also stopped in at the Nettos' apartment. White noticed that Joseph Netto had a cut on his hand that he appeared to be treating. There were bottles of "expensive"liquor on the table, and a basket of other items. Towels and clothing were soaking in the bathroom sink and tub. White asked Joseph Netto where the liquor had come from. Joseph replied that he had stolen it from his brother-in-law's basement. He offered one of the bottles to White, telling him not to tell Griffin about it. White asked him about the cut on his hand. Joseph replied that he had been cut during the theft. While White was still there, Nancy Netto and Costanzo returned from their heroin-buying trip. The Nettos each injected some heroin, and gave a bag to White.

Constanzo left, at which point Nancy Netto asked White to give her a ride to buy groceries. As they were about to leave, Joseph Netto reminded White that he was not to say anything to Griffin about the liquor he had been given. On hearing this remark, Nancy Netto "went out of her mind," screaming to Joseph that he "[was not] supposed to tell anyone" and that she "[could not] believe [he] said anything." Joseph took her into the bedroom to calm her down. When they came back out, Joseph asked Nancy where the money was. She told him that she had "stashed it," but could not remember where. They then found the money in the bedroom, and White and Nancy Netto left to buy groceries.

White took Nancy Netto to two different stores, at which she spent approximately one hundred dollars on groceries. While they were out, Griffin, from her own apartment on the second floor, heard "banging around, clattering, scuffling" noises from Levesque's apartment. After the noises had gone on for quite some time, she heard a loud "thump," which prompted her to go out and investigate. She saw that the Nettos' apartment door was slightly open, and as she approached that door, Joseph Netto came up behind her in the hallway. He was still barefoot and dressed only in shorts. Joseph asked her if she had heard noises in Levesque's apartment.

5

When Griffin replied that she had, Joseph took her arm and directed her into his own apartment. Griffin asked him if Nancy and White were back, to which Joseph replied that Nancy had a great deal of money to spend and would be out for a while. Griffin was uneasy and wanted to leave, but Joseph kept his hold on her arm and asked her to wait for Nancy and White to return.

Nancy and White did return shortly thereafter, loaded with grocery bags. Griffin had never seen the Nettos buy such a quantity of groceries before. When Joseph suggested that they give some of the groceries to Griffin and White, Nancy protested that she had not eaten in three days and that they were "her groceries." Griffin and White left and returned to their own apartment.

At approximately 6 A.M. the next day, the Nettos went to Costanzo's home, inviting him to go out for coffee. Costanzo declined. Later that morning, the Nettos rented a room at a motel located a few miles from their home. They paid for the room in cash. One of the motel workers who knew Nancy Netto struck up a conversation with her. Nancy and Joseph both explained that their apartment was being painted and that they had come to the motel to escape the paint fumes. They had bags of items with them, which they claimed to have bought at a second-hand store.

When Levesque failed to show up at his restaurant at the usual time that Saturday morning, one of the restaurant workers went to his home. Discovering Levesque's vehicle in the lot, and getting no response from knocking on his door, she telephoned the police. The police broke down the door to Levesque's apartment and found his body lying ten feet inside the doorway with a knife sticking out of his back. He had been stabbed nineteen times. He had also suffered multiple cuts in the nature of defensive wounds, and a blow from a blunt object to his forehead. The knife in his back matched those in a set found in a drawer in the kitchen. The apartment was "a shambles," with items turned over, drawers opened, and contents strewn about.

Forensic examination of blood samples at the scene identified two samples where the blood types and groupings were consistent with a combination of Levesque's blood and Joseph Netto's blood.[4] A bloody footprint on a piece of floor tile matched Joseph's right footprint. A fingerprint on the handle of the bathroom door matched Nancy Netto's right thumb. That thumbprint was determined to be "fairly fresh," based on the speed with which it reacted to the application of chemicals and on the fact that the print had been left in a location that would, in the ordinary course, be subjected to frequent handling.

