UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-CV-10695-RGS

NANCY NETTO,

Petitioner

V.

LYNN BISSONNETTE,

Respondent

**REPORT AND RECOMMENDATION ON**

**PETITION FOR A WRIT OF HABEAS CORPUS**

**(Docket # 1)**

ALEXANDER, M.J.

On March 19, 1996, a Bristol Superior Court jury found the petitioner,

Nancy Netto, guilty of first-degree murder and armed robbery. Ms. Netto was

sentenced to life imprisonment on the murder conviction, as required by statute,

and to a concurrent term of nine to ten years on the armed robbery conviction. Her

co-defendant and husband, Joseph Netto, was also found guilty on both counts.

Ms. Netto's motion to set aside the verdict and for a new trial was denied and, on

direct appeal, the Supreme Judicial Court ("SJC") affirmed the murder conviction

but vacated the armed robbery conviction as duplicative. (The murder, which

occurred during an armed robbery, was charged as a felony murder.) Following

the denial of a second motion for a new trial, Ms. Netto filed a timely petition for a

writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on April 7, 2005.

Ms. Netto's petition includes claims of ineffective assistance of counsel,

conviction upon insufficient evidence, and denial of her due process rights to a fair

trial. The matter was referred to this Court for a Report and Recommendation,

and, after a hearing on the petition and for the reasons set forth more fully below,

the Court RECOMMENDS that the petition for a writ of habeas corpus be

DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts as determined by the SJC are entitled to a presumption

of correctness under 28 U.S.C. § 2254(e)(1). The facts as set forth by the SJC are

as follows:

> The victim, Robert Levesque, lived alone in a second-
> floor apartment at 837 Second Street in Fall River. He
> operated a restaurant located nearby, and was known to
> carry a significant amount of cash on his person. He also
> loaned money to many people, taking as pledges various
> items of personal property. As a result, he possessed a
> quantity of jewelry, belonging either to himself or to
> persons who owed him money.

2

The defendants, Joseph and Nancy Netto, husband and wife, lived in the apartment next to Levesque, having moved in only a few weeks prior to Levesque's murder. Another apartment on the second floor was occupied by Michelle Griffin and Bennie White, who were friends of the Nettos. The Nettos were impoverished and addicted to heroin. They had few possessions and, much of the time, no food. They received a Social Security check at the beginning of each month, but spent most of the little money they had on heroin.

Levesque had helped the Nettos acquire their apartment and, for some brief period after they moved in, the Nettos had been on friendly terms with Levesque. Nancy Netto would visit Levesque in his apartment on occasion. However, approximately one week prior to his murder, there had been some friction between Levesque and Nancy Netto; as a result, she was no longer welcome in his apartment. At some point prior to the murder, Joseph Netto told Bennie White that he did not like Levesque, predicting that Levesque would "end up with a knife in his back."

On November 18, 1993, the day before the murder, the police were summoned to the Nettos' apartment in response to a report of some disturbance. Joseph Netto mistakenly believed that it was Levesque who had telephoned the police, and Joseph Netto expressed anger that Levesque had done so.

As of the next morning, Friday, November 19, the Nettos were in desperate need of money for heroin. Nancy Netto was described as "very dope sick," suffering withdrawal to the point that she was drooling. She asked Griffin and White for money, telling them that she had not eaten in three days. She promised to pay them back when her next Social Security check arrived. Both Griffin and

3

White refused to lend her any money. She asked to use their telephone (as the Nettos had no telephone in their apartment), and Griffin overheard her making telephone calls to other friends in a vain effort to obtain money from them.

In the late afternoon, Levesque had closed up his restaurant and stopped in at a local club that he often patronized. At the club, he was seen with significant cash, including many one hundred dollar bills. He left the club at approximately 5:30 P.M. Sometime shortly thereafter, a neighbor in the apartment below Levesque's heard loud noises coming from Levesque's apartment. She heard men's voices yelling, the sounds of furniture being moved, and objects breaking. There was then a loud crash on the floor. Next, she heard rapid footsteps going in and out of Levesque's apartment, up and down the stairway, and in and out the building's front door. Over the course of the evening, she also heard foot traffic going from Levesque's apartment toward the back of the building, where the Nettos' apartment was located.