The police obtained arrest warrants for the Nettos and a warrant to search their

---

[4]    In footnote 5 of its opinion, the SJC stated: There was no DNA analysis performed on any of the samples.

apartment. That search uncovered eighteen dollars under a television set in the bedroom and clothes soaking in the bathroom tub and sink. There was no sign that the apartment had been or was in the process of being painted.

Later that night, police found and arrested the Nettos in their room at the motel. Among the items in their possession at the time of their arrest were jewelry, an ashtray, a toaster, and keys which were later identified as belonging to Levesque. They also had cash, including ten one hundred dollar bills, three of which had spots of blood on them.[5] Examination of Joseph Netto's hand revealed a fresh cut between his thumb and forefinger.[6]

Counsel for Joseph Netto presented evidence that Costanzo had spent considerable amounts of money in the days immediately following the murder, and that he had not obtained such a sum of money from work. Counsel also presented evidence of a telephone call made to his office by Bennie White two months prior to the trial, during which White suggested that he knew more about the murder than he had told police (or the jury). Counsel for both defendants suggested in closing argument that the crime had been perpetrated by either Costanzo or White.

*Commonwealth v. Netto*, 438 Mass. at 441-445, 783 N.E.2d at 688-692; S.A. 4. Other findings of fact by the SJC will be recited herein as they relate to specific issues raised by the petitioner.

## ARGUMENT

### *STANDARD OF REVIEW*

Because the subject petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("the AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas

---

[5] In footnote 6 of its opinion, the SJC stated: The Nettos moved to suppress all of the evidence seized from their motel room. Details of those seizures are discussed below in connection with our analysis of the motion to suppress.

[6] In footnote 7 of its opinion, the SJC stated: The Commonwealth's theory was that the murder weapon had become slippery with blood, causing Joseph Netto's hand to slide down and be cut against the blade.

corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir.2000) ("a federal [habeas] court operates within a closely circumscribed sphere"). In relevant part, the AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(2). In addition, under the AEDPA, state-court determinations of factual issues "shall be presumed to be correct," unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary responsibility" for evaluating federal law claims raised in criminal trials in the state courts, courts which must be presumed in habeas corpus courts to know and follow the law. *Woodford v. Visciotti*, 537 U.S.19, 24, 27 (2002) (per curiam).

A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (1) "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme court] precedent." *Taylor*, 529 U.S. at 405-06. Under either scenario, to satisfy the "contrary to" clause, the state-court

decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme court precedent. *Id.*

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 413. In making this determination, a habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The same objective unreasonableness standard applies to the "unreasonable determination of facts prong of § 2254(d)(2). *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Taylor*, 529 U.S. at 410. As the *Taylor* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.* "Indeed, because Congress used the word 'unreasonable' . . . and not words like 'erroneous' or 'incorrect,' a federal habeas court 'may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable.'" *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) , *cert. denied*, 534 U.S. 925 (2001) (quoting *Taylor*, 529 U.S. at 411). As the First Circuit, sitting en banc held, "'some increment of incorrectness beyond error is required' . . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and

9

objective judgment of the federal court."  *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).  If, for instance, the state court reaches a determination that is "devoid of record support for its conclusion or is arbitrary," the AEDPA's unreasonable application prong may be satisfied.  *Id.* at 36-37 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).   Since "[a]pplying a general standard to a specific case can demand a substantial element of judgment," "[t]he more general the rule, the more leeway courts have in reaching outcomes in case by case determinations."  *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004).  The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases extant at the time of the state court decision, and does not include the dicta of such cases.  *Id.* at 2147; *Williams*, 529 U.S. at 412.

Factual determinations of state courts are granted similar deference.  To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable.  *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 399 (2000)).  Objective unreasonableness is not merely an incorrect or erroneous decision.  *Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error.   Instead, he must further establish that the state court committed unreasonable error.");  *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination").

Moreover, § 2254(d)(2) must be interpreted in conjunction with § 2254(e)(1), which specifies both that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Sanna v. DiPaolo*, 265 F.3d 1, 7. *See also Miller-El,* 537 U.S. at 341 (noting that to prevail under § 2254(d)(2), habeas petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the court's factual determination was objectively unreasonable).