At approximately 6 P.M., Nancy Netto telephoned a friend, one John Costanzo, asking him to come over and give her a ride. Sometime later, Costanzo arrived at the defendants' apartment, where he saw Joseph Netto with several one hundred dollar bills in his hands. On seeing the money, Costanzo asked to be paid back on an earlier loan. Joseph Netto said that the money was not his, and that he would repay Costanzo in a few days. Costanzo then drove Nancy Netto to Providence, where she purchased at least twenty bags of heroin, costing approximately $140. She also bought cigarettes and gave Costanzo twenty dollars for gasoline.

While they were out, Michelle Griffin stopped in briefly at the Nettos' apartment. Joseph Netto was there,

4

barefoot and wearing nothing but shorts. Griffin saw
miscellaneous items on the kitchen table, which was odd
because the Nettos had very few possessions. After
Griffin left, White also stopped in at the Nettos'
apartment. White noticed that Joseph Netto had a cut on
his hand that he appeared to be treating. There were
bottles of "expensive" liquor on the table, and a basket of
other items. Towels and clothing were soaking in the
bathroom sink and tub. White asked Joseph Netto where
the liquor had come from. Joseph replied that he had
stolen it from his brother-in-law's basement. He offered
one of the bottles to White, telling him not to tell Griffin
about it. White asked him about the cut on his hand.
Joseph replied that he had been cut during the theft.
While White was still there, Nancy Netto and Costanzo
returned from their heroin-buying trip. The Nettos each
injected some heroin, and gave a bag to White.

Costanzo left, at which point Nancy Netto asked White
to give her a ride to buy groceries. As they were about to
leave, Joseph Netto reminded White that he was not to
say anything to Griffin about the bottle of liquor he had
been given. On hearing this remark, Nancy Netto "went
out of her mind," screaming to Joseph that he "[was not]
supposed to tell anyone" and that she "[could not]
believe [he] said anything." Joseph took her into the
bedroom to calm her down. When they came back out,
Joseph asked Nancy where the money was. She told him
that she had "stashed it," but could not remember where.
They then found the money in the bedroom, and White
and Nancy Netto left to buy groceries.

White took Nancy Netto to two different stores, at which
she spent approximately one hundred dollars on
groceries. While they were out, Griffin, from her own
apartment on the second floor, heard "banging around,
clattering, scuffling" noises from Levesque's apartment.

5

After the noises had gone on for quite some time, she heard a loud "thump," which prompted her to go out and investigate. She saw that the Nettos' apartment door was slightly open, and, as she approached that door, Joseph Netto came up behind her in the hallway. He was still barefoot and dressed only in shorts. Joseph asked her if she had heard noises in Levesque's apartment. When Griffin replied that she had, Joseph took her arm and directed her into his own apartment. Griffin asked him if Nancy and White were back, to which Joseph replied that Nancy had a great deal of money to spend and would be out for a while. Griffin was uneasy and wanted to leave, but Joseph kept his hold on her arm and asked her to wait for Nancy and White to return.

Nancy and White did return shortly thereafter, loaded with grocery bags. Griffin had never seen the Nettos buy such a quantity of groceries before. When Joseph suggested that they give some of the groceries to Griffin and White, Nancy protested that she had not eaten in three days and that they were "her groceries." Griffin and White left and returned to their own apartment.

At approximately 6 A.M. the next day, the Nettos went to Costanzo's home, inviting him to go out for coffee. Costanzo declined. Later that morning, the Nettos rented a room at a motel located a few miles from their home. They paid for the room in cash. One of the motel workers who knew Nancy Netto struck up a conversation with her. Nancy and Joseph both explained that their apartment was being painted and that they had come to the motel to escape the paint fumes. They had bags of items with them, which they claimed to have bought at a second-hand store.

When Levesque failed to show up at his restaurant at the usual time that Saturday morning, one of the restaurant

6

workers went to his home. Discovering Levesque's vehicle in the lot, and getting no response from knocking on his door, she telephoned the police. The police broke down the door to Levesque's apartment and found his body lying ten feet inside the doorway with a knife sticking out of his back. He had been stabbed nineteen times. He had also suffered multiple cuts in the nature of defensive wounds, and a blow from a blunt object to his forehead. The knife in his back matched those in a set found in a drawer in the kitchen. The apartment was "a shambles," with items turned over, drawers opened, and contents strewn about.