I.   **THE SUPREME JUDICIAL COURT'S HOLDING THAT THE COMMONWEALTH PRESENTED SUFFICIENT EVIDENCE OF THE PETITIONER'S GUILT WAS NOT AN UNREASONABLE APPLICATION OF** *JACKSON V. VIRGINIA.*

The petitioner's first claim is that the Supreme Judicial Court unreasonably applied the standard for sufficiency of the evidence pursuant to *Jackson v. Virgina*, 443 U.S. 307, 318-319 (1979) in holding that the weight of the evidence was sufficient to warrant the conviction (Memo pp.18-22).[7]   The petitioner notes that the SJC never cited to *Jackson*, nor to the equivalent state case, *Commonwealth v. Latimore*, 378 Mass. 671 (1979) in its decision, but acknowledges that this claim would turn on whether the SJC's decision was an unreasonable application of the *Jackson* standard (Memo, p. 19).    *See Hurtado v. Tucker*, 245 F.3d 7,  15 (1st Cir. 2001).  As this court made clear in *Hurtado*, "[h]abeas review involves the layering of two standards.  The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted." *Id.* at 16.   Here, as in *Hurtado,* the

--------

[7]  The petitioner does not claim that the SJC made an unreasonable determination of facts in light of the evidence presented at trial.

"constitutional right is governed by *Jackson*'s test of 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.,* quoting *Jackson*, 443 U.S. at 319.   In this context, the petitioner seeks to challenge the sufficiency of the Commonwealth's evidence of the petitioner's presence, knowledge of a weapon or participation in the crime as a joint venturer pursuant to Massachusetts common law.   The petitioner claims that the SJC's decision was an unreasonable application of *Jackson* because it was devoid of record support.   (Pet. memo, pp. 19-22).   This argument must fail.

Here, there was ample evidence to demonstrate the reasonableness of the SJC's determination.   Under Massachusetts law, one may be found guilty as a joint venturer in either of two ways.   *Commonwealth v. Ortiz*, 424 Mass. 853, 856, 679 N.E.2d 1007, 1009 (1997).   A defendant can be convicted as a joint participant in a felony, if he was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary."   *Commonwealth v. Longo*, 402 Mass. 482, 486, 524 N.E.2d 67 (1988), *quoting Commonwealth v. Bianco*, 388 Mass. 358, 366, 446 N.E.2d 1041, *S.C.*, 390 Mass. 254, 454 N.E.2d 901 (1983).   A defendant may also be convicted as a joint participant in a felony if he "aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed."   G. L. c. 274, § 2.   *Commonwealth v. Raposo*, 413 Mass. 182, 184-185, 595 N.E.2d 773 (1992).   *See* Nolan & Henry, Criminal Law § 633, at 521-523 (2d ed. 1988 & 1999 Supp.). While the statute requires something more than mere acquiescence, physical participation

12

is not required so long as there is "association with the criminal venture and any significant participation in it." *Commonwealth v. Raposo*, 413 Mass. at 185, 595 N.E.2d 773, *quoting Commonwealth v. Morrow*, 363 Mass. 601, 609, 296 N.E.2d 468 (1973). In general, the point of difference between the two theories is the factor of the defendant's presence at the scene of the felony. *Commonwealth v. Ortiz*, 424 Mass. at 856, 679 N.E.2d at 1009. *See Commonwealth v. Echavarria*, 428 Mass. 593, 598, 703 N.E.2d 1137, 1140-1141 (1998).