Forensic examination of blood samples at the scene identified two samples where the blood types and groupings were consistent with a combination of Levesque's blood and Joseph Netto's blood A bloody footprint on a piece of floor tile matched Joseph's right footprint. A fingerprint on the handle of the bathroom door matched Nancy Netto's right thumb. That thumbprint was determined to be "fairly fresh," based on the speed with which it reacted to the application of chemicals and on the fact that the print had been left in a location that would, in the ordinary course, be subjected to frequent handling.

The police obtained arrest warrants for the Nettos and a warrant to search their apartment. That search uncovered eighteen dollars under a television set in the bedroom and clothes soaking in the bathroom tub and sink. There was no sign that the apartment had been or was in the process of being painted.

Later that night, police found and arrested the Nettos in their room at the motel. Among the items in their possession at the time of their arrest were jewelry, an ashtray, a toaster, and keys, which were later identified

7

as belonging to Levesque. They also had cash, including ten one hundred dollar bills, three of which had spots of blood on them.

Counsel for Joseph Netto presented evidence that Costanzo had spent considerable amounts of money in the days immediately following the murder, and that he had not obtained such a sum of money from work. Counsel also presented evidence of a telephone call made to his office by Bennie White two months prior to the trial, during which White suggested that he knew more about the murder than he had told the police (or the jury). Counsel for both defendants suggested in closing argument that the crime had been perpetrated by either Costanzo or White.

Commonwealth v. Netto, 438 Mass. 686, 688-92, 783 N.E.2d 439, 441-45 (2003)

(footnotes omitted).

Ms. Netto was found guilty of first-degree murder and armed robbery on March 19, 1996, and was sentenced to life imprisonment on the murder conviction, as required by statute, and to a concurrent term of nine to ten years on the armed robbery conviction. Three days later, she filed a motion pursuant to Mass. R. Crim. P. 25(b)(2) and 30(b) to set aside the verdict and enter a finding of not guilty or, in the alternative, to order a new trial or enter a finding on any lesser included offense to the offenses charged. The motion was denied on May 3, 1996. On direct appeal, the SJC affirmed the murder conviction but vacated the armed robbery conviction as duplicative.

8

Then, on April 13, 2004, more than a year after the SJC affirmed the murder conviction, Ms. Netto filed a second motion for a new trial in which she alleged ineffective assistance of trial counsel for failing to consult with her regarding whether to request a jury instruction on lesser included offenses. She also averred that the government's presentation of "fresh fingerprint" testimony resulted in a substantial miscarriage of justice because the testimony "was based on outrageously flawed forensic evidence." Petitioner's Memorandum of Law ("Petitioner's Memo") Ex. M. The motion was denied. Pursuant to Mass. Gen. Laws ch. 278, § 33E, Ms. Netto then sought leave from a single justice of the SJC to appeal the denial of the motion. On March 18, 2005, the single "gatekeeper" justice denied Ms. Netto's application.

Shortly thereafter, on April 7, 2005, Ms. Netto filed her habeas petition, which includes four claims: 1) conviction on the basis of insufficient evidence; 2) denial of effective assistance of counsel due to the failure of trial counsel to consult with or allow her to make a decision as to whether to request a jury instruction on lesser included offenses; 3) denial of due process right to a fair trial because the government used flawed fingerprint evidence; and 4) denial of effective assistance of counsel on the basis of trial counsel's failure to challenge the forensics behind the government's fresh fingerprint testimony.

9

## ANALYSIS

### Federal Habeas Corpus Standard

The scope of this Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. 2244, et seq. Lindh v. Murphy, 521 U.S. 320 (1997). The AEDPA places a constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to grounds adjudicated in state court." Williams v. Taylor, 529 U.S. 362, 364 (2000). The role of this Court is not to act as another level of appeal in the state system. "The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden variety errors, whether of fact or law, that may stain the record of a state criminal trial." Burks v. Dubois, 55 F.3d 712, 715 (1st Cir. 1995).