_____In this case, the Commonwealth presented ample evidence from which the jury could infer the petitioner's presence, knowledge of a weapon and participation in the crime to warrant a conviction of felony-murder. In proving her presence in the victim's apartment, the Commonwealth relied on the petitioner's fingerprint on the victim's bathroom door handle coupled with testimony that she had not been allowed into the victim's apartment for one week prior to the crime. *Commonwealth v. Netto*, 438 Mass. at 702, 783 N.E.2d at 451. The SJC reasonably concluded that that evidence, in combination, viewed in the light most favorable to the Commonwealth, was sufficient to prove that the petitioner was in the apartment at the time of the crime. *Id*. *See Commonwealth v. LeClaire*, 28 Mass. App. Ct. 932, 934 (1990), quoting *Commonwealth v. Fazzino*, 27 Mass. App. Ct. 485, 487 (1989) (presence of fingerprint at scene of crime is not by itself a sufficient basis for submitting a case to a jury but other evidence "reasonably excludes the hypothesis that the fingerprints were impressed at a time other than when the crime was committed").

The petitioner makes much of the fact that the Commonwealth's fingerprint expert could not definitively state how long the petitioner's fingerprint had actually been present

on the door handle (Memo, p. 20).  But it was reasonable for the jury to infer that because

the fingerprint was on a handle that was regularly used, the print was likely put there by

one of the last people to touch it.  *See Commonwealth v. Hall*, 32 Mass. App. Ct. 951,  952

(1992) (where fingerprint on doorknob of bathroom was unsmudged and since bathroom

was used regularly by store's employees, print was likely put there by robber).

The SJC also reasonably concluded that there was sufficient evidence to prove that

the petitioner knew that her co-venturer was armed with a dangerous weapon and

participated in the robbery and murder.  *Commonwealth v. Netto*, 438 Mass. at 451, 783

N.E.2d at 702-703.  The SJC found that:

> it was readily foreseeable that the robbery of Levesque, which was to occur in his
> own home after he had told Nancy Netto that she was no longer welcome there,
> would require some means of subduing him.  And, where the robbers intended to
> go through Levesque's apartment looking for various items to steal, Levesque would
> need to be subdued for some period of time, not just temporarily distracted or held
> at bay while a single item was snatched.  The defendants could not expect to
> incapacitate Levesque for that length of time merely by outnumbering him -- the
> evidence was that Nancy Netto was extremely skinny, frail, and sickly at the time.

*Id*. at 703.  *See Commonwealth v. Kilburn*, 426 Mass. 31, 35 n.7, 686 N.E.2d 961, 964

(1997) (where a defendant apprehends that the intended victim might resist, he could

suppose that the other actors might be furnished with weapons).  In light of this evidence,

it was reasonable to infer that the plan for the robbery included a plan with respect to the

use of some form of weapon, of which the petitioner would have been aware.  The fact that

the co-venturer used a knife from inside the apartment to kill Levesque did not make the

killing or the use of a weapon unforeseeable.   As the SJC held, inferences need only be

reasonable, and need not be inescapable.  *Netto*, 438 Mass. at 703, 783 N.E.2d at 452.

Even if co-venturers did not intend to use a weapon before they went into the victim's

apartment, "an anticipatory compact is not necessary for joint venture liability, as long as 'at the climactic moments the parties consciously acted together in carrying out the criminal endeavor.'" *Commonwealth v. Allison*, 434 Mass. 670, 676, 751 N.E.2d 868, 879 (2001), quoting *Commonwealth v. Fidler*, 23 Mass. App. Ct. 506, 513, 503 N.E.2d 1302 (1987). As the SJC found:

> From the combination of wounds and the location of the body, it would appear that Levesque was struck with some object just inside the door and, when that blow proved inadequate to subdue him, one of the defendants obtained a more lethal weapon from the kitchen.

*Commonwealth v. Netto*, 438 Mass. at 704, 783 N.E.2d at 452.