Pursuant to the AEDPA, a state prisoner can prevail on a petition for a writ of habeas corpus only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Tyler v. Cain, 533 U.S. 656, 660 (2001). In response to the statutory language of the AEDPA, the First Circuit clarified the dichotomous standard:

10

> the first category embraces cases in which a state court
> decision directly contravenes Supreme Court precedent,
> and the second embraces cases in which a state court
> decision, although not 'contrary to' relevant Supreme
> Court precedent, nonetheless constitutes an
> 'unreasonable application' of relevant Supreme Court
> precedent.

O'Brien v. DuBois, 145 F.3d 16, 24 (1st Cir. 1998). See also Taylor, 529 U.S. at

404-05 (O'Connor, J., concurring) (explaining that the AEDPA's "contrary to"

and "unreasonable application" prongs have independent meaning). Furthermore,

the AEDPA does not require the state courts to cite or even be aware of Supreme

Court precedent as long as "neither the reasoning nor the result of the state-court

decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). See also

Downs v. Spencer, 238 F.Supp.2d 332, 336-37 (D. Mass. 2003) (commenting that

a state court's failure to directly cite the controlling Supreme Court precedent is

"entirely irrelevant").

In petitions based upon the "contrary to" prong of the habeas statute, a state

court decision is contrary to clearly established precedent if the state court applied

a rule that contradicts the governing law set forth by the Supreme Court of the

United States, or confronts facts that are materially indistinguishable from a Court

decision and nevertheless arrives at a different result. Lockyear v. Andrade, 538

U.S. 63, 73 (2003). The Court in Taylor defined the word "contrary" to be

11

commonly understood to mean "'diametrically different,' 'opposite in character or nature,' or mutually opposed.'" Taylor, 529 U.S. at 405.

A federal court may also grant relief based on the "unreasonable application" prong of the habeas statute when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." Lockyear, 538 U.S. at 75. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous – it must have been "objectively unreasonable." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Taylor, 529 U.S. at 409. Commenting on various federal court's readings of the "unreasonable application" component, the First Circuit in McCambridge v. Hall expounded that some increment of incorrectness beyond error is required to denote a unreasonable application of governing legal principle. McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc). "The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." Id. With these principles in mind, the Court turns to the claims made by Ms. Netto.

12

**Sufficiency of the Evidence**

Ms. Netto's first claim is that she was convicted on the basis of insufficient evidence. She avers that the SJC, in reviewing her conviction on direct appeal, unreasonably applied the relevant sufficiency-of-the-evidence standard. For a court reviewing a claim that a criminal conviction was based on insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Although the SJC did not cite Jackson, both Ms. Netto and the respondent recognize that Jackson provides the relevant standard and that Ms. Netto's sufficiency-of-the-evidence claim turns on whether the SJC's application of that standard was objectively unreasonable.[1]

Ms. Netto was convicted of felony murder as a joint venturer, with her husband. In the context of her habeas petition, she contends that the SJC's decision that sufficient evidence demonstrated her physical presence in the victim's apartment on the night of the murder as well as her knowledge that her co-venturer was armed with a dangerous weapon was objectively unreasonable.

---

[1]The "contrary to" prong does not apply where, as here, the question is not whether the correct standard was applied, but, rather, how the standard was applied. See Hurtado v. Tucker, 245 F. 3d 7, 16 (1st Cir. 2001).

13

As the SJC noted, "the Commonwealth introduced evidence that [Nancy Netto's]
fingerprint was on the bathroom door handle in Levesque's apartment, that it was
a 'fairly fresh' print, and that Nancy Netto had not been allowed into the apartment
for one week." Netto, 438 Mass. at 702, 783 N.E. 2d at 451. Although Ms. Netto
takes issue with the fingerprint evidence, averring that "it is premised upon
impermissible speculation regarding the timing of the placement of the . . .
fingerprint," Petitioner's Memorandum of Law at 19-20, this is not the only
evidence linking Ms. Netto to the crime. As the SJC noted, Ms. Netto "made
immediate use of the proceeds of the crime," purchasing heroin that she had not
been able to afford earlier in the day, stashing money taken from the victim, and
purchasing groceries with "her" money. Netto, 438 Mass. at 70 n. 17, 738 N.E.2d
at 451. Furthermore, the victim's keys were found in her pocketbook. Id. Put
succinctly by the SJC, "[t]his is not a case where 'fingerprints constitute the only
identification evidence' linking [Ms. Netto] to the crime." Id. (quoting
Commonwealth v. LaCorte, 373 Mass. 700, 703, 369 N.E.2d 1006 (1977)).