"The ultimate question on habeas review. . . is not how well reasoned the state court decision is, but whether the outcome is reasonable." *Hurtado*, 245 F.3d at 20, citing to *O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998). From the above evidence, the SJC's decision that the petitioner was properly found guilty of the crimes charged was abundantly reasonable. The petitioner has offered nothing, let alone clear and convincing evidence, to rebut the presumed correctness under 28 U.S.C. §2254(e)(1) of the SJC's findings of fact, which includes deference to inferences drawn by the state court from those factual determinations. *See Parke v. Raley*, 506 U. S. at 35; *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass 1999). All of the evidence, taken together with the reasonable inferences therefrom and in the light most favorable to the Commonwealth, constituted sufficient evidence from which a rational jury could have found the petitioner participated in the robbery and murder as a joint venturer beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The petitioner is not entitled to habeas relief on this claim.

15

II.   **THE PETITIONER'S REMAINING CLAIMS REGARDING A LESSER INCLUDED OFFENSE INSTRUCTION AND CHALLENGES TO THE FINGERPRINT EVIDENCE ARE PROCEDURALLY DEFAULTED AND THE PETITIONER HAS NOT SHOWN CAUSE FOR AND PREJUDICE FROM THE DEFAULT OR THAT A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT REVIEWED.**

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial.  Rather, the remedy is limited to the consideration of federal constitutional claims."  *Burks v. DuBois*, 55 F.3d 712, 715 (1st Cir. 1995).  *See Herrera v. Collins*, 506 U. S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is to ensure that individuals are not imprisoned in violation of the Constitution).  *See also Barefoot v. Estelle*, 463 U. S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials").  Thus, federal habeas review is precluded, as a general proposition, when a state court has reached its decision on the basis of an adequate and independent state-law ground.  *See Coleman v. Thompson*, 501 U. S. 722 (1991).  In *Coleman*, the Supreme Court held that where

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id*. at 750.  *See Tart v. Massachusetts*, 949 F.2d 490, 496-497 (1st Cir. 1991); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 493 (1st Cir.), *cert. denied sub nom., Palmariello v. Butler*, 493 U. S. 865 (1989).  A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the

rule and has not waived it. *Wainwright v. Sykes*, 433 U. S. 72, 87 (1977); *Burks v. DuBois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir. 1987), *cert. denied*, 485 U. S. 990 (1988). The very nature of the independent and adequate state ground inquiry, i.e., one borne out of comity and federalism concerns, requires that it be addressed by this Court at the outset. *Lambrix v. Singletary*, 520 U. S. 518, 523-24 (1997).

### A.    THE GATEKEEPER'S DECISION WAS INDEPENDENT OF FEDERAL LAW.

_____As a matter of Massachusetts appellate procedural law, there exist special provisions for those indicted for, and convicted of, first degree murder. Under M.G. L. ch. 278, § 33E, such a "capital" defendant has a right of direct appeal to the Supreme Judicial Court for the Commonwealth ("SJC"), without the case being first entered on the docket of the Appeals Court. *See Dickerson v. Latessa*, 872 F.2d 1116, 1117-1118 (1st Cir. 1989). The scope of the SJC's review is exceedingly broad under § 33E -- it reviews the "whole case" to determine whether the verdict is against the weight of the evidence, and the court is empowered to order a new trial or to reduce the verdict to a lesser degree of guilt if the interests of justice so require. *See Dickerson v. Latessa*, 872 F.2d at 1118; 32 Nolan & Henry, *Criminal Law*, § 187 (2d ed. 1988 and 1993 Supp.).

After this plenary review on direct appeal, a capital defendant may not appeal the decision of the Superior Court denying his motion for a new trial unless the "gatekeeper," *i.e.*, a single justice of the Supreme Judicial Court for Suffolk County, finds that the appeal presents a "new" and "substantial" question which ought to be determined by the full court. *Dickerson v. Latessa*, 872 F.2d at 1118. In other words, it is the gatekeeper's duty to "screen[ ] out appeals that lack merit." *See Commonwealth v. Francis*, 411 Mass. 579,