As to Ms. Netto's knowledge regarding whether her husband was armed
with a dangerous weapon, "[k]nowledge that a fellow joint venturer is armed may
be inferred when, from the circumstances of the crime, a victim's resistance is

14

reasonably to be anticipated such that the participants in the crime would have

recognized the need for some means by which to overcome that resistance."

Id. at 702-703, 783 N.E.2d at 451-52. Given that Ms. Netto was no longer

welcome in the victim's apartment, it was foreseeable that the victim might need

to be subdued. Id. at 703, 783 N.E.2d at 452. It was not objectively unreasonable

for the SJC to determine that a jury could permissibly infer that Ms. Netto had

knowledge that her co-venturer was armed. Such inferences need only be

reasonable; they need not be "inescapable." Id. In affirming Ms. Netto's

conviction, the SJC did not unreasonably apply the Jackson standard regarding the

sufficiency of the evidence.   This Court therefore RECOMMENDS that the

District Court DENY Ms. Netto's habeas petition to the extent that it seeks relief

on the basis that the SJC engaged in an objectively unreasonable application of

Jackson v. Virginia.

**Ineffective Assistance of Counsel and Denial of Due Process**

### Procedurally Barred Claims

The three remaining claims in Ms. Netto's petition are subject to the

procedural default rule. Claims that have been waived and are procedurally barred

in state court are, generally, not reviewable by a federal court. The procedural

default doctrine bars federal review of habeas claims when a state court has

15

declined to address a prisoner's federal claims because the prisoner failed to meet

a state procedural requirement. Coleman v. Thompson, 501 U.S. 722, 729-30

(1991). In these cases, the state judgment is considered to rest on independent and

adequate state procedural grounds. Id. at 730. In Coleman, the Supreme Court

explicitly held that:

> In all cases in which a state prisoner has defaulted his
> federal claims in state court pursuant to an independent
> and adequate state procedural rule, federal habeas review
> of the claims is barred unless the prisoner can
> demonstrate cause for the default and actual prejudice as
> a result of the alleged violation of federal law, or
> demonstrate that failure to consider the claims will result
> in a fundamental miscarriage of justice.

Id. at 750; see also Harris v. Reed, 489 U.S. 255, 260 (1989). In the habeas

context, the procedural default doctrine is grounded in concerns of comity and

federalism, attempting to limit the federal court's jurisdiction when hearing a

habeas claim would undermine the state's interest in finality and enforcing its own

laws. Coleman, 501 U.S. at 730-31.

When reviewing a habeas petition for possible procedural default, a federal

court must determine whether the state court's decision rested upon independent

and adequate state law grounds. Coleman, 501 U.S. at 736. A petitioner's

procedural default constitutes an adequate and independent state ground so long as

16

the state consistently applies the state forfeiture rule and has not waived it by

basing the decision on some other ground. Horton v. Allen, 370 F.3d 75, 80-81

(1st Cir. 2004); see also Puleio v. Vose, 830 F.2d 1197, 1199 (1st Cir. 1987), cert.

denied, 485 U.S. 990 (1988) (". . .defendant's failure to object at his original state

trial may constitute an 'independent and adequate state procedural ground'

sufficient to foreclose collateral federal review of claimed constitutional error, as

long as the state has a contemporaneous objection rule and has not waived its

enforcement.") (quoting Wainwright v. Sykes, 433 U.S. 72, 87 (1977)).