584, 583 N.E.2d 849 (1992). The gatekeeper's denial of a defendant's petition for leave to appeal is final and unreviewable. *Commonwealth v. Ambers*, 397 Mass. 705, 710-711, 493 N.E.2d 837 (1986); *Leaster v. Commonwealth*, 385 Mass. 547, 548, 432 N.E.2d 708, 709 (1982). *See McLaughlin v. Gabriel*, 726 F.2d 7, 9 (1st Cir. 1984). The rule barring appeals from the denial of gatekeeper petitions is a "firmly established and regularly followed" rule of Massachusetts practice. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

A gatekeeper justice's denial of a petitioner's application for leave to appeal, is a finding by the SJC of procedural default on the part of the petitioner and, as such, is a "classic example of an independent and adequate state ground." *Simpson v. Matesanz*, 175 F. 3d 200, 207 (1st Cir. 1999)(citations omitted). *See Moore v. Ponte*, 186 F.3d 26, 32 (1st Cir. 1999)(denial of gatekeeper petition functions as a procedural default). In making the determination under G.L. c. 278, § 33E, "the single justice does not make a decision directly on the merits of any claim. He examines the claims to decide whether there exists a new and substantial question which ought to be determined by the full court." *McLaughlin v. Gabriel*, 726 F.2d 7, 9 (1st Cir. 1984). "Consequently, a screening decision by a single justice, which merely decides whether the full court should review the case to determine the state question of law does not waive the [procedural default] rule *a fortiori*." *Id*.

_____The petitioner in this case raised two claims in her second motion for new trial following the SJC's affirmance of her convictions: 1) that she received ineffective assistance of counsel due to her counsel's failure to consult with her about a lesser

included offense instruction and 2) that the Commonwealth's presentation of "fresh fingerprint" testimony resulted in a substantial risk of a miscarriage of justice and her attorney was ineffective for failing to adequately challenge that testimony (Pet. Ex. M). The trial judge denied the motion because the issues were waived and because trial counsel provided effective assistance of counsel (Pet. Ex. O). The petitioner also raised these claims in her application for leave to appeal from the denial of the motion for new trial (See S.A. 5). The single justice denied the application, finding that both claims were neither new nor substantial (S.A. 6).

The state court's rejection of the petitioner's request for appellate review clearly rests on his default of state procedural law. *See Avellar v. DuBois*, 30 F. Supp.2d 76, 79 (D. Mass. 1998) (as an adequate and independent state ground, the gatekeeper's "decision is a sufficient basis in and of itself to dismiss the petition"). This case is unlike *Phoenix v. Matesanz*, 189 F. 3d 20, 26 (1st Cir. 1999). In *Phoenix,* the First Circuit held that a gatekeeper's determination that a claim of ineffective assistance of counsel was new but not substantial was interwoven with federal law because the standard of review for ineffective assistance is so similar in the state and federal contexts. In this case, the basis for both of the petitioner's claims of ineffective assistance were not new. The merits of the lesser included offense claim had already been decided by the SJC in the petitioner's direct appeal, *Commonwealth v. Netto*, 438 Mass. at 704-707, S.A. 6, pp. 2-5. The challenge to the fingerprint evidence was not preserved at trial and the gatekeeper merely determined that the fingerprint testimony did not create a substantial risk of a miscarriage of justice (S.A. 6 pp. 5-6). *See Phoenix*, 189 F.3d at 25 n.2, quoting *Burks v. DuBois*, 55

F.3d 712, 716 n.2 (1995) (where a single justice finds a procedural default, but then briefly reviews the merits of a claim solely to determine whether there was a substantial risk of a miscarriage of justice, that "does not undercut the adequacy and independence of the state grounds"). This sets out the operation of the procedural bar, independent of federal law, and not a decision on the merits. *See McLaughlin v. Gabriel*, 726 F.2d at 9.