       In instances where a state court decision "appears to rest primarily on

federal law, or to be interwoven with federal law," there is a presumption that the

state grounds required for establishing procedural default do not exist. Coleman,

501 U.S. at 734-35. In such circumstances, habeas review is only prevented when

it is clear from the face of the state court opinion that it relied upon independent

and adequate state law grounds. Harris, 489 U.S. at 261. If the state court's

decision relied on state procedural law rather than federal law, federal habeas

review is inappropriate in most circumstances. Boutwell v. Bissonnette, 66 F.

Supp. 2d 243, 245 (D. Mass. 1999).

       In her second motion for a new trial Ms. Netto raised the same ineffective

assistance counsel claims that she includes in her habeas petition. That is, that her

17

trial counsel was ineffective because he did not consult with her regarding whether

to request a jury instruction on the lesser included offenses of unarmed robbery

and larceny and because he did not adequately challenge the Commonwealth's

"fresh fingerprint" testimony.  Petitioner's Memo Ex. M.  She also asserted, as

she does in her habeas petition, that the Commonwealth's presentation of "fresh

fingerprint" testimony resulted in a substantial risk of a miscarriage of justice

"because it was based on outrageously flawed forensic evidence."  Id.  Ms. Netto's

motion was denied.  Her appeal of the denial was governed, as noted *supra*, by G.

L. c. 278, § 33E.

Section 33E, a "gatekeeper" provision, "stops further review of a prisoner's

claim by the SJC, unless a gatekeeper Justice of the SJC finds that the prisoner's

claim is 'new and substantial.'"  Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir.

1999) (quoting § 33E).  "Where there has been procedural waiver below, the

denial of review under § 33E is an independent and adequate state ground that

bars federal habeas review."  Id.  In the instant case, the "gatekeeper" justice

determined that the issues raised in Ms. Netto's second motion for a new trial were

not "new and substantial" and therefore did not warrant review by the full court.

Petitioner's Memo Ex. Q.  The gatekeeper's decision was based on the fact that

the issues could have been, but were not, previously raised, and that the issues

18

were not substantial. To the extent that Ms. Netto avers that she could not have

raised her ineffective assistance of trial counsel in her first motion for a new trial

because she was still represented by the same counsel, she could have either raised

the issue in her direct appeal, where she was represented by new counsel or by

filing a motion for a new trial while her appeal was pending. Petitioner's Memo

Ex. O. The gatekeeper justice "made it clear that [s]he was barring further review

because the latest claim[s] were not new – a theory which *is* compatible with

waiver." Olszewski v. Spencer, 369 F. Supp. 2d 113, 134 (D. Mass. 2005). The

issues had been waived and the gatekeeper's denial is an "independent and

adequate state ground" that bars habeas review of those claims.

## Overcoming the Procedural Bar

Ms. Netto can escape the preclusive effect of the procedural default of her

ineffective assistance of counsel and flawed fingerprint testimony claims only if

she can show both "cause" for and "prejudice" from noncompliance with the

underlying procedural rule, or that a fundamental miscarriage of justice will result

if the claim is not considered. Murray v. Carrier, 477 U.S. 478, 485-489 (1986).[2]

Ms. Netto cannot demonstrate "cause" for the default, as that requires "that some

---

[2] Cause and prejudice are mutually dependent requirements. Puleio, 830 F.2d at 1202.
The failure to show the first dispenses with the need to inquire as to the second. Id.

19

objective factor external to the defense" interfered with counsel's ability to raise the claims on direct appeal. Id. at 479. Here, Ms. Netto's appellate counsel did not raise the claim of ineffective assistance of trial counsel on direct appeal even though nothing prevented him from doing so if counsel thought the claim was meritorious.

Ms. Netto's assertion that the record on appeal was "factually inadequate for [her] new appellate counsel to present her ineffective assistance of counsel claims . . . on direct appeal" is also unavailing. Ms. Netto contends that her trial counsel was ineffective both because he failed to confer with her, or let her make a decision, regarding whether to request a jury instruction on lesser included offenses and for failing to adequately respond to the Commonwealth's "fresh fingerprint" testimony. As noted by the "gatekeeper" justice, Ms. Netto did raise, on direct appeal, the issue of whether her trial counsel should have consulted her regarding the jury instruction issue. Petitioner's Memo Ex. Q. Furthermore, Ms. Netto stated in her own direct appeal brief that there was no indication that trial counsel had consulted with her. Id.[3] The record clearly indicated, therefore, that there was no discussion between counsel and client regarding the jury instructions.