### B.   THE GATEKEEPER'S DECISION WAS AN ADEQUATE BASIS FOR THE STATE COURT JUDGMENT.

"[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (citations omitted). *See Ford v. Georgia*, 498 U.S. 411, 423 (1991); *Brewer v. Marshall*, 119 F.3d at 1001. The SJC strictly and regularly enforces the "gatekeeper" provision of G. L. c. 278, §33E. *See Trigones v. Attorney General*, 420 Mass. at 863, 652 N.E.2d at 895; *Leaster v. Commonwealth*, 385 Mass. at 548, 432 N.E.2d at 709. In fact, "a state's efforts to stop gross miscarriages of justice should not suddenly force it to grapple with complex federal issues that its procedural rules would otherwise lawfully bar." *McCown v. Callahan*, 726 F.2d 1, 4 (1st Cir.), *cert. denied*, 469 U.S. 839 (1984).

In addition, "[t]here is no constitutional impediment to" barring an appeal of the denial of a collateral attack on a state conviction. *See Brewer v. Marshall*, 119 F.3d at 1001. In fact, it is well settled that there is no constitutional right to even a direct appeal, *Abney* v. *United States*, 431 U.S. 651, 656 (1977); *McKane* v. *Durston*, 153 U.S. 684, 687 (1894), let alone an appeal from the denial of post-conviction relief. *Herrera* v. *Collins*, 506 U.S. at 408-410; *Murray* v. *Giarrantano*, 492 U.S. 1, 10 (1989); *Pennsylvania* v. *Finley*, 481 U S.

551, 557 (1987).  *See United States* v. *MacCollom*, 426 U.S. 317, 324 (1976) (due process distinguishes between a first appeal of right and subsequent discretionary appeal within the same system).  Here, because petitioner's claims did not meet the requirements of §33E, the SJC enforced the procedural bar.  Accordingly, this Court should hold that the conviction rests on an adequate and independent state-law ground as to these claims and dismiss the petition._____

C.    THE PETITIONER FAILED TO ESTABLISH "CAUSE" OR "PREJUDICE" FOR HIS DEFAULT OR THAT A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT ENTERTAINED.

Habeas review of a procedurally defaulted claim is precluded unless "petitioner can demonstrate cause for the default and prejudice stemming therefrom, or alternatively, unless the petitioner can show that a refusal to consider the merits of the constitutional claim will work a miscarriage of justice."  *Harris*, 489 U.S. at 262.  *Accord, Coleman*, 501 U.S. at 749-50; *Burks v. DuBois*, 55 F.3d 712, 716 (1st Cir. 1995).  The "miscarriage of justice" exception to a showing of cause and prejudice is "'seldom to be used, and explicitly tied to a showing of actual innocence.'"  *Killela v. Hall*, 84 F.Supp. 2d 204, 210 (D. Mass. 2000), *quoting Burks*, 55 F.3d at 717.  In this case, the petitioner has made no attempt to demonstrate any of these, nor could she.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Magee v. Harshbarger*, 16 F.3d 469, 471 (1st Cir. 1994).  The Supreme Court has recognized three objective factors, external to the defense, that are sufficient to constitute

cause to excuse a procedural default: (1) the factual or legal basis for a claim was not reasonably available; (2) interference by state officials that made compliance with the state procedural rules impracticable; or (3) attorney error rising to the level of constitutionally ineffective assistance of counsel. *Coleman*, 501 U.S. at 751; *Murray*, 477 U.S. at 488. *See also Edwards*, 529 U.S. at 451.

The only potential cause available to the petitioner is alleged attorney error or oversight in failing to timely object and prejudice stemming therefrom. It is well settled, however, that attorney error or oversight is not sufficient cause for excusing a procedural default unless it rises to the level of constitutional ineffective assistance. *Burks*, 55 F.3d 712. The petitioner cannot assert ineffective assistance of counsel as "cause" for her default where that claim is itself in procedural default due to her failure to raise it in her direct appeal. Just as a petitioner may not rely on an unexhausted claim of ineffective assistance to excuse a default, *Murray v. Carrier*, 477 U.S. 478, 488-489 (1986); *Puleio v. Vose*, 830 F.2d 1197, 1202 (1st Cir. 1987), a procedurally defaulted ineffective assistance claim also fails to provide an external, independent basis to overcome the default. *See Edwards v. Carpenter*, 529 U.S. 446, 450-54 (2000). Therefore the petitioner has failed to show adequate cause to excuse her procedurally defaulted claims.