---

[3]Although Ms. Netto contended, on direct appeal, that the failure to instruct on the lesser included offenses created a substantial likelihood of miscarriage of justice, she did not raise an ineffective assistance of counsel argument.

20

Even assuming Ms. Netto could establish cause to excuse the procedural

default, she cannot establish prejudice. "The question is not whether the

defendant would more likely than not have received a different verdict," but

whether the defendant "received a fair trial, understood as a trial resulting in a

verdict worthy of confidence." Strickler v. Greene, 527 U.S. 263, 289 (1999)

(quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). The SJC recognized that if

Ms. Netto had requested a jury instruction on the lesser included offenses of

unarmed robbery and felony-murder predicated on unarmed robbery, such

instructions would have been appropriate. Netto, 438 Mass. at 705; 783 N.E. 2d at

453. That, however, "does not mean that failure so to instruct necessarily gives

rise to a substantial likelihood of a miscarriage of justice." Id. The jury was not

compelled to infer that Ms. Netto had the requisite knowledge that her husband

and coventurer was armed, but it did so. Id. The fact that Ms. Netto's counsel did

not consult Ms. Netto, or allow her to make a decision, on the jury instruction

issue did not result in an unfair trial or a verdict that lacks confidence.

Similarly, Ms. Netto was not prejudiced by the Commonwealth's "fresh

fingerprint" testimony or her trial counsel's alleged inadequate response thereto.

Although Ms. Netto did not present her own expert on the fingerprint evidence,

she did cross-examine the Commonwealth's expert. The Commonwealth's expert

21

"based his evaluation [of the fingerprint's freshness] both on how quickly and clearly the print became visible when treated, and on its presence in a location that frequently would be touched." Petitioner's Memo Ex. Q. Other evidence demonstrated that Ms. Netto had not been allowed in the victim's apartment for a week prior to his murder. Netto, 438 Mass. at 702; 783 N.E. 2d at 451. The introduction of the "fresh fingerprint" testimony did not result in an unfair trial.

Finally, "even absent a showing of cause and prejudice, a federal court exercising its habeas powers should nonetheless overlook a procedural default and hear a barred constitutional claim on the merits if fail[ing] to do so would result in a fundamental miscarriage of justice." Burks, 55 F.3d at 717. This is a "narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence." Id. In the instant case, Ms. Netto does not meet her burden of proving that, but for the errors alleged, the jury would not have convicted her and she makes no claim of actual innocence.

Because the ineffective assistance of counsel and flawed fingerprint testimony claims in Ms. Netto's application for federal habeas relief are procedurally defaulted in the state court, and because Ms. Netto cannot demonstrate cause and prejudice to excuse the default, or show actual innocence, the federal court is barred from hearing these claims.

22

## CONCLUSION

For the foregoing reasons, this Court RECOMMENDS that the District

Court DENY the petition for a writ of habeas corpus.

SO ORDERED.

5/31/06
Date

United States Magistrate Judge

## **NOTICE TO THE PARTIES**

The parties are hereby advised that under the provisions of Rule 3(b) of the
Rules for United States Magistrate Judges in the United States District Court the
District Court of Massachusetts, any party who objects to this proposed Report
and Recommendation must file a written objection thereto with the Clerk of this
Court within ten (10) days of the party's receipt of the Report and
Recommendation. The written objections must specifically identify the
proportions of the proposed findings, recommendations or report to which
objection is made and the basis for such objection. The parties are further advised
that the United States Court of Appeals for this Circuit has indicated that failure to
comply with this rule shall preclude further appellate review. See Keating v.
Sec'y of Health & Human Svcs., 848 F.2d 271, 273 (1st Cir. 1988); United States
v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d
13, 14 (1st Cir. 1983); United States v. Vega, 687 F.2d 376, 378-79 (1st Cir.
1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604 (1st Cir.
1980); see also Thomas v. Arn, 474 U.S. 140, 155 (1985), *reh'g denied*, 474 U.S.
1111 (1986).

23