_____The petitioner has also failed to allege sufficient prejudice stemming from the procedural default. Prejudice requires the petitioner to demonstrate "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *cert. denied*, 513 U. S. 1085 (1995),

*quoting United States v. Frady*, 456 U. S. 152, 170 (1982).  The petitioner has failed to demonstrate this level of prejudice.

As the SJC found on direct appeal, the failure to give a lesser included offense instruction on unarmed robbery did not create a substantial likelihood of a miscarriage of justice where it was a reasonable tactical decision and potentially beneficial to the defendant to capitalize on the weaknesses in the Commonwealth's evidence in the hopes of obtaining an acquittal.  *Netto*, 438 Mass. at 705-706, 783 N.E.2d at 453-454.  Moreover, "there was abundant evidence on which the jury could have concluded that this particular robbery, even assuming that it was initially undertaken by Nancy Netto in the belief that it was an unarmed robbery, was committed with a conscious disregard of the risk to human life."  *Id*. at 705.  Therefore "[h]ad the jury been instructed on the requirements for felony-murder predicated on unarmed robbery, the Commonwealth had readily met its burden of proving the additional requirement of a conscious disregard of the risk to human life in the circumstances of this particular robbery."  *Id*.

Nor can the petitioner show sufficient prejudice due to the default of the fingerprint claim.   Trooper Lauria's opinion that the petitioner's fingerprint on the bathroom door handle was "fairly fresh" did not infect the trial with error of constitutional dimension.  The expert based his opinion both on how quickly and clearly the print became visible when treated, and its presence in a location that frequently would be touched.  As the single justice gatekeeper found there was "ample justification for the Commonwealth's expert's conclusion that the print was probably between two and four days old" (S.A. 6, p. 6). Moreover, defense counsel challenged the credibility of the expert's opinion on cross-

examination (Tr. III/80-84) and in his closing argument (Tr. V/32-34).  An opposing expert would not have added much to the petitioner's defense.

_____  The only other avenue of relief, that a refusal to hear the claims would result in a "miscarriage of justice," is also foreclosed.  "To establish actual innocence,'petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Simpson v. Matesanz*, 175 F. 3d 200, 210 (1st Cir. 1999), quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citations omitted).  "This exception is quite narrow and seldom used."  *Id*.

The petitioner cannot advance such a claim of actual innocence with regard to her first claim where she merely argues that if the judge had given the lesser included offense instruction, the jury could have found her guilty of second degree felony murder, which would allow her the possibility of parole (Memo, p. 47).   This does not amount to a claim of actual innocence.

The petitioner has also failed to show actual innocence with regard to the fingerprint evidence.  She does not dispute that the fingerprint was hers, but alleges that her counsel should have done more to challenge the evidence (Memo, pp. 56-60).   Her counsel did challenge the testimony during cross-examination of Trooper Lauria (Tr. III/80-85).  Further impeachment of the fingerprint testimony by a defense expert would not have guaranteed that the petitioner would have been acquitted but merely cast doubt on how fresh the fingerprint was.  As the single justice "gatekeeper" found, "there was ample justification for the Commonwealth's expert's conclusion that the print was probably between two and four days old." (S.A. 6, p. 6).  The gatekeeper also pointed out that the testimony at issue was elicited only on redirect examination after defense counsel raised an issue about the print's

24

freshness on cross-examination. (S.A. 6, p. 6).  Thus, the testimony did not go to the heart of the Commonwealth's case, as alleged by the petitioner.

_____Therefore, the last three claims raised by the petitioner are procedurally defaulted and where the petitioner has failed to show cause for the defaults and prejudice therefrom or actual innocence, the claims should be denied.

## **CONCLUSION**

For the foregoing reasons, this court should deny the petition for habeas corpus.


Respectfully submitted,
THOMAS F. REILLY
ATTORNEY GENERAL

/s/ Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 561669


November 18, 2